# Exhibit 2

FOR THE EXCLUSIVE USE OF: _____                    COPY NO. _____

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

Relating to the private offering of Shares in

# SYNERGY HYBRID FUND LTD.

A CAYMAN ISLANDS EXEMPTED COMPANY

ED CAPITAL MANAGEMENT, LLC
INVESTMENT MANAGER

ED CAPITAL, LLC
INVESTMENT ADVISER

ADMINISTRATOR
APEX FUND SERVICES LTD.
3RD FLOOR, 31 REID STREET
HAMILTON HM12, BERMUDA
TEL: + 1 441 292 2739
FAX: +1 441 292 1884

**Effective June 2010**

THE LIMITED VOTING, PARTICIPATING, REDEEMABLE SHARES ("SHARES") IN SYNERGY HYBRID FUND LTD. ("FUND") ARE NOT REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED ("1933 ACT"), IN RELIANCE ON THE PROVISIONS OF REGULATIONS S AND D UNDER THE 1933 ACT. THE SHARES ARE SUBJECT TO RESTRICTIONS ON RESALE AND GENERALLY MAY NOT BE RESOLD TO U.S. PERSONS EXCEPT AS PERMITTED UNDER THE 1933 ACT AND APPLICABLE U.S. STATE SECURITIES LAWS, PURSUANT TO REGISTRATION THEREUNDER OR EXEMPTION THEREFROM, AND AS PERMITTED IN THE FUND'S MEMORANDUM AND ARTICLES OF ASSOCIATION ("ARTICLES OF ASSOCIATION"). HEDGING TRANSACTIONS INVOLVING THE SALE OF SHARES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE 1933 ACT. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF AN INVESTMENT IN THE FUND FOR AN INDEFINITE PERIOD OF TIME.

PROSPECTIVE INVESTORS IN THE FUND SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS AND TAX CONSEQUENCES WITHIN THE COUNTRIES OF THEIR RESIDENCE AND DOMICILE FOR THE ACQUISITION, HOLDING AND DISPOSAL OF SHARES AND ANY FOREIGN EXCHANGE RESTRICTIONS THAT MAY BE RELEVANT TO THEM. IF YOU ARE IN DOUBT ABOUT THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM ("MEMORANDUM"), YOU SHOULD CONSULT YOUR ATTORNEY, ACCOUNTANT OR OTHER FINANCIAL ADVISER.

NY-639680 v11 0224435-00201

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY UPON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. APART FROM THE FOREGOING, THIS MEMORANDUM HAS NOT BEEN FILED WITH OR APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY OTHER STATE OR FEDERAL GOVERNMENTAL AGENCY OR ANY U.S. NATIONAL SECURITIES EXCHANGE OR ANY GOVERNMENTAL AGENCY OR EXCHANGE OF ANY OTHER JURISDICTION. NEITHER THE SEC NOR ANY SUCH AGENCY OR EXCHANGE OF ANY JURISDICTION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM OR THE MERITS OF AN INVESTMENT IN THE SHARES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE FUND IS NOT CURRENTLY REQUIRED TO REGISTER AS A "MUTUAL FUND" UNDER THE MUTUAL FUNDS LAW (AS AMENDED) OF THE CAYMAN ISLANDS (THE "MUTUAL FUNDS LAW") BECAUSE THE FUND DOES NOT HAVE MORE THAN 15 INVESTORS, AND A MAJORITY OF INVESTORS OF THE FUND ARE ENTITLED TO APPOINT AND REMOVE THE DIRECTORS.  THE FUND MAY DETERMINE TO ACCEPT MORE THAN 15 INVESTORS.  IN THAT EVENT, THE FUND WOULD REGISTER AS A MUTUAL FUND WITH THE CAYMAN ISLANDS MONETARY AUTHORITY ( "CIMA") PURSUANT TO §4(3) OF THE MUTUAL FUNDS LAW. HOWEVER, NO CAYMAN ISLANDS OR OTHER REGULATORY AUTHORITY WILL PASS UPON OR ENDORSE THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS CONFIDENTIAL MEMORANDUM.

SHARES IN THE FUND ARE SUITABLE ONLY FOR SOPHISTICATED INVESTORS FOR WHOM AN INVESTMENT IN THE FUND DOES NOT CONSTITUTE A COMPLETE INVESTMENT PROGRAM AND WHO FULLY UNDERSTAND AND ARE WILLING TO ASSUME THE RISKS INVOLVED IN THE FUND'S INVESTMENT STRATEGY. THE FUND'S INVESTMENT PRACTICES, BY THEIR NATURE, MAY BE CONSIDERED TO INVOLVE A HIGH DEGREE OF RISK.  SEE "INVESTMENT OBJECTIVE AND STRATEGIES" AND "RISK FACTORS."

THE TERMS OF THIS MEMORANDUM ARE QUALIFIED IN THEIR ENTIRETY BY THE ARTICLES OF ASSOCIATION.  NO PERSON OTHER THAN ED CAPITAL MANAGEMENT, LLC (THE "INVESTMENT MANAGER") OR SYNERGY CAPITAL GROUP LTD. (THE "INVESTMENT ADVISER") HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION, OR GIVE ANY INFORMATION, WITH RESPECT TO THE FUND, EXCEPT THE INFORMATION CONTAINED HEREIN AND IN OTHER DOCUMENTS DISTRIBUTED BY THE INVESTMENT MANAGER, AND ANY SUCH REPRESENTATIONS OR INFORMATION, IF GIVEN, MAY NOT BE RELIED UPON.

THE CONTENTS OF THIS MEMORANDUM SHOULD NOT BE CONSIDERED TO BE LEGAL OR TAX ADVICE, AND PROSPECTIVE SHAREHOLDERS SHOULD CONSULT WITH THEIR OWN COUNSEL AND ADVISERS AS TO ALL MATTERS CONCERNING AN INVESTMENT IN SHARES. THIS MEMORANDUM, INCLUDING ALL EXHIBITS, IS

CONFIDENTIAL AND MAY NOT BE DUPLICATED OR REPRODUCED IN ANY FASHION.

EACH PROSPECTIVE INVESTOR IS INVITED TO MEET WITH REPRESENTATIVES OF THE FUND AND THE INVESTMENT MANAGER TO DISCUSS WITH THEM, AND TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THEM, CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING OF SHARES, AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THAT ANY OF THOSE PERSONS POSSESSES THAT INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE INFORMATION CONTAINED HEREIN.

PURSUANT TO AN EXEMPTION FROM THE U.S. COMMODITY FUTURES TRADING COMMISSION (THE "CFTC"), NEITHER THE INVESTMENT MANAGER NOR THE INVESTMENT ADVISER IS REQUIRED TO REGISTER, AND THEY ARE NOT REGISTERED, WITH THE CFTC AS COMMODITY POOL OPERATORS OR AS COMMODITY TRADING ADVISORS. AS A RESULT, NEITHER THE INVESTMENT MANAGER NOR THE INVESTMENT ADVISER IS, AMONG OTHER THINGS, REQUIRED TO PROVIDE PROSPECTIVE POOL PARTICIPANTS WITH A DISCLOSURE DOCUMENT CONTAINING SPECIFIED INFORMATION OR TO PROVIDE CERTIFIED ANNUAL REPORTS TO PARTICIPANTS IN THE FUND.

THE INVESTMENT MANAGER'S AND THE INVESTMENT ADVISER'S ELIGIBILITY FOR THE REGISTRATION EXEMPTIONS SET FORTH ABOVE IS BASED ON THE FACT THAT: (I) THE SHARES ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND ARE NOT AND WILL NOT BE MARKETED TO THE PUBLIC IN THE UNITED STATES AS OR IN A VEHICLE FOR TRADING IN THE COMMODITY FUTURES OR COMMODITY OPTIONS MARKETS; AND (II) THE INVESTORS IN THE FUND ARE LIMITED TO "ACCREDITED INVESTORS" AS SUCH TERM IS DEFINED IN THE SECURITIES ACT AND THE REGULATIONS PROMULGATED THEREUNDER AND "QUALIFIED PURCHASERS" AS SUCH TERM IS DEFINED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT") AND REGULATIONS PROMULGATED THEREUNDER.

THE FUND IS NOT REGISTERED AS AN INVESTMENT COMPANY UNDER THE 1940 ACT IN RELIANCE ON THE EXEMPTION PROVIDED IN SECTION 3(C)(7) OF THAT ACT.

THERE WILL BE NO PUBLIC OFFERING OF THE SHARES. NO OFFER TO SELL OR SOLICITATION OF AN OFFER TO BUY THE SHARES IS BEING MADE IN ANY JURISDICTION IN WHICH THAT OFFER OR SOLICITATION WOULD BE UNLAWFUL.

SHARES MAY NOT BE OFFERED TO THE PUBLIC IN THE CAYMAN ISLANDS. THIS RESTRICTION DOES NOT INCLUDE EXEMPTED OR ORDINARY NON-RESIDENT CAYMAN ISLANDS COMPANIES.

<u>NOTICE TO RESIDENTS OF FLORIDA</u>

UPON THE ACCEPTANCE OF FIVE (5) OR MORE FLORIDA INVESTORS, AND IF THE FLORIDA INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVINGS INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY AS DEFINED IN THE 1940 ACT, A PENSION OR PROFIT-SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE 1933 ACT), THE FLORIDA INVESTOR ACKNOWLEDGES THAT ANY SALE OF SHARES TO THE FLORIDA INVESTOR IS VOIDABLE BY THE FLORIDA INVESTOR EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE FLORIDA INVESTOR TO THE FUND, OR AN AGENT OF THE FUND, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE FLORIDA INVESTOR, WHICHEVER OCCURS LATER.

**Table of Contents**

Page

SUMMARY.................................................................................................................................1
DIRECTORY............................................................................................................................16
INVESTMENT OBJECTIVES AND STRATEGIES ........................................................17
RISK FACTORS .....................................................................................................................20
POTENTIAL CONFLICTS OF INTEREST ........................................................................45
PLAN OF DISTRIBUTION; SUITABILITY STANDARDS ............................................48
MANAGEMENT.....................................................................................................................51
EXECUTION OF PORTFOLIO TRANSACTIONS ...........................................................57
DETERMINATION OF NET ASSET VALUE ....................................................................59
REDEMPTION OF SHARES ................................................................................................62
CERTAIN PROVISIONS OF THE ARTICLES OF ASSOCIATION .............................64
REPORTS .................................................................................................................................73
TAXATION...............................................................................................................................73
ERISA CONSIDERATIONS .................................................................................................88
ACCOUNTING ........................................................................................................................91
ADDITIONAL INFORMATION ..........................................................................................92

EXHIBIT A—MEMORANDUM AND ARTICLES OF ASSOCIATION OF SYNERGY HYBRID FUND LTD.

EXHIBIT B—SUBSCRIPTION AGREEMENT

SUMMARY

*The following summary is qualified in its entirety by the more detailed information contained elsewhere in this Private Placement Memorandum ("Memorandum"). For definitions of certain capitalized terms used in this Memorandum, see the Fund's Memorandum and Articles of Association, a copy of which is attached as Exhibit A to this Memorandum ("Articles of Association").*

| | |
|---|---|
| **The Fund and its Investment Objective** | Shares are intended to be offered by Synergy Hybrid Fund Ltd. (the "Fund"), a Cayman Islands exempted company. The investment manager to the Fund is ED Capital Management, LLC (the "Investment Manager"), a Delaware limited liability company and the investment adviser to the fund is ED Capital, LLC (the "Investment Adviser"), a Delaware limited liability company.    The Investment Adviser is not subject to regulation by the Cayman Islands Monetary Authority.

The Fund's investment objective is to achieve long term capital appreciation by investing primarily, but not exclusively, in Russian public and privately held equity and debt securities, as well as securities of companies located in the Commonwealth of Independent States (the "CIS").

In addition to publicly traded debt and equity securities, the securities in which the Fund invests may include private or restricted securities or investments. Certain of such private or restricted securities will be determined by the Investment Manager to be "Special Investments." Special Investments are private or restricted securities that carry substantial risks, the value of which are not readily or reliably ascertainable and/or which have a long-term investment horizon.   The Fund may invest in Special Investments which may include securities that arise from corporate buy-outs, management buy-outs, leveraged buy-outs, IP portfolios, private equity investments, venture capital investments, other pooled investment vehicles, limited partnership interests, preferred stock, options, warrants, real estate related securities or other investments in privately held companies, restructurings, recapitalizations or similar events or securities of established public companies or private companies that are purchased in private placements.    These Special Investments will generally carry significant or complete restrictions on transfer prior to the occurrence of specified events, which may be outside of the control of the Fund. Accordingly, the |

1

|                                      | Fund may be required to hold Special Investments for several years before any disposition can be effected. Special Investments may represent a material and substantial portion of the Fund's portfolio. |
|---|---|

Fund may be required to hold Special Investments for several years before any disposition can be effected. Special Investments may represent a material and substantial portion of the Fund's portfolio.

There can be no assurances that the Fund will achieve its investment objectives.

**Management and Service Providers**

Under the Fund's Articles of Association, the Directors of the Fund ("Directors") will be primarily responsible for the general management of the Fund.   See *"Management – Directors."*

The Fund's Articles of Association will permit the Fund's Directors to delegate certain duties.  The Directors intend to delegate duties relating to the implementation of the Fund's investment strategy and certain administrative functions to the Investment Manager and the Investment Adviser, pursuant to an Investment Advisory Agreement among the Fund, the Investment Manager and the Investment Adviser (the "Advisory Agreement").  The Investment Manager and the Investment Adviser may resign as investment manager and investment adviser, respectively, on 30 days' prior written notice to the Fund.   See *"Management – The Investment Manager and the Investment Adviser."* The sole principal of the Investment Manager and the Investment Adviser is Elliot Daniloff. Mr. Daniloff's biography appears under *"Management – The Investment Manager and The Investment Adviser"* below.   The sole principal of the Investment Adviser and the Investment Manager is Elliot Daniloff.   The Investment Manager will be primarily responsible for the implementation of the Fund's investment strategy and the Investment Adviser will assist the Investment Manager with certain research and administrative responsibilities.

The Fund has entered into an administration agreement with Apex Fund Services Ltd. (the "Administrator").  The Fund will pay the Administrator a fee based on its standard schedule of fees charged by the Administrator for similar services as provided for in the Administration Agreement.

ING Bank Eurasia (ZAO), Moscow, Russia, will act as the Fund's custodian (the "Custodian").

BDO Tortuga, Cayman Islands, acts as the auditor of the

Fund.

**The Offering**

The Fund has an authorized share capital of US$50,000 divided into 49,999,000 redeemable, participating, limited voting Shares of US$0.001 par value each and 1,000 voting, non-participating, non-redeemable shares of US$0.001 par value each. In addition, in order to implement the "Performance Allocation," the Fund will also issue "Allocation Class Shares" (as such term is defined the Articles of Association). The Allocation Class Shares will be held solely by the Investment Adviser and will be allocated the Performance Allocation. In order to accomplish the foregoing, at the end of each Fiscal Year, the Fund will allocate to the Allocation Shares of the Investment Adviser from each Series of each Class of Shares an amount equal to the Performance Allocation payable for such Fiscal Year.

The Shares in the Fund are primarily offered in two classes – class A ("Class A") and class B ("Class B") (each, a "Class").

Class B Shares will be available to qualified investors that are "Restricted Persons" (as defined in the FINRA Rule 2790 and as further described in the subscription agreement to be executed by each investor ("Subscription Agreement")) and Class A Shares are available only to other qualified investors; the rights and obligations of the classes are identical except with respect to their participation (through this investment in the Fund) in "new issues" (*i.e.*, equity securities that are issued in an initial public offering). Unless an exemption is available, Shares in the Restricted Class (Class B) will not participate in any new issue investment made by the Fund.

In addition, the Fund will issue class R ("Class R") and class S ("Class S") Shares in respect of Special Investments made by the Fund. If the Fund purchases Special Investments, those holders of the Fund's shares (the "Shareholders") who are Shareholders on the date the particular Special Investment is purchased will participate in that Special Investment by having the relevant number of Class B or Class A Shares (as the case may be) redeemed and by being issued with a corresponding number of Class R or Class S Shares (as the case may be), as further explained under *"Certain Provisions of the Articles of Association – Share Capital."*

3

The Fund may issue additional Classes from time to time. See *"Certain Provisions of the Articles of Association – Share Capital."*

Shares in each Class will be offered in series ("Series"). Each investor may receive a separate Series with respect to each investment in the Fund. The Fund may, as of the close of business on the last Business Day of each Fiscal Year (as hereinafter defined), convert the Shares of any Series of a Class into Shares of the Initial Series (as hereinafter defined) of such Class. See *"Certain Provisions of the Articles of Association – Share Capital,"* in conjunction *with "Compensation of The Investment Manager and The Investment Advisor."*

The Fund intended to commence operations on November 1, 2008 but has not yet commenced operations. Following the commencement of the Fund's operations, Shareholders may be admitted in the Fund as of the opening of business (9 a.m. Eastern Time) on the first Business Day of a month at the subscription price per Share of each Series of US$1,000 (each, the "Initial Series"). "Business Day" means a day on which banks are open for normal banking business in New York and the Cayman Islands and Bermuda (Administrator's location), except as the Directors may specify otherwise in their sole and absolute discretion. Proceeds received by the Fund from the sale of Shares will be used by the Fund in its investment program. The Fund reserves the right to discontinue accepting any initial or additional subscription from its existing or new investors at any time.

Any issued and outstanding Series of a Class (other than those Shares of the Initial Series of each Class) may be redesignated and converted by way of reissue and redemption into the Initial Series of Shares of a Class (after accrual or allocation of any Performance Allocation (as hereinafter defined)) at the end of each calendar year, or at such other time as the Directors in their sole and absolute discretion see fit, at the prevailing Net Asset Value per Share of the Initial Series of the relevant Class. See *"Certain Provisions of the Articles of Association – Share Capital."*

Class R and/or Class S Shares will, from time to time, be issued by the Fund to existing Shareholders in exchange for their Class B and Class A Shares (respectively). Upon the designation of an investment (at the time acquisition or at

4

any time thereafter) by the Investment Manager as a "Special Investment", a pro-rata portion of each current Shareholder's Class B or Class A Shares having an aggregate Net Asset Value equal to the value (generally, the fair market value) of the Special Investment will be redesignated and converted by way of compulsory redemption of the relevant Shares and reissue of Class R or Class S Shares (respectively) to the Shareholder whose Shares were compulsorily redeemed. The Shares so redeemed will be cancelled and the Directors will effect all adjustments necessary to give effect to the foregoing including allocating the value (generally, the fair market value) of the applicable Special Investment to the Class R and/or Class S Shares (as appropriate). No compulsory redemption of Class B or Class A Shares pursuant to the designation of an investment as a Special Investment will require prior notice to be given to Shareholders. Upon a complete or partial disposition or a deemed disposition (by the Fund) of a Special Investment, the Class R and/or Class S Shares of each holder thereof shall be redesignated as and converted (by way of compulsory redemption and the issue of the relevant class of Shares to the Shareholder) to Class B or Class A Shares (respectively) at the Net Asset Value of the respective classes of Shares so redeemed and issued. No compulsory redemption of Class R and/or Class S Shares pursuant hereto will require prior notice to be given to Shareholders.

Additionally, the Fund may, as determined by the Directors, offer shares of different classes having different rights and obligations and/or paying fees different from the Shares offered hereby.

A subscriber will be required to provide at least two Business Days' notice to the Fund of its interest to purchase Shares (unless such notice is waived by the Fund). See *"Net Asset Value"* for a description of how the Fund's Net Asset Value and the Net Asset Value per Share of each Class and Series are determined. A subscriber for Shares is referred to as a "Subscriber."

The minimum subscription is US$1 million for initial investments in the Fund and US$500,000 for additional investments in the Fund (whether made at the time of initial investment or thereafter). The Fund may accept subscriptions for lesser amounts in the sole and absolute discretion of the Directors; however, in no event will the minimum initial subscription amount be less than

US$100,000.   For additional information pertaining to the subscription procedure see *"Plan of Distribution; Suitability Standards"* herein.

No certificates will be issued for Shares in the Fund. Investors will, however, receive written confirmation of their holdings.

Each investor in the Fund that is a "United States person" (as defined in the Internal Revenue Code of 1986, as amended ("Code")) must be an "accredited investor," as defined in Regulation D under the Securities Act of 1933, as amended (the "1933 Act") and a "qualified purchaser", as defined in the Investment Company Act of 1940, as amended (the "1940 Act").

Each other investor (1) must be a "Non-United States person" within the meaning of Commodity Futures Trading Commission Rule 4.7 and (2) must not be a "U.S. person," as defined in Regulation S under the 1933 Act or a "United States person" as defined in the Code (a "Non-U.S. Shareholder").   See *"Plan of Distribution; Suitability Standards."*

The Shares will not be registered under the 1933 Act or the securities laws of any state or any other jurisdiction, nor is any such registration contemplated.   The Fund will not be registered as an investment company under the 1940 Act, in reliance on Section 3(c)(7) thereof.

Each prospective investor in the Fund will be required to execute a revocable Subscription Agreement pursuant to which the investor will make certain representations to the Fund.

The Directors and the Administrator may reject a subscription for Shares for any reason in their sole and absolute discretion.  If a subscription is rejected, the payment remitted by the Subscriber will be returned without interest.

**Limitation of Liability and Indemnification**

The Fund's Articles of Association limit the Directors' liability and provide for their indemnification in certain circumstances.   The Advisory Agreement will limit the Investment Manager's and the Investment Adviser's liability and provides for indemnification of the Investment Manager and the Investment Adviser in certain circumstances.  See *"Certain Provisions of the Articles of Association —*

6

|  | *Directors' Liability; Indemnification"* and *"Management – The Investment Manager and The Investment Adviser."* |
|---|---|
| **Fiscal Year** | The Fund's "Fiscal Year" is the calendar year. |
| **Redemption of Shares** | Except with respect to Shares representing Special Investments, Shareholders will have the right to redeem all or a portion of its Shares (i) as of the close of business on the last Business Day of each calendar quarter following the expiration (or the waiver by the Fund, in accordance with the terms hereof) of the Lock-Up Period (see *"Lock-Up Period"* below), and (ii) on any other date determined by the Directors in their sole and absolute discretion (each, a "Redemption Date"), at the Redemption Price per Share of the appropriate Series of the appropriate Class. All redemption fees will be payable to the Fund. Redemption requests must be received by the Fund in writing at least 90 calendar days prior to the Redemption Date specified in the redemption request unless such notice is waived by the Directors. |

Shares relating to Special Investments may not be redeemed until such investments have been liquidated or disposed of (including if, in the sole discretion of the Investment Manager, they no longer qualify as Special Investments). A "disposition" of a Special Investment shall include a complete or partial disposition of a Special Investment or an earlier determination by the Investment Manager in its sole discretion that such Special Investment has a readily ascertainable market value.

If the Fund in its discretion permits a Shareholder to redeem capital other than on a Redemption Date, the Fund may impose an additional administrative fee to cover the legal, accounting, administrative, brokerage, and any other costs and expenses associated with such redemption.

Redemption Price per Share means in respect of a Series of a Class an amount calculated by dividing (a) the difference between (i) the value of the Investment Account (as hereinafter defined) relating to that Series (after making any adjustments thereto referred as discussed herein) on the Redemption Date as of which the redemption is effective and (ii) the amount of any Management Fees, Performance Allocations or expenses not otherwise reflected in the Investment Account by (b) the number of Shares of that Series in issue at that time (including shares of that Series

that are to be redeemed at that time).  For the sole purpose of determining the number of Shares of a Series in issue, Shares of that Series that are to be redeemed on the relevant Redemption Date shall be deemed to be in issue until and including the close of business on the applicable Redemption Date.

Each redemption request must be in the minimum amount of US$100,000 or for all of such Shareholder's Shares, if less, and a Shareholder may not make a redemption request for a partial redemption if, after implementation thereof, it would hold Shares having an aggregate Net Asset Value of less than US$1 million (although the Directors may, in their sole and absolute discretion, permit a smaller redemption or waive the latter requirement).

Once sent, a redemption request cannot be revoked without the Directors' consent, which may be withheld in their sole and absolute discretion, unless redemptions are suspended. Payment of redemption proceeds, under normal circumstances, will generally be made in the following installments:  (i) 90% of the estimated Redemption Price with respect to all Shares that are being redeemed will be paid within 30 calendar days after the Redemption Date or, in any event, as soon as practicable, upon completion of the computation of the Fund's Net Asset Value by the Administrator and (ii) the balance of the Redemption Price shall be paid, without interest, as soon as practicable upon completion of the Fund's annual audit.

The Fund may, in the Directors' sole and absolute discretion, pay a redemption (in whole or in part) in securities held by the Fund ("Redemption-In-Kind Securities") on a *pro rata* basis.   The amount and type of Redemption-In-Kind Securities will be selected by the Directors in their sole and absolute discretion.  If a redemption is paid in Redemption-In-Kind Securities, the redeeming Shareholder will bear transaction costs if and when it sells such Redemption-In-Kind Securities.  See *"Certain Provisions of the Articles of Association – Redemption of Shares."*

The Directors may, in consultation with the Investment Manager but otherwise in their sole and absolute discretion, in certain circumstances declare a suspension of the determination of the value of an Investment Account, the Redemption Price per Share of a Series of a Class, the redemption of any Series of Shares of a Class (including the

right to receive redemption proceeds), the subscription for any Series of Shares of a Class and/or extend the period for payment on redemption, in whole or in part. In addition, if redemption requests in respect of a particular Redemption Date exceed 12.5% of the Fund's Net Asset Value or such other (smaller or larger) amount that the Directors, in their sole and absolute discretion, determine would cause a material adverse effect on the Fund, the Directors may suspend or limit such redemptions in such manner and for such period as the Directors determine. See *"Certain Provisions of the Articles of Association – Suspension of Determination of Net Asset Value, Subscriptions and Redemptions."*

The Directors, in their sole and absolute discretion, may cause the Fund to redeem a Shareholder's Shares, in whole or in part, by giving the Shareholder written notice at least two days before the effective redemption date determined by the Directors.

**Determination of Net Asset Value**

The Administrator is responsible for calculation of the Fund's Net Asset Value. The "Net Asset Value" of the Fund is calculated by adding the value of its investments, cash, and other assets and subtracting its accrued liabilities and expenses, all determined in accordance with generally accepted accounting principles, consistently applied, in the United States ("GAAP"), except that the Fund's start-up and organizational expenses may be amortized over a period of not more than five years from the commencement of the Fund's operations. Notwithstanding the foregoing, the Fund will limit the amount of start-up and organizational expenses that it amortizes so that the audit opinion issued with respect to the Fund's financial statements will not be qualified.

The Fund will establish a separate investment account ("Investment Account") for each Class and Series. The amount of each Investment Account will be calculated by allocating to the Investment Account (which will initially consist of the aggregate subscription amounts for Shares of the appropriate Class or Series) its share of income, expenditures, assets and accrued liabilities attributable to the Class or Series. The "Net Asset Value per Series" or "Net Asset Value of a Series" means the amount in its Investment Account. The Net Asset Value per Share of a Series of a Class will be calculated by dividing the Net Asset Value of that Series by the number of Shares of that Series issued and outstanding as of the date of the calculation. See *"Net Asset*

9

*Value."*

| | |
|---|---|
| **Limited Transferability of Shares** | A Shareholder may not transfer or pledge its Shares without the prior written consent of the Directors, the granting of which is in the Directors' sole and absolute discretion.  See *"Plan of Distribution; Suitability Standards – Suitability Standards"* and *"Certain Provisions of the Articles of Association – Transferability of Shares."* |
| **Lock-Up Period** | Each initial and additional investment by a Shareholder shall separately be subject to a one year "lock-up" period during which such investment may not be redeemed by the Shareholder (the "Lock-Up Period").   In addition, the Directors may issue further classes or sub-classes of Shares with different lock-up periods and related fee or other arrangements. |
| **Fees and Expenses; Performance Allocation** | *Performance Allocation.*   The Fund will allocate to the Investment Adviser a performance allocation ("Performance Allocation") for each Series of each Class generally as of the end of each Fiscal Year.  The Performance Allocation for a Series for a Fiscal Year is equal to 20% of the amount, if any, by which the increase in Net Asset Value per Series for that Fiscal Year exceeds the aggregate amount in the Loss Recovery Account (as hereinafter defined) for the Series as of the beginning of that Fiscal Year.   No Performance Allocation shall be allocable with respect to Special Investments until their disposition or other determination by the Investment Manager, in its sole discretion, that the underlying investments no longer constitute Special Investments.

The Performance Allocation will be made at the Fund level and will be implemented by the issuance of special allocation class shares of US$0.001 par value per share (the "Allocation Class Shares") by the Fund to the Investment Adviser.  The Performance Allocation will be allocated to the Allocation Class Shares.  Such Allocation Class Shares shall participate in the profits and losses of the Fund and shall not be subject to the Management Fee or Performance Allocation set forth in this Memorandum.

The Allocation Class Shares will be issued initially at US$0.001 par value per share and any subsequent subscriptions of such Allocation Class Shares may at the discretion of the Directors be issued in separate Series at par value per share, each subject to such other price as |

10

determined by the Directors in their sole and absolute discretion. The Performance Allocation attributable to the Allocation Class Shares will remain at risk in the Fund. Such Allocation Class Shares may be redeemed at the option of the Investment Adviser or the Directors may pay dividends in respect of the Allocation Class Shares as determined by the Directors in their sole and absolute discretion.

In order to calculate the Performance Allocation, a "Loss Recovery Account" will be established for each Series of each Class, the opening balance of which will be zero. As of the end of each Fiscal Year, the balance in each Series' Loss Recovery Account will be (1) decreased by any increase in Net Asset Value per Series of the Series for that Fiscal Year and (2) increased by any decrease in Net Asset Value per Series of the Series for that Fiscal Year. The balance in a Loss Recovery Account will never be reduced below zero.

If a Shareholder redeems Shares of a Series of a Class other than as of the close of business on the last Business Day of a Fiscal Year, the date of such redemption will be treated as the last Business Day of the Fiscal Year for such Series. Accordingly, a Performance Allocation will be calculated on the Shares to be redeemed and the redemption proceeds payable to such Shareholder will be reduced by the amount of the Performance Allocation allocable to such Shares, as well as by the accrued Management Fee payable on such Shares. If a Shareholder redeems Shares of more than one Series, the redemption proceeds from each Series will be reduced in the same manner, on a per Series basis.

The Investment Adviser may redeem all or a portion of its Allocation Class Shares as of the last Business Day of each Fiscal Year or such other day as determined by the Directors in their sole and absolute discretion. In the event that the Investment Adviser ceases to act as investment advisor or a redemption of all of the Investment Adviser's Allocation Class Shares is made prior to the last Business Day of a Fiscal Year, the Performance Allocation will be computed as though the termination date or redemption date were the last Business Day of the Fiscal Year.

The Directors may, with the consent of the Investment Manager and the Investment Adviser, waive all or any portion of the Performance Allocation with respect to any Shares in whole or in part, including with respect to Shares

11

held by employees of the Investment Manager.

See *"Management – Compensation of The Investment Manager and The Investment Adviser."*

*Management Fee.* The Investment Manager will receive a quarterly Management Fee (the "Management Fee") equal to 0.5% (2%, annually) of the Fund's Net Asset Value of Shares adjusted for subscriptions made during the calendar quarter.

The Special Investments shall generally be included in the Fund's Net Asset Value and shall be valued at the fair market value until they are disposed of or are deemed to have been disposed of (including if, in the sole discretion of the Investment Manager, they no longer qualify as Special Investments) for the purposes of calculating the Management Fee.

The Directors may, in their sole and absolute discretion, but with the consent of the Investment Manager, waive the payment of all or part of the Management Fee payable with respect to any Shareholder for any quarter the Directors determine is appropriate, including with respect to Shareholders who are employees of the Investment Manager.

See *"Management – Compensation of The Investment Manager and the Investment Adviser."*

*Expenses.* The Fund will pay its own start-up, offering and organizational expenses, such as the cost of preparing the Fund's Articles of Association, the expenses incurred in offering and selling Shares, and other legal, accounting, and administrative, government filing and printing and mailing fees and expenses related thereto. On an ongoing basis, the Fund will bear its ongoing transaction (*e.g.,* brokerage commissions and custody expenses), investment (including any direct or indirect costs of investing potential investments or maximizing return on existing investments), consulting, research and statistical services, administrative, legal, tax preparation, compliance and accounting fees and expenses, expenses related to the purchase and sale of Special Investments, any extraordinary expenses (*e.g.,* litigation expenses) and any expenses for services that the Shareholders require the Directors and/or the Investment Manager to obtain. The Fund will also pay the fees and expenses of its prime

brokers and the Administrator. The Investment Manager will be responsible for and will pay all overhead expenses of an ordinary and recurring nature such as rent, supplies, secretarial expenses, stationery, charges for furniture and fixtures, employee insurance, payroll taxes and compensation of employees.

The Investment Manager and the Investment Adviser (if applicable) will be reimbursed for any expenses it bears on the Fund's behalf as soon as reasonably practicable. See *"Management – Fund Expenses."*

**Placement Agent**

The Directors may select one or more placement agents for the Fund from time to time and determine fees or compensation to such agents as appropriate. See *"Plan of Distribution; Suitability Standards."*

**Dividends**

The Fund does not expect to pay dividends with respect to Shares, although the Directors may, in their sole and absolute discretion, declare dividends in relation to one or more Classes of Shares at any time. Therefore, a Shareholder will need to redeem its Shares to realize the value of its investment. See *"Certain Provisions of the Articles of Association – Dividends."*

**Risk Factors**

The Fund is subject to substantial risks, in particular because the Shareholders will not be able to redeem all or any portion of Special Investments (which are likely to represent a material and substantial portion of the Fund's portfolio) until their disposition or deemed disposition. You could lose all or most of your investment in the Fund. The Fund is suitable only for a limited portion of your investment portfolio. It is not a complete investment program.

**Conflicts of Interest**

The Fund will be subject to certain actual and potential conflicts of interest.

**Tax Considerations**

The Fund intends to elect to be classified for federal income tax purposes as a partnership that is not a "publicly traded partnership" treated as a corporation. As such, the Fund should not itself be subject to U.S. federal income taxation. Rather, each Shareholder otherwise subject to U.S. federal income tax is required to include in such Shareholder's taxable income such Shareholder's distributive share of the Fund's income and gains, when realized by the Fund (regardless of cash distributions from the Fund to such investor), and may claim, to the extent allowable, such

Shareholder's share of the Fund's losses and deductions. Due to the nature of the Fund's activities, the Fund's income or loss for U.S. federal income tax purposes for a particular taxable period may differ from its financial or economic results. The deductibility of a Shareholder's share of any Fund losses or deductions may be limited.

A tax-exempt Shareholder generally will not be subject to U.S. federal income tax on its distributive share of items of income or on gains it recognizes on the sale, exchange or withdrawal of its interest in the Fund, unless such items of income or such gains constitute UBTI for such Shareholder under the Internal Revenue Code of 1986, as amended (the "Code"). A tax-exempt Shareholder may have UBTI if the Fund engages in borrowing or if that Shareholder incurs debt to acquire its interest in the Fund. Because the Fund may use leverage in both its securities and derivatives trading, an investment in the Fund may not be appropriate for a tax-exempt investor.

PROSPECTIVE INVESTORS SHOULD CONSULT THEIR OWN LEGAL AND TAX ADVISERS REGARDING THE TAX CONSEQUENCES TO THEM OF AN INVESTMENT IN THE FUND.

| | |
|---|---|
| **Employee Benefit Plan Considerations** | An authorized fiduciary of an employee benefit plan proposing to invest in the Fund should consider whether that investment is consistent with the terms of the plan's governing documents and applicable law. As discussed in greater detail below, the Fund intends to restrict investments in Shares by "benefit plan investors," as that term is defined in regulations issued by the U.S. Department of Labor ("DOL") under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), so that such benefit plan investors will not hold 25% or more of the value of any class of Shares. Accordingly, it is not expected that the assets of the Fund will be treated as "plan assets" for purposes of the fiduciary responsibility standards and prohibited transaction restrictions of ERISA or the parallel prohibited transaction excise tax provisions of Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"). See *"ERISA Considerations."* |
| **Reports** | Each Shareholder will receive the following: (i) annual financial statements of the Fund audited by an independent certified public accounting firm generally within 120 days of (or as promptly as reasonably possible after) the end of the |

14

Fund's Fiscal Year, (ii) in the discretion of the Investment Manager, a monthly letter from the Investment Manager discussing the results of the Fund for the previous month, and (iii) other reports as determined by the Investment Manager in its sole discretion.

**Additional Information**

Each prospective investor is invited to meet with representatives of the Fund and the Investment Manager to discuss with them, and to ask questions of and receive answers from them, concerning the terms and conditions of this offering of Shares, and to obtain any additional information, to the extent that any of those persons possesses that information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein.

**Legal Counsel**

K&L Gates LLP acts as United States legal counsel to the Investment Manager, the Investment Adviser and the Fund in connection with the offering of Shares and other ongoing matters and does not represent the Shareholders.

Mourant Ozannes acts as Cayman Islands legal counsel to the Investment Manager, the Investment Adviser and the Fund in connection with the offering of Shares and other ongoing matters and does not represent the Shareholders.

## DIRECTORY

**Fund**
Synergy Hybrid Fund Ltd.
c/o Mourant Ozannes Corporate
Services (Cayman) Limited
Harbour Centre,
P.O. Box 1348,
Grand Cayman KY1-1108
Cayman Islands

**Investment Manager**
ED Capital Management, LLC
825 Third Avenue, 2nd Floor
New York, NY 10022
USA

**Custodian**
ING Bank Eurasia (ZAO)
36 Krasnoproletarskaya Street
Moscow 127473
Russia

**Investment Adviser**
ED Capital, LLC
825 Third Avenue, 2nd Floor
New York, NY 10022
USA

**Administrator**
Apex Fund Services Ltd.
TJ Pearman Building, 3 Burnaby
Street
Hamilton HM12, P.O. Box 2460
HMJX
Bermuda

**Auditors**
BDO Tortuga
P.O. Box 31118
2nd Floor - Building 3, Governors Square
23 Lime Tree Bay Avenue
Grand Cayman KY1-1205
Cayman Islands

**U.S. Legal Counsel**
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022
USA

**Cayman Islands Legal Counsel**
Mourant Ozannes
Harbour Centre
42 North Church Street
George Town
P.O. Box 1348
Grand Cayman KY1-1108,
Cayman Islands

### Directors of the Fund

Elliot Daniloff
825 Third Avenue, 2nd Floor
New York, NY 10022
USA

Peter Hughes
c/o Apex Fund Services Ltd.
TJ Pearman Building, 3 Burnaby Street
Hamilton HM12, P.O. Box 2460 HMJX
Bermuda

## INVESTMENT OBJECTIVES AND STRATEGIES

### Investment Objective

The Fund's investment objective is to achieve long term capital appreciation by investing primarily, but not exclusively, in Russian public and privately held equity and debt securities, as well as securities of companies located in the Commonwealth of Independent States (the "CIS").

In addition to publicly traded debt and equity securities, the securities in which the Fund invests may include private or restricted securities or investments.  Certain of such private or restricted securities will be determined by the Investment Manager to be "Special Investments."  Special Investments are private or restricted securities that carry substantial risks, the value of which are not readily or reliably ascertainable and/or which have a long-term investment horizon.  The Fund may invest in Special Investments which may include securities that arise from corporate buy-outs, management buy-outs, leveraged buy-outs, IP portfolios, private equity investments, venture capital investments, other pooled investment vehicles, limited partnership interests, preferred stock, options, warrants, real estate related securities or other investments in privately held companies, restructurings, recapitalizations or similar events or securities of established public companies or private companies that are purchased in private placements.  These Special Investments will generally carry significant or complete restrictions on transfer prior to the occurrence of specified events, which may be outside of the control of the Fund.  Accordingly, the Fund may be required to hold Special Investments for several years before any disposition can be effected.  Special Investments may represent a material and substantial portion of the Fund's portfolio.

There can be no assurances that the Fund will achieve its investment objectives.

### Investment Rationale

The Investment Manager believes that the Russian economy has been managed very prudently since the beginning of the 21st century and a large percentage of Russia's massive oil revenues has been preserved. In this way, the Russian government has intended to stimulate growth in non-energy-related industries, and, as a result, GDP and employment have grown fast and steadily, with the main impetus coming from domestic demand. The Federal budget has been in surplus every year since 2000. The Russian government is now beginning to spend more of its wealth on a program to rehabilitate Russia's infrastructure, and that program, together with continuing growth in consumer spending and other investment, is expected to support the continued growth of the economy. In this strong economic environment, many companies, including companies that are privately held, are likely to continue to grow their profitability. Some other CIS countries are also experiencing strong growth, and may also offer attractive opportunities to the Fund.

### Investment Strategy

The Investment Manager will seek to identify attractive investment targets taking into consideration the likely or possible exits.  The Investment Manager has the intention of meeting the companies in which it aims to invest, however, it will also make investments in companies never visited. While fundamental and asset-based valuations will be considered, investment

decisions will ultimately be based on an understanding of how to realize value from the company, rather than on pure fundamental valuation.

Although the Fund generally expects to hold minority positions, it may hold a majority stake in any company, group or issuer either at the time of investment or as a consequence of a change in the ownership structure of an invested company.

The Fund intends to make long-term investments in securities which the Investment Manager believes increases significantly in value. The Fund will in general not trade on a short-term basis or take advantage of short-term volatility. However, if a situation arises in which the Investment Manager believes a short-term trade is warranted, the Fund may seek to profit from such situation.

The Fund may also hold Russian and CIS countries securities in the form of American Depository Receipts ("ADRs"), European Depository Receipts ("EDRs"), Global Depository Receipts ("GDRs") and instruments similar to depository receipts which are transferable securities or other securities convertible into securities of eligible issuers. Generally, ADRs in registered form are designed for use in US securities markets and EDRs, GDRs and other similar global instruments in bearer form are designed for use in non-US securities markets.

In implementing the Fund's investment strategies, the Investment Manager may hedge foreign exchange risk by the purchase of out-of-the money put options enabling the Fund to buy U.S. dollars, designed to provide partial downside protection for investors in the event that these currencies experience a major appreciation. In the case of rouble-denominated assets, the underlying assets can be sold forward for U.S. dollars, so that the rouble/dollar foreign exchange risk is hedged much more closely, on the upside as well as the downside. An analogous procedure can be applied to the proceeds of any assets which are denominated in currencies other than the rouble.

The Investment Manager anticipates that the Fund's portfolio will also include cash or cash-equivalent instruments, pending investment, for defensive purposes, to meet the expense needs of the Fund or to fund redemptions. Such cash balances of the Fund may be held temporarily in shares of money market mutual funds. The Fund's investment strategy may also include leverage, fixed-income securities, event-driven investments and private placements as described above.

## Investment Policies

*Geographic parameters.* The Fund's investments are intended to be made in corporate securities of issuers in Russia and other CIS countries or companies of other countries that do business in Russia or CIS.

*Diversification guidelines.* The Fund has no set limit on asset allocation with respect to its underlying investments including with respect to Special Investments.

*Leverage.* The Fund may use leverage in both its securities and derivatives trading. In such cases, the Fund will incur borrowing expenses, which will reduce the return to investors. The use of leverage magnifies both the favorable and unfavorable effects of price movements in the

investments made by the Fund, which may subject the Shareholders to substantial risk of loss. There is no limit on the amount of leverage that the Fund may incur.

*Derivatives.* The Fund may use derivatives and enter into short positions, either as a vehicle to implement an underlying investment strategy or for hedging purposes.

*Investments in Other Investment Vehicles.* The Investment Manager may allocate a portion of the Fund's assets to other investment managers of other pooled vehicles or separate accounts whose strategies are consistent with the Fund's objectives. In connection with such investments, the Investment Manager will endeavor to select strategies that are best suited to the Fund's goals, to research and select the most suitable managers, and to monitor and review their ongoing performance.

## Description of Investment Process

*Investment Identification.* The Investment Manager's investment ideas will likely be generated from a wide variety of sources including industry contacts, trade and financial publications, trade shows, investment conferences and stock screens. Company analyses will generally begin with review of public filings (10-K's, 10-Q's, 8-K's, 13-G's, etc.), if applicable, and relevant research analyst or other reports. Particular attention will be paid to sales and earnings history and outlook, historical and expected cash flows, comparison with competing and related companies and general investor sentiment.

*Relationship with Portfolio Companies.* Although the Investment Manager does not take an active role in the affairs of the companies in which the Fund has a position, it is intended to be the policy of the Fund to take such steps as are necessary to protect its economic interests. The Investment Manager reserves the option to accept a role on the board of directors of any company in which the Fund holds securities, if the opportunity presents itself.

*Portfolio Evaluation.* Once an investment opportunity is determined to be attractive as a stand-alone investment or as part of a pair, the Investment Manager will evaluate the effect of adding that investment to the Fund's portfolio. In doing so, the Investment Manager will seek to minimize the market-related portfolio volatility as well as the risk of a capital loss.

*Investment and Portfolio Monitoring.* The Investment Manager intends to monitor the Fund's positions to ensure that the investment thesis behind each is intact. The Investment Manager intends to also monitor trading prices so that profits can be taken as trading and intrinsic values converge or losses can be minimized in the event of a significant shift in an investment's fundamental premise. The Investment Manager intends to further monitor investment positions in view of the portfolio as a whole in order to manage risk. The Fund may also utilize third party risk management and portfolio management services to monitor the Fund's portfolio exposure to the market.

*Development and Risks of Investment Manager's Investment Strategy.* The development of an investment strategy is a continuous process and the Fund's investment strategy and methods may therefore be modified from time to time. The Fund's trading and investment methods are confidential and the descriptions of them in this Memorandum are not exhaustive. The Fund's trading and investment strategies may differ from those used by the Investment Manager and its

affiliates with respect to other accounts or investment vehicles they manage. Trading or investment decisions require the exercise of judgment by the Investment Manager. The Investment Manager may, at times, decide not to make certain investments, thereby foregoing participation in price movements which would have yielded profits or avoided losses. Shareholders cannot be assured that the strategies or methods utilized by the Investment Manager will result in profitable investments for the Fund.

**Other Strategies**

The Investment Manager may make investments in certain other foreign countries, including emerging market countries.

The Fund may also invest in "new issues," as defined in Rule 2790 of the Financial Industry Regulatory Authority, Inc. ("FINRA"). Unless an exemption is available, Shares in the Restricted Class (Class B) will not participate in any new issue investment made by the Fund.

The Fund may invest in futures contracts and options on futures contracts in reliance on Commodity Futures Trading Commission ("CFTC") Rules 4.13(a)(3) and 4.14(a)(5). These rules allow the Investment Manager to invest the Fund's assets in futures contracts and options on futures contracts without registering as a commodity pool operator ("CPO") or a commodity trading advisor ("CTA") so long as each investor in the Fund is an "accredited investor" (within the meaning of Regulation D under the 1933 Act) and a "qualified purchaser" as defined under the 1940 Act. In such case, Shareholders would not receive the disclosure document and certified annual report that registered CPOs are ordinarily required to provide to commodity pool investors. However, Shareholders will receive certain annual and periodic reports. See *"Reports."*

THE FUND'S INVESTMENT PROGRAM ENTAILS SUBSTANTIAL RISKS AND THERE CAN BE NO ASSURANCE THAT ITS INVESTMENT OBJECTIVES WILL BE ACHIEVED. THE PRACTICES OF OPTIONS TRADING, SHORT SELLING, USE OF LEVERAGE, PRIVATE PLACEMENT INVESTING AND OTHER INVESTMENT TECHNIQUES EMPLOYED BY THE FUND CAN, IN CERTAIN CIRCUMSTANCES, MAXIMIZE THE ADVERSE IMPACT TO WHICH THE FUND'S INVESTMENT PORTFOLIO MAY BE SUBJECT. AN INVESTOR SHOULD NOT MAKE AN INVESTMENT IN THE FUND WITH THE EXPECTATION OF SHELTERING INCOME OR RECEIVING CASH DISTRIBUTIONS. INVESTORS ARE URGED TO CONSULT WITH THEIR PERSONAL ADVISERS IN CONNECTION WITH ANY INVESTMENT IN THE FUND.

## RISK FACTORS

*Investing in the Fund involves various risks. In addition to the matters set forth elsewhere in this Memorandum, investors should consider the following factors before purchasing Shares.*

**Investment Risks**

*Limited Operating History.* The Fund has limited operating history. There is no assurance that the Fund will achieve its investment objective or that the Fund will maintain a cumulative profit

20

during the period of its existence. The past investment performance of the Investment Manager, its principals, or entities with which they have been associated should not be construed as an indication of the future results of an investment in the Fund.

*Investment Strategies.* The Fund's success depends on the Investment Manager's ability to select individual securities, to correctly interpret market data, predict future market movements and otherwise implement its investment strategy. The Fund is not a market-neutral fund and may underperform the broader markets. Any factor that would make it more difficult to execute more timely trades, such as a significant lessening of liquidity in a particular market, may also be detrimental to profitability. No assurance can be given that the investment strategies to be used by the Fund will be successful under all or any market conditions.

*Dependence upon the Investment Manager and Elliot Daniloff.* The Fund's success will depend on the management of the Investment Manager and on the skill and acumen of Elliot Daniloff, the Investment Manager's primary portfolio manager for the Fund. If Elliot Daniloff should die, become incompetent or disabled or otherwise cease to participate in the Fund's business, the Fund's ability to select attractive investments and manage its portfolio could be severely impaired.

As a Shareholder, you should be aware that you will have no right to participate in the management of the Fund, and you will have no opportunity to select or evaluate any of the Fund's investments or strategies. Accordingly, you should not invest in the Fund unless you are willing to entrust all aspects of the management of the Fund and its investments to the discretion of the Investment Manager. Although Mr. Daniloff intends to devote a substantial part of his time to the business of the Fund, he may not devote all of his time.

*Changes in Investment Strategies.* The Directors and the Investment Manager (or any other entity the Directors choose to serve as the Fund's investment adviser) have broad discretion to expand, revise or contract the Fund's business without the consent of its Shareholders. The Fund's investment strategies may be altered without prior approval by its Shareholders. Any such decision to engage in a new activity or alter the Fund's existing investment strategies could result in the exposure of the Fund's capital to additional risks that may be substantial.

*Investment Risks in General.* The Fund will engage in highly speculative investment strategies. A potential investor in the Fund should note that the prices of securities and derivatives instruments in which the Fund invests may be volatile. Market movements are difficult to predict and are influenced by, among other things, government trade, fiscal, monetary and exchange control programs and policies; changing supply and demand relationships; national and international political and economic events; changes in interest rates; and the inherent volatility of the marketplace. In addition, governments from time to time intervene, directly and by regulation, in certain markets, often with the intent to influence prices directly. The effects of governmental intervention may be particularly significant at certain times in the financial instrument and currency markets, and such intervention (as well as other factors) may cause these markets and related investments to move rapidly.

*Illiquid Investments.* A significant and material portion of the securities and other instruments in which the Fund invests may be thinly traded and relatively illiquid or may cease to be traded after the Fund invests, including the investments that may be classified by the Investment Manager as Special Investments. The Fund may not be able to liquidate its investments, in particular, Special Investments promptly if the need should arise. In addition, the Fund's sales of thinly traded securities or other investments could depress the market value of such investments and thereby reduce the Fund's profitability or increase its losses. Such circumstances or events could affect materially and adversely the amount of gain or loss the Fund may realize. In addition, the Fund may have difficulty selling illiquid securities and other investments, perhaps causing the Fund to have difficulty in meeting redemptions. No assurance may be given that the Fund will be able to satisfy its Shareholders' redemption requests as of each applicable redemption date.

*Restricted Securities.* The Fund may invest a substantial and material portion of its assets in restricted securities that are subject to substantial holding periods or that are not traded in public markets. Restricted securities generally are difficult or impossible to sell at prices comparable to the market prices of similar securities that are publicly traded. No assurance can be given that any such restricted securities will be eligible to be traded on a public market even if a public market for securities of the same class were to develop. It is highly speculative as to whether and when an issuer will be able to register its securities so that they become eligible for trading in public markets.

*Equity Securities.* Investment in equity securities offers the potential for substantial capital appreciation. However, such investment also involves certain risks, including issuer, industry, market and general economic related risks. The Fund may attempt to reduce these risks; however, adverse developments or perceived adverse developments in one or more of these areas could cause a substantial decline in the value of equity securities owned by the Fund.

*Debt and Other Income Securities.* The Fund may invest in fixed-income and adjustable rate securities. Income securities are subject to interest rate, market and credit risk. Interest rate risk relates to changes in a security's value as a result of changes in interest rates generally. Even though such instruments are investments that may promise a stable stream of income, the prices of such securities are inversely affected by changes in interest rates and, therefore, are subject to the risk of market price fluctuations. In general, the values of fixed income securities increase when prevailing interest rates fall and decrease when interest rates rise. Because of the resetting of interest rates, adjustable rate securities are less likely than non-adjustable rate securities of comparable quality and maturity to increase or decrease significantly in value when market interest rates fall or rise, respectively. Market risk relates to the changes in the risk or perceived risk of an issuer, country or region. Credit risk relates to the ability of the issuer to make payments of principal and interest. The values of income securities may be affected by changes in the credit rating or financial condition of the issuing entities. Income securities denominated in non-U.S. currencies are also subject to the risk of a decline in the value of the denominating currency relative to the U.S. dollar.

*Region and Country Investing.* The Fund may focus its investments in particular regions and/or in certain foreign countries. Focusing its investments in such a manner will subject the Fund, to a greater extent than if its investments in those regions or countries were more limited, to the

22

risks of adverse securities markets, exchange rates and social, political or economic developments that may occur in those regions or countries.

*Concentration and Nondiversification Risks.* The Fund may be considered nondiversified if it invests a relatively high percentage of its assets in a few companies and/or sectors. Such companies and/or sectors may be uncorrelated and/or overly correlated with the broader markets. Accordingly, the Fund may be subject to nondiversification risk, which is the possibility that the Fund's performance may be hurt disproportionately by the poor performance of relatively few stocks or even a single stock. In the event the Fund invests a large proportion of its assets in the particular industry or related industries, the Fund's performance will largely depend on the overall condition of those industries. Accordingly, the Fund may also be subject to industry concentration risk, which is the possibility that there will be overall problems affecting a particular industry.

*Effectiveness of Risk Reduction Techniques.* The Fund may employ various risk reduction strategies designed to minimize the risk of its trading positions. A substantial risk remains, nonetheless, that such strategies will not always be possible to implement and when possible will not always be effective in limiting losses. If the Investment Manager analyzes market conditions incorrectly, or employs a risk reduction strategy that does not correlate well with the Fund's investments, such risk reduction techniques could result in a loss, regardless of whether the intent was to reduce risk or increase return. These risk reduction techniques may also increase the volatility of the Fund and/or result in a loss if the counterparty to the transaction does not perform as promised.

*Hedging Transactions.* The Fund may utilize financial instruments such as forward contracts, options and interest rate swaps, caps and floors to seek to hedge against fluctuations in the relative values of its portfolio positions as a result of changes in currency exchange rates, certain changes in the equity markets and changes in interest rates. Hedging against a decline in the value of portfolio positions does not eliminate fluctuations in the values of portfolio positions or prevent losses if the values of such positions decline, but establishes other positions designed to gain from those same developments, thus moderating the decline in the portfolio positions' value. Such hedging transactions also limit the opportunity for gain if the value of the portfolio positions should increase. Moreover, it may not be possible for the Fund to hedge against a fluctuation at a price sufficient to protect the Fund's assets from the decline in value of the portfolio positions anticipated as a result of such fluctuations. For example, the cost of options is related, in part, to the degree of volatility of the underlying securities. Accordingly options on highly volatile securities may be more expensive than options on other securities and of limited utility in hedging against fluctuations in those securities.

The Investment Manager is not obligated to establish hedges for portfolio positions and may not do so. To the extent that hedging transactions are effected, their success is dependent on the Investment Manager's ability to correctly predict movements in the direction of currency and interest rates and the equity markets or sectors thereof.

*Short Sales.* The Fund may sell securities short. Short selling involves the sale of a security that the Fund does not own and must borrow in order to make delivery in the hope of purchasing the same security at a later date at a lower price. In order to make delivery to its purchaser, the Fund

23

must borrow securities from a third party lender. The Fund subsequently returns the borrowed securities to the lender by delivering to the lender the securities it receives in the transaction or by purchasing securities in the open market. The Fund must generally pledge cash with the lender equal to the market price of the borrowed securities. This deposit may be increased or decreased in accordance with changes in the market price of the borrowed securities. During the period in which the securities are borrowed, the lender typically retains his right to receive interest and dividends accruing to the securities. In exchange, in addition to lending the securities, the lender generally pays the Fund a fee for the use of the Fund's cash. This fee is based on prevailing interest rates, the availability of the particular security for borrowing and other market factors.

Theoretically, securities sold short are subject to unlimited risk of loss because there is no limit on the price that a security may appreciate before the short position is closed. In addition, the supply of securities that can be borrowed fluctuates from time to time. The Fund may be subject to losses if a security lender demands return of the lent securities and an alternative lending source cannot be found.

*Accuracy of Public Information.* The Investment Manager selects investments for the Fund, in part, on the basis of information and data filed by issuers with various government regulators or made directly available to the Investment Manager by the issuers or through sources other than the issuers. Although the Investment Manager evaluates all such information and data and ordinarily seeks independent corroboration when the Investment Manager considers it is appropriate and reasonably available, the Investment Manager is not in a position to confirm the completeness, genuineness or accuracy of such information and data, and in some cases, complete and accurate information is not available.

*Leverage.* When deemed appropriate by the Investment Manager and subject to applicable regulations, the Fund may use leverage in its investment program, including the use of borrowed funds and investments in certain types of options, such as puts, calls and warrants, which may be purchased for a fraction of the price of the underlying securities while giving the purchaser the full benefit of movement in the market of those underlying securities. While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. To the extent the Fund purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Fund. If the interest expense on borrowings were to exceed the net return on the portfolio securities purchased with borrowed funds, the Fund's use of leverage would result in a lower rate of return than if the Fund were not leveraged.

If the amount of borrowings which the Fund may have outstanding at any one time is large in relation to its capital, fluctuations in the market value of the Fund's portfolios will have disproportionately large effects in relation to the Fund's capital and the possibilities for profit and the risk of loss will therefore be increased. Any investment gains made with the additional monies borrowed will generally cause the Net Asset Value of the Fund to rise more rapidly than would otherwise be the case. Conversely, if the investment performance of the additional moneys borrowed fails to cover their cost to the Fund, the Net Asset Value of the Fund will generally decline faster than would otherwise be the case.

24

Certain of the Fund's trading and investment activities may be subject to FRB margin requirements which are computed each day. At present, the FRB's Regulation T permits a broker to lend no more than 50% of the purchase price of "margin stock" bought by a customer. When the market value of a particular open position changes to a point where the margin on deposit does not satisfy maintenance margin requirements, a "margin call" on the customer is made. If the customer does not deposit additional funds with the broker to meet the margin call within a reasonable time, the customers' position may be closed out. In the event of a precipitous drop in the value of the assets managed by the Fund, the Fund might not be able to liquidate assets quickly enough to pay off the margin debt and might suffer mandatory liquidation of positions in a declining market at relatively low prices, incurring substantial losses. With respect to the Fund's trading activities, the Fund, and not the Shareholders personally, will be subject to margin calls.

Overall, the use of leverage, while providing the opportunity for a higher return on investments, also increases the volatility of such investments and the risk of loss. Investors should be aware that an investment program utilizing leverage is inherently more speculative, with a greater potential for losses, than a program that does not utilize leverage.

*Repurchase Agreements.* The Fund may enter into repurchase agreements and reverse repurchase agreements, both of which are subject to interest rate risk and credit risk. Interest rate risk relates to changes in a security's value as a result of changes in interest rates. The value of repurchase agreements is inversely affected by changes in interest rates. Credit risk refers to the fact that the other party to the agreement may be unable to complete the transaction.

*Securities Lending Risk.* The Fund may lend securities from its portfolio to brokers, dealers and other financial institutions needing to borrow securities to complete certain transactions. The Fund might experience risk of loss if the institution with which it has engaged in a portfolio loan transaction breaches its agreement with the Fund.

*Convertible Securities.* Convertible securities ("Convertibles") are generally debt securities or preferred stocks that may be converted into common stock. Convertibles typically pay current income as either interest (debt security convertibles) or dividends (preferred stocks). A Convertible's value usually reflects both the stream of current income payments and the value of the underlying common stock. The market value of a Convertible performs like that of a regular debt security; that is, if market interest rates rise, the value of a Convertible usually falls. Since it is convertible into common stock, the Convertible generally has the same types of market and issuer risk as the underlying common stock. Convertibles that are debt securities are also subject to the normal risks associated with debt securities, such as interest rate risks, credit spread expansion and ultimately default risk, as discussed below. Convertibles are also prone to liquidity risk as demand can dry up periodically, and bid/ask spreads on bonds can widen significantly.

An issuer may be more likely to fail to make regular payments on a Convertible than on its other debt because other debt securities may have a prior claim on the issuer's assets, particularly if the Convertible is preferred stock. However, Convertibles usually have a claim prior to the issuer's common stock.

25

In addition, for some Convertibles, the issuer can choose when to convert to common stock, or can "call" (redeem) the Convertible. An issuer may convert or call a Convertible when it is disadvantageous for the Fund, causing the Fund to lose an opportunity for gain. For other Convertibles, the Fund can choose when to convert the security to common stock or to put (sell) the Convertible back to the issuer.

Because convertible arbitrage also involves the short sale of underlying common stock, the strategy is also subject to stock-borrow risk, which is the risk that the Fund will be unable to sustain the short position in the underlying common shares.

*Derivatives.* Derivatives are financial contracts whose value depends on, or is derived from, an underlying product, such as the value of a securities index. Among the types of derivatives that may be used by the Fund are futures, options and swaps. The risks generally associated with derivatives include the risks that: (1) the value of the derivative will change in a manner detrimental to the Fund; (2) before purchasing the derivative, the Fund will not have the opportunity to observe its performance under all market conditions; (3) another party to the derivative may fail to comply with the terms of the derivative contract; (4) the derivative may be difficult to purchase or sell; and (5) the derivative may involve indebtedness or economic leverage, such that adverse changes in the value of the underlying asset could result in a loss substantially greater than the amount invested in the derivative itself or in heightened price sensitivity to market fluctuations. The Fund will often be required to pledge all or a part of its assets to the counterparty in a derivatives transaction.

The Fund may also invest in non-U.S.-traded derivatives. When traded outside the United States, derivatives may not be regulated as rigorously as in the United States, may not involve a clearing mechanism and related guarantees, and will be subject to the risk of government actions affecting trading in, or the prices of, foreign securities and other instruments. The value of positions taken as part of non-U.S. derivatives also could be adversely affected by: (1) other complex foreign political, legal and economic factors, (2) lesser availability of data on which to make trading decisions than in the United States, (3) delays in the Fund's ability to act upon economic events occurring in foreign markets during non-business hours in the United States, (4) the imposition of different exercise and settlement terms and procedures and margin requirements than in the United States and (5) lower trading volume and liquidity.

*Swap Agreements.* The Investment Manager may enter into equity, interest rate, index, currency rate swap and other agreements on behalf of the Fund. These transactions are entered into in an attempt to obtain a particular return when it is considered desirable to do so, possibly at a lower cost than if the Fund had invested directly in the asset that yielded the desired return. The Investment Manager anticipates that the risk of loss with respect to most swaps the Fund would enter into would be limited to the net amount of payments that the Fund is contractually obligated to make. If the other party to a swap defaults, the risk of loss of the Fund consists of the net amount of payments that the Fund contractually is entitled to receive.

*Investment Selection.* The Investment Manager may select investments for the Fund in part on the basis of information and data filed by the issuers of such securities with various government regulators or made directly available to the Investment Manager by the issuers of securities or through sources other than the issuers. Although the Investment Manager will evaluate all such

26

information and data and seek independent corroboration when the Investment Manager considers it appropriate and when it is reasonably available, the Investment Manager will not be in a position to confirm the completeness, genuineness or accuracy of such information and data, and in some cases, complete and accurate information will not be readily available.

The Fund will acquire investment assets that have not yet been identified. Accordingly, prospective investors will not have an opportunity to review the terms upon which any assets will be acquired prior to investing in the Fund. The likelihood that Shareholders will realize income or gain depends on the skill and expertise of the Investment Manager.

*Non-U.S. Exchanges and Markets.* The Fund may engage in trading on non-U.S. exchanges and markets. Trading on such exchanges and markets may involve certain risks not applicable to trading on U.S. exchanges and is frequently less regulated. For example, certain of those exchanges may not provide the same assurances of the integrity (financial and otherwise) of the marketplace and its participants, as do U.S. exchanges. There also may be less regulatory oversight and supervision by the exchanges themselves over transactions and participants in such transactions on those exchanges. Some non-U.S. exchanges, in contrast to U.S. exchanges, are "principals' markets" in which performance is the responsibility only of the individual member with whom the trader has dealt and is not the responsibility of an exchange or clearing association. Furthermore, trading on certain non-U.S. exchanges may be conducted in such a manner that all participants are not afforded an equal opportunity to execute certain trades and may also be subject to a variety of political influences and the possibility of direct government intervention. Investment in non-U.S. markets would also be subject to the risk of fluctuations in the exchange rate between the local currency and the dollar and to the possibility of exchange controls. Foreign brokerage commissions and other fees are also generally higher than in the United States.

*Investments in Non-U.S. Securities.* The Fund invest and trade a major portion of its assets in non-U.S. securities, which give rise to risks relating to political, social and economic developments abroad, as well as risks resulting from the differences between the regulations to which U.S. and foreign issuers and markets are subject:

> ➢ These risks may include political or social instability, the seizure by foreign governments of company assets, acts of war or terrorism, withholding taxes on dividends and interest, high or confiscatory tax levels, and limitations on the use or transfer of portfolio assets.

> ➢ Enforcing legal rights in some foreign countries is difficult, costly and slow, and there are sometimes special problems enforcing claims against foreign governments.

> ➢ Foreign securities often trade in currencies other than the U.S. dollar, and the Fund may directly hold foreign currencies and purchase and sell foreign currencies through forward exchange contracts. Changes in currency exchange rates will affect the Fund's Net Asset Value, the value of dividends and interest earned, and gains and losses realized on the sale of securities. An increase in the strength of the U.S. dollar relative to these other currencies may cause the value of the Fund's investments to decline. Some foreign currencies are particularly volatile. Foreign governments may

intervene in the currency markets, causing a decline in value or liquidity of the Fund's foreign currency holdings. If the Fund enters into forward foreign currency exchange contracts for hedging purposes, it may lose the benefits of advantageous changes in exchange rates. On the other hand, if the Fund enters forward contracts for the purpose of increasing return, it may sustain losses.

➤ Non-U.S. securities markets may be less liquid, more volatile and less closely supervised by the government than in the United States. Foreign countries often lack uniform accounting, auditing and financial reporting standards, and there may be less public information about their operations.

*Investments in Undervalued Securities.* The Fund may invest in undervalued securities. The identification of investment opportunities in undervalued securities is a difficult task, and there are no assurances that such opportunities will be successfully recognized or acquired. While investments in undervalued securities offer the opportunities for above-average capital appreciation, these investments involve a high degree of financial risk and can result in substantial losses. Returns generated from the Fund's investments may not adequately compensate for the business and financial risks assumed.

The Fund may invest in bonds or other fixed income securities, including, without limitation, commercial paper and "higher yielding" (and, therefore, higher risk) debt securities. It is likely that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities. In addition, it is likely that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default for such securities.

The Fund may make certain speculative investments in securities which the Investment Manager believes to be undervalued, however, there are no assurances that the securities purchased will in fact be undervalued. In addition, the Fund may be required to hold such securities for a substantial period of time before realizing their anticipated value. During this period, a portion of the Fund's funds would be committed to the securities purchased, thus possibly preventing the Fund from investing in other opportunities.

*Small Companies.* The Fund may invest a portion of its assets in small and/or unseasoned companies with small market capitalizations. While smaller companies generally have potential for rapid growth, they often involve higher risks because they may lack the management experience, financial resources, product diversification, and competitive strength of larger companies. In addition, in many instances, the frequency and volume of their trading may be substantially less than is typical of larger companies. As a result, the securities of smaller companies may be subject to wider price fluctuations. When making large sales, the Fund may have to sell portfolio holdings at discounts from quoted prices or may have to make a series of small sales over an extended period of time due to the lower trading volume of smaller company securities.

*Real Estate Industry Considerations.* The Fund may invest in real estate related securities. Therefore, an investment in the Fund is subject to certain risks associated with the direct ownership of real estate and with the real estate industry in general. These risks include, among

others: possible declines in the value of real estate; risks related to general and local economic conditions; possible lack of availability of mortgage funds; overbuilding; extended vacancies of properties; increases in competition, property taxes and operating expenses; changes in zoning laws; costs resulting from the clean-up of, and liability to third parties for damages resulting from, environmental problems; casualty or condemnation losses; uninsured damages from floods, earthquakes or other natural disasters; limitations on and variations in rents; and changes in interest rates. To the extent that assets underlying the Fund's investments are concentrated geographically, by property type or in certain other respects, the Fund may be subject to certain of the foregoing risks to a greater extent.

*Currency Risk.* The value of the Fund's assets may be affected favorably or unfavorably by the changes in currency rates and exchange control regulations. Some currency exchange costs may be incurred when the Fund changes investments from one country to another. Currency exchange rates may fluctuate significantly over short periods of time. They generally are determined by the forces of supply and demand in the respective markets and the relative merits of investments in different countries, actual or perceived changes in interest rates and other complex factors, as seen from an international perspective. Currency exchange rates can also be affected unpredictably by intervention by governments or central banks (or the failure to intervene) or by currency controls or political developments. The Fund may or may not seek to mitigate the risk of currency exchange fluctuation.

*Turnover.* The Fund's trading activities may be made on the basis of short-term market considerations. The Fund's portfolio turnover rate may be significant, involving substantial brokerage commissions and fees. The Fund will be responsible for the payment of all of the trading expenses incurred in connection with its trading activities, which will ultimately affect the return achieved by the Fund.

*Call and Put Options on Indices.* The Fund may purchase and sell call and put options on indices listed on national securities exchanges or traded in the over-the-counter market for hedging purposes and non-hedging purposes to pursue its investment objective. The successful use of options on stock indexes requires different skills and techniques than predicting changes in the price of individual stocks.

*Use of Warrants & Rights.* Warrants permit, but do not obligate, the holder to subscribe for other securities or commodities. Rights are similar to warrants, but normally have a shorter duration and are offered or distributed to shareholders of a company. Warrants and rights may be considered more speculative than certain other types of equity-like securities because they do not carry with them rights to dividends or voting rights and they do not represent any rights in the assets of the issuer. These instruments cease to have value if they are not exercised prior to their expiration dates. The market for warrants and rights can become very illiquid. Changes in liquidity may significantly impact the price for warrants and rights.

*Use of When-Issued & Forward Commitment Securities.* The Fund may purchase securities on a "when-issued" basis. These transactions involve a commitment by the Fund to purchase or sell securities at a future date (ordinarily one or two months later). No income accrues on securities that have been purchased on a when-issued basis prior to delivery to the Fund. When-issued securities may be sold prior to the settlement date. If the Fund disposes of the right to acquire a

when-issued security prior to its acquisition, it may incur a gain or loss. There is a risk that securities purchased on a when-issued basis may not be delivered. In such cases, the Fund may incur a loss.

*Securities of Financially Distressed Companies.* The Fund may purchase securities and other obligations of companies that are experiencing significant financial or business distress, including companies involved in bankruptcy or other reorganization and liquidation proceedings. Although such purchases may result in significant returns, they involve a substantial degree of risk and may not show any return for a considerable period of time, if ever. In fact, many of these securities and investments ordinarily remain unpaid unless and until the company reorganizes and/or emerges from bankruptcy proceedings and, as a result, may have to be held for an extended period of time. The level of analytical sophistication, both financial and legal, necessary for successful investment in companies experiencing significant business and financial distress is unusually high. There is no assurance that the Investment Manager will correctly evaluate the nature and magnitude of the various factors that could affect the prospect for a successful reorganization or similar action. In any reorganization or liquidation proceeding relating to a company in which the Fund invests, the Fund may lose its entire investment or maybe required to accept cash or securities with a value less than the Fund's original investment.

*Trading in Indices and Related Financial Instruments.* The Fund may trade indices and related financial instruments. The effect of governmental intervention may be particularly significant at certain times in indices and related financial instruments' futures and options markets and such intervention (as well as other factors) may cause all these markets to move rapidly in the same direction because of, among other things, interest rate fluctuations.

*Futures Contracts and Options on Futures Contracts.* In entering into futures contracts and options on futures contracts, there is a credit risk that a counterparty will not be able to meet its obligations to the Fund. The counterparty for futures contracts and options on futures contracts traded in the United States and on most foreign futures exchanges is the clearinghouse associated with such exchange. In general, clearinghouses are backed by the corporate members of the clearinghouse who are required to share any financial burden resulting from the non-performance by one of its members and, as such, should significantly reduce this credit risk. In cases where the clearinghouse is not backed by the clearing members (*i.e.,* some foreign exchanges), it is normally backed by a consortium of banks or other financial institutions. There can be no assurance that any counterparty, clearing member or clearinghouse will be able to meet its obligations to the Fund.

In addition, under the CEA, futures commission merchants are required to maintain customers' assets in a segregated account. If the Fund engages in futures and options contract trading and the futures commission merchants with whom the Fund maintains accounts fail to so segregate the Fund's assets or are not required to do so, the Fund will be subject to a risk of loss in the event of the bankruptcy of any of its futures commission merchants. Even where customers' funds are properly segregated, the Fund might be able to recover only a *pro rata* share of its property pursuant to a distribution of a bankrupt futures commission merchant's assets.

*Futures Cash Flow.* Futures contracts gains and losses are marked-to-market daily for purposes of determining margin requirements. Option positions generally are not, although short option positions will require additional margin if the market moves against the position. Due to these differences in margin treatment between futures and options, there may be periods in which positions on both sides must be closed down prematurely due to short-term cash flow needs. Were this to occur during an adverse move in the spread or straddle relationships, a substantial loss could occur.

Most United States futures exchanges limit fluctuations in certain commodity interest contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits." During a single trading day, no trades may be executed at prices beyond the daily limits. Once the price of a particular contract has increased or decreased by an amount equal to the daily limit, positions in the contract can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit. Contract prices have occasionally moved to the daily limit for several consecutive days with little or no trading. Similar occurrences could prevent the Investment Manager from promptly liquidating unfavorable positions and subject the Fund to substantial losses, which could exceed the margin initially committed to such trades.

Each exchange on which futures are traded typically has the right to suspend or limit trading in the contracts listed on such exchange. The CFTC also has the right to suspend or limit trading in futures contracts. Such a suspension or limitation could render it impossible for the Fund to liquidate its positions and thereby expose it to losses. In addition, there is no guarantee that exchange and other secondary markets will always remain liquid enough for the Investment Manager to close out existing futures positions. It is also possible that an exchange or the CFTC could order the immediate liquidation and settlement of a particular contract, or order that trading in a particular contract be conducted for liquidation only.

*Option Transactions.* The purchase or sale of an option by the Fund involves the payment or receipt of a premium payment and the corresponding right or obligation, as the case may be, to either purchase or sell the underlying security or other instrument for a specific price at a certain time or during a certain period. Purchasing options involves the risk that the underlying instrument does not change price in the manner expected, so that the option expires worthless and the investor loses its premium. Selling options, on the other hand, involves potentially greater risk because the investor is exposed to the extent of the actual price movement in the underlying security or other instrument in excess of the premium payment received.

*Yield Curve Risk.* The Fund may purchase a bond, a future contract or receive in an interest rate swap of a given maturity. At the same time the Fund may sell a bond, a future contract or pay on an interest rate swap of a different maturity. In this situation, there is yield curve risk. There are numerous factors that will affect the shape of the yield curve that are beyond the control of the Fund.

*Inflation Risk.* Inflation risk results from the variation in the value of cash flows from a security due to inflation, as measured in terms of purchasing power. For example, if the Fund purchases a 5 year bond in which it can realize a coupon rate of 5 percent, but the rate of inflation is 6 percent, then the purchasing power of the cash flow has declined. For all but inflation linked bonds, adjustable bonds or floating rate bonds, the Fund is exposed to inflation risk because the

31

interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

*Investments in New Issues.* The Fund may, directly or indirectly, invest in "new issues," as such term is defined in FINRA Rule 2790. Those Shareholders that are categorized by the Fund as "restricted persons" as defined by FINRA may participate in the receipt of new issues only to the extent that such restricted persons' aggregate beneficial ownership of the Fund does not exceed 10% of the Fund's assets. To the extent that a Shareholder or a potential investor is a "restricted" person, its investment in the Fund may not yield the same performance results as the Shareholders who are entitled to participate in all of the Fund's new issues.

*Failure of Custodian, Broker-Dealers.* Institutions, such as brokerage firms or banks, may hold certain of the Fund's assets in "street name." Bankruptcy or fraud at one of these institutions, in particular, the Fund's Custodian, which would hold the majority of the Fund's assets, could impair the operational capabilities or the capital position of the Fund.

In addition, as the Fund may borrow money or securities or utilize operational leverage with respect to their assets, the Fund will post certain of their assets as collateral securing the obligations or leverage ("Margin Securities"). The Fund's Custodian and brokers generally hold the Margin Securities on a commingled basis with margin securities of their other customers and may use certain of the Margin Securities to generate cash to fund the Fund's leverage, including pledging such Margin Securities. Some or all of the Margin Securities may be available to creditors of the Fund's Custodian and brokers in the event of their insolvency. The Fund's Custodian and brokers have netting and set off rights over all the assets held by them (which may indirectly include amounts held for the Fund's benefit in the special segregated bank account) to satisfy the Fund's obligations under their agreements with the Fund's Custodian and brokers, including obligations relating to any margin or short positions.

*Over-the-Counter ("OTC") Transactions.* The Fund may deal in forward foreign exchange contracts between currencies of the different countries and multi-national currency units and options on currencies for hedging or speculation. With respect to forward currency contracts, this is accomplished through contractual agreements generally to purchase or sell one specified currency for another currency at a specified future date and price determined at the inception of the contract. The Fund may engage in other OTC transactions, such as options not traded on an exchange, swaps, caps, floors, and collars.

In general, there is less governmental regulation and supervision in the OTC markets than of transactions entered into on an organized exchange. In addition, many of the protections afforded to participants on some organized exchanges, such as the performance guarantee of an exchange clearinghouse, will not be available in connection with OTC transactions. This exposes the Fund to the risks that a counterparty will not settle a transaction because of a credit or liquidity problem or because of disputes over the terms of the contract. The Fund is not restricted from concentrating transactions with one counterparty. The Fund, therefore, will be exposed to greater risk of loss through default than if it confined its trading to regulated exchanges.

The Fund will be subject to the risk of the inability of counterparties to perform with respect to transactions, whether due to insolvency, bankruptcy, governmental prohibition or other causes, which could subject the Fund to substantial losses.

*Risks of Non-Controlling Investments; Control Person Liability.* The Fund may take minority shareholdings in certain investee companies and, as a result, may be unable to protect its interests effectively. Such investments may involve risk not present in the Fund's investments where a third party is not involved, including the risk that a co-investor might at any time have economic or business interests or goals that are inconsistent with those of the Fund or may be in a position to take action contrary to the Fund's investment objectives. Conversely, the Fund may acquire controlling interests in certain investee companies. The exercise of control over an investee company may impose additional risks of liability for environmental damage, product defects, failure to supervise management, violation of governmental regulations or other types of liability in which the limited liability generally characteristic of business ownership may be ignored. If these liabilities were to arise, the Fund might suffer a significant loss.

*Start-Up Periods.* The Fund may encounter start-up periods during which it will incur certain risks relating to the initial investment of newly contributed assets. Moreover, the start-up periods also represent a special risk in that the level of diversification of the Fund's portfolio may be lower than in a fully invested portfolio. Finally, the Investment Adviser and the Fund will be subject to business and operational risks applicable to all newly established entities, such as the risks of failure or malfunction of the telephone and data network, technical telephone equipment, cable service, computer equipment and other infrastructure.

*Trading Errors.* Though the Investment Manager will attempt to correct trading errors as soon as they are discovered, it may not be responsible for poor executions or trading errors committed by the brokers with which it transacts or the Investment Manager itself, unless, in the case of the Investment Manager, such errors resulted from the Investment Manager's Gross Negligence (as defined below) or willful misconduct. The term "Gross Negligence," whenever used herein, shall have the meaning given to such term under the laws of the State of Delaware, United States of America.

*Valuation of Fund Investments.* The Administrator shall calculate the Net Asset Value of the Fund with the assistance of the Investment Manager and under the supervision of the Directors. Valuation of the Fund's investments, including the Special Investments (which will indirectly determine the amount of the Management Fee and the Performance Allocation) may involve uncertainties and judgmental determinations, and if such valuations should prove to be incorrect, the Shareholders could be adversely affected. Independent pricing information may not at times be available with respect to certain of the Fund's securities and other investments. Accordingly, while the Directors, the Investment Manager and the Administrator will use their best efforts to value and/or calculate (as applicable) all investments in the Fund fairly, certain investments may be difficult to value and may be subject to varying interpretations of value.

*Money Market Instruments.* For temporary defensive purposes or in order to earn a return on available cash balances pending investment or reinvestment, the Fund may invest its assets in short-term debt securities of U.S. or foreign companies, foreign governments or the U.S. government or their agencies or instrumentalities, as well as in other money market instruments.

In the event the Fund's assets are invested in such instruments for a significant period of time, the Fund's performance may be negatively affected.

*Future Regulatory Change is Impossible to Predict.* The securities and derivatives markets are subject to comprehensive statutes, regulations and margin requirements. In addition, the SEC and the exchanges are authorized to take extraordinary actions in the event of a market emergency, including, for example, the retroactive implementation of speculative position limits or higher margin requirements, the establishment of daily price limits and the suspension of trading. The regulation of securities and derivatives both inside and outside the United States is a rapidly changing area of law and is subject to modification by government and judicial action. The effect of any future regulatory change on hedge funds, in general, and the Fund, in particular, is impossible to predict, but could be substantial and adverse.

*Competition.* The Fund will engage in investment activities which may become competitive with other investment programs such as those of other financial institutions, mutual funds, investment banks, broker-dealers, commercial banks, insurance companies and pension funds, as well as private investors, all of whom may have investment objectives similar to those of the Fund. These competitors may have substantially greater resources than the Fund and may have greater experience than the Investment Manager and its affiliates. Substantial capital suddenly deployed in the asset classes in which the Fund invests to take advantage of the opportunities present in the sector can also reduce available investment and potential returns of the Fund.

*Cross-Class Liability.* The Fund will have at least two Classes of Shares and is likely to have at least four Classes of Shares. Notwithstanding the fact that the Fund may issue Shares in more than one Class, the Fund is a single legal entity. Thus, all the assets of the Fund may be available to meet all of the liabilities of the Fund. In practice, cross-class liability will usually only arise where any Class becomes insolvent or exhausts its assets and is unable to meet its liabilities. In this case, all of the assets of the Fund attributable to the other Classes may be applied to cover the liabilities of the insolvent Class.

## Risks Related to Investments in Other Funds and Investment Vehicles

*Compensation Arrangements with Fund Managers.* The Fund may enter into arrangements with certain managers of investment funds or vehicles ("Managers") which provide that such Managers be compensated, in whole or in part, based on the appreciation in value (including unrealized appreciation) of the account during specific measuring periods. In other cases, Managers may be paid a fee based on appreciation during the specific period without taking into account losses occurring in prior periods. Such fee arrangements may create an incentive for such Managers to make investments that are riskier or more speculative than would be the case in the absence of such performance based compensation arrangements. Due to the fees and expenses charged by the Managers, the Fund is subject to layering of administrative expenses and management fees, as well as of incentive compensation. In addition, the Fund may be required to make an incentive allocation to certain Managers who make a profit for the Fund in a particular fiscal year even though the Fund may in the aggregate incur a net loss for such fiscal year. The Fund may also be subject to misallocations of the incentive compensation assessed on the Fund's investments with Managers.

34

*Valuation, Reporting and Independence of Managers.*  In certain cases, the Fund may be dependent on financial information provided by Managers or administrators in computing the Fund's Net Asset Value.  Such financial information could be incorrect, delayed or subject to significant adjustments, any of which events could adversely affect the valuation of the Fund's investments.  Although the Investment Manager will normally receive periodic reports on investments made by a Manager, the Investment Manager may not always be provided with detailed information regarding all the investments made by a Manager because certain of this information may be considered proprietary.  This potential lack of access to information may make it more difficult for the Investment Manager to select, allocate amongst and evaluate certain Managers.  In general, the Fund does not and will not control any of the Managers, their choice of investments and other investment decisions, all of which are entirely within the control of such Managers.

## Product Risk

*ADRs, EDRs and GDRs.*  Investments in ADRs, EDRs and GDRs and similar instruments will be deemed to be investments in the underlying equity securities of the issuers. The Fund may acquire depository receipts from banks that do not have a contractual relationship with the issuer of the security underlying the depository receipt.  To the extent the Fund invests in such depository receipts there may be a possibility that the Fund may not become aware of events affecting the underlying security and thus the value of the related depository receipt.  In addition, certain benefits (*i.e.*, rights offerings) which may be associated with the security underlying the depository receipt may not inure to the benefit of the holder of such depository receipt.

*Synthetic Product Risk.*  The synthetic products in which the Fund may invest are subject to the following counterparty and regulatory risks.  The counterparty risk lies with each party with whom the Fund contracts for the purpose of making investments (the counterparty) and, where relevant, the entity in Russia and the CIS with whom the counterparty has made arrangements to ensure an on-shore presence in Russia and the CIS.  The Fund may not be entitled to assert any rights against the entity in Russia and the CIS with whom it does not have a contractual relationship.  The Fund may not be able to procure that the counterparty asserts its own rights, if any, against the on-shore entity in Russia and the CIS with whom it has made arrangements.  In the event of the counterparty's insolvency, the Fund will only rank as an unsecured creditor.  In the event of the insolvency of any entity in Russia and the CIS with whom the Fund does not have a direct contractual relationship, it is likely that the Fund will lose its entire investment.  The effectiveness and legality of the synthetic product structure, and in particular the ability of the Fund's counterparty to invest efficiently in Russia and the CIS from off-shore, is subject to the intervention by the relevant regional authorities, their re-interpretation of law and current commercial and tax efficient practice and legislation, as well as to changes in relevant laws and regulations.  As a result, the Fund may not get back all or any part of its investment in the synthetic products in which it invests or it may find that the proceeds of its investment are not repatriable.  It may not be possible for the Fund to negotiate favorable terms for its investment in synthetic products.  In some cases the Fund may be obliged to hold harmless and indemnify its counterparty from and against all losses resulting from a breach of Fund's obligations or in respect of all costs and expenses incurred by the counterparty in relation to its arrangements with the on-shore entity.  In the event that the underlying investment remains unpaid or is rescheduled (including being the subject of a moratorium, debt substitution, exchange or similar event) the

35

Fund could lose part or the whole of its investment. Similarly, if the underlying investment or the synthetic product structure is re-characterized, the Fund may be forced to terminate its investment in the synthetic product earlier than had been anticipated and at a loss to part or all of the investment.

### Risk Factors Relating to Russia and CIS

Described below are certain risk factors peculiar to investing in Russia and CIS which require consideration of matters not usually associated with investing in securities of issuers in more developed capital markets. Russia and CIS present different economic and political conditions from those in Western markets, and less social, political and economic stability. The absence, until relatively recently, of any move towards capital markets structures or to a free-market economy means investing in these countries is more risky than investing in Western markets. Information on Russia and CIS is to be treated with particular care due to the limited availability and reliability of such information.

*Political and Economic Risks.* Under the Communists, Russia had a centrally planned, socialist economy and a totalitarian system of government. Since the break-up of the Soviet Union at the end of 1991, Russia and other countries within the CIS have undergone substantial political and social upheaval. Though the transition from a centrally controlled, command system to a market-oriented, democratic model is taking place, the terms on which this will occur are still not entirely clear and may be affected by further fears of inflation. The consequences, however, are profound, and investors should take into account the unpredictability of their eventual outcome. The economies of Russia and the CIS may differ significantly from the economies of Western Europe, North America and Japan in such respects as the rate of inflation, currency depreciation, capital reinvestment, structural unemployment and balance of payments position. The value of the Fund may therefore be affected by uncertainties such as political or diplomatic developments, social and religious instability, changes in government policies, taxation and interest rates, currency repatriation and other political and economic developments in law or regulations in Russia and the CIS and, in particular, the risks of expropriation, nationalism and confiscation of assets and changes in legislation relating to the level of foreign ownership. Russia's economy and markets remain highly sensitive to oil prices. According to direct revenue estimates, Russia's budget surplus would be reduced by US$ 1 billion, or 0.2% of GDP, for each US$ 1/bbl drop in oil price. Additionally, a sharp fall in the oil price might cause enterprises to delay investment plans, thus growth could slow, leading to a greater negative impact on the overall federal budget.

*Regulatory Risk.* Enterprises in which the Fund invests may be or become subject to unduly burdensome and restrictive regulation affecting the commercial freedom of the investee company, thereby diminishing the value of the Fund's investment in it. Restrictive or overregulation may therefore be a form of indirect nationalization.

*Lack of Market Economy.* Businesses in Russia have only a very recent history of operating within a market oriented economy. In general, relative to companies operating in Western economies, companies in Russia are characterized by a lack of experienced management; modern technology; and sufficient capital base with which to develop and expand their

operations.  It is unclear what will be the effect on companies in Russia, if any, of attempts to move towards a more market-oriented economy.

*Settlement Risk.*  Because of the relatively underdeveloped securities markets, banking and telecommunications systems concerns arise in relation to settlement, clearing and registration of transactions in securities.  Furthermore, due to the local postal and banking systems, no guarantee can be given that all entitlements attaching to securities acquired by the Fund, including in relation to dividends, can be realized.  However, none of the Fund, the Custodian, the Administrator, the Investment Manager or the Investment Adviser or any of their agents makes any representation or warranty about, or any guarantee of, the operation, performance or settlement, clearing and registration of transactions dealing in securities in Russia.

*Registration Risk in Russia.*  Currently, evidence of legal title to shares in Russia is typically maintained in "bookentry" form.  In order to be recognized as the registered owner of a company's shares, a purchaser or a purchaser's representative must physically visit the registrar of the company ("Regional Registrar") and open an account with the Regional Registrar (which, in certain cases, requires the payment of an account opening fee).  Thereafter, each time that purchaser purchases additional shares in the company, the purchaser's representative must present to the Regional Registrar powers of attorney from the purchaser and the vendor of such shares, along with evidence of such purchase, at which time the Regional Registrar will debit such purchased shares from the vendor's account maintained on the register and credit such purchased shares to the purchaser's account maintained on the register.  The role of the Regional Registrar in the custodial and registration process is crucial.  Although the Russian Federal Securities Commission has published regulations governing activities of registrars the effectiveness of government supervision of registrars is questionable and it is possible for the Fund to lose its registration in one or more securities through fraud, negligence or mere oversight.  Furthermore, while companies with more than 500 shareholders are required under Russian law to maintain independent Regional Registrars that meet certain statutory criteria, in practice this regulation has not historically always been strictly enforced.  Because of the lack of independence, the management of a company can potentially exert significant influence over the make-up of that company's shareholders.  If a Regional Registrar were to suffer a fire or other catastrophe, the consequence of which were to be the destruction or mutilation of the Register, the Fund's holdings of the relevant shares of the related company could be substantially impaired or, in certain cases, erased.  The Regional Registrars typically do not maintain insurance against such occurrence, nor are they likely to have assets sufficient to compensate the Fund as a result thereof.  While the Regional Registrar and the company may be legally obliged to remedy such loss, there is no guarantee that either of them would do so, nor is there any guarantee that the Fund would be able to successfully bring a claim against them as a result of any such loss.  In addition to the possibility of a Regional Registrar suffering a catastrophic loss, a Regional Registrar or the relevant company could willfully refuse to recognize the Fund as the registered owner of shares previously purchased by the Fund.  None of the Fund, the Investment Manager, the Investment Adviser, the Administrator, the Custodian or any of their agents makes any representation or warranty about, or any guarantee of, any Regional Registrar's operations or performance.

*Title to Shares.*  Although the Russian Civil Code does provide for the concept of a "good faith purchaser", such a purchaser is not protected to the extent that would be the case in most

Western jurisdictions. As a result, under Russian law, a purchaser of securities (other than cash and bearer instruments) takes such securities subject to any laws in title and ownership that may have existed in the seller thereof or any of such seller's predecessors in title. Consequently, at the present time, it is possible that the Fund's ownership of shares could be challenged by a prior owner from whom the shares were acquired, in which case the value of the Fund's assets would possibly be impaired.

*Custody Risk.* Custody services in Russia and the CIS remain undeveloped and, although the Fund will endeavor to put into place control mechanisms, including the selection of agents to register securities on behalf of the Fund, and, where appropriate, regular reconciliations of entries on relevant securities registers to ensure that the Fund's interests continue to be recorded, there is a transaction and custody risk of dealing in these securities. The Custodian and Sub-custodian are empowered by the Fund to delegate all or any of their functions and duties to local sub-custodians ("Correspondents") in Russia and the CIS. The Custodian and Sub-Custodian will exercise due skill, care and diligence in the selection, appointment and monitoring of such Correspondents and will maintain an appropriate level of supervision over such Correspondents and make appropriate periodic enquiries to confirm that the obligations of such Correspondents continue to be competently discharged. The Custodian retains responsibility for the acts and omissions of its Correspondents in developed markets, but is not liable for any loss directly or indirectly arising as a result of the acts or omissions of its Correspondents in certain emerging markets countries (as referred to in the Custodian Agreement, and including Russia and the majority of CIS countries). The Custodian shall for the duration of any agreement with such Correspondent satisfy itself as to the ongoing suitability of that Correspondent to provide custodial services to the Fund. The Custodian will not be liable for any losses suffered by the Fund as a result of the bankruptcy or insolvency of any Correspondent. The Custodian is not responsible for the safekeeping of assets deposited with brokers. The fees of any Correspondent (other than an affiliate of the Custodian) appointed by the Custodian shall be paid by the Fund. The fees and other costs of any Correspondent shall be borne by the Fund.

*Possible Business Failures.* The insolvency or other business failure of any one or more of the Fund's investments could have an adverse effect on the Fund's performance and ability to achieve its objectives. Russia has enacted a law on the insolvency of enterprises, but there is as yet no significant level of experience as to how this law will be implemented and applied in practice. The lack of generally available enhancing alternatives for companies in Russia and other CIS countries increases the risk of business failure.

*Accounting Practice.* Accounting standards in Russia and the CIS do not correspond to accounting principles generally accepted in the United States of America in all material respects. In addition, auditing requirements and standards differ from those generally accepted in the international capital markets and consequently information available to investors in developed capital markets is not always obtainable in respect of companies in Russia and the CIS. The Fund's own financial statements will conform to accounting principles generally accepted in the United States of America.

*Quality of Information.* Investors in Russia and the CIS generally have access to less reliable or less detailed information, including both general economic data and information concerning the operations, financial results, capitalization and financial obligations, earnings and securities of

specific enterprises. The quality and reliability of information available to the Fund will, therefore, be less than in respect of investments in Western countries. Obligations on companies to publish information are also more limited, thus further restricting opportunities for the Fund to carry out due diligence. At present, the Fund will be obliged to make investment decisions and investment valuations on the basis of financial information that will be less complete and reliable than that customarily available in the West. Also, the quality and reliability of official data published by the government and government agencies of Russia and the CIS is generally not equivalent to that of more developed Western countries.

*Uncertain Legal and Regulatory Environment.* The laws and regulations in Russia and the CIS affecting Western investment and business continue to evolve in an unpredictable manner. Laws and regulations, particularly those involving taxation, currency regulation, foreign investment, trade and transfer of title to securities and other property applicable to the Fund's activities are relatively new and can change quickly and unpredictably. Although basic commercial laws are in place, they are often unclear and untested and subject to varying interpretation, and may at any time be amended, modified, repealed or replaced in a manner adverse to the interests of the Fund. Enterprises in which the Fund invests may be or may become subject to unduly burdensome and restrictive regulation, including, in particular, price controls and restrictions on export. Such regulations may affect the commercial freedom of such enterprises and thereby diminish the value of the Fund's investment in such enterprises.

*Taxation.* Tax law and practice in Russia and the CIS is not as clearly established as that of the Western nations. It is possible, therefore, that the current interpretation of the law or understanding of practice may change or, indeed, that the law may be changed with retrospective effect. Accordingly, it is possible that the Fund could become subject to taxation in Russia and the CIS that is not anticipated either at the date of this document or when investments are made, valued or disposed of. In addition, in some of these countries the domestic tax burden is high and the discretion of local authorities to create new forms of taxation has resulted in a proliferation of taxes, in some cases imposed or interpreted retrospectively. Penalties on the late payment of tax (even when it is imposed retrospectively) can be substantial.

*Repatriation Restrictions.* The foreign investment legislation of Russia currently provides general assurances of the rights of foreign investors to remit profits and dividends from their investments in Russia. In some cases, however, these rights are subject to currency, tax and export restrictions and no guarantee can be given that all the proceeds of investments will be capable of being remitted.

*Exchange and Currency Risk.* Russia's currency has in the past experienced steady devaluation relative to convertible currencies, such as the US dollar.

The value of an investment in the Fund, whose Shares are denominated in US dollars, will be affected by fluctuations in the value of the underlying currency of denomination of the Fund's investments against the US dollar or by changes in exchange control regulations, tax laws, withholding taxes, and economic or monetary policies. Adverse fluctuations in currency exchange rates can result in a decrease in net return and in a loss of capital. Accordingly, investors must recognize that the value of Shares can fall as well as rise for this reason.

Case 1:15-cv-09056-VM   Document 27-2   Filed 03/15/16   Page 46 of 98

The Fund may attempt to mitigate the risks associated with currency fluctuations by entering into forward and options contracts to purchase or sell the currency of denomination of any investment held by the Fund and any other currencies held by the Fund, to the extent such contracts are available on terms acceptable to the Fund, although there is no assurance that any such hedging will take place nor as to its efficacy.

*Amendments to Russian Currency Legislation.*  Russian currency control legislation, particularly Federal Law No. 173-FZ "On Currency Regulation and Currency Control" dated 10 December 2003 (the "Law"), has recently undergone substantial changes. The amendments were to be enacted in two steps: the reservation requirement would be abolished starting July 1, 2006, and the obligation to use special accounts for currency transactions and most other restrictions would be abolished starting January 1, 2007.

However, the liberalization took place earlier than planned. On May 29, 2006, the Central Bank by its directive No. 1688-U abolished the requirement to use special accounts and to sell a portion of the currency revenue. On July 27, 2006, the first batch of amendments to the Law came into force (they retroactively applied to the relations since July 1, 2006). Therefore, the most important currency restrictions including the reservation requirement, the special accounts requirement and the requirement to sell a portion of currency proceeds, have been abolished as of mid 2006.

On January 1, 2007, as planned, the second batch of amendments to the Law came into force. The amendments abolished most of the remaining currency restrictions. The cumulative amendments to the currency control legislation, which include the amendments effective as of July 1, 2006, and January 1, 2007, include the following:

- Mandatory reservation requirements are no longer applicable.  These requirements could be triggered in case of export of goods, acquisition of shares in legal entities and simple partnerships and other operations with securities, loans between residents and non-residents, foreign bank account operations, and in certain other cases;

- Residents and non-residents are no longer required to use special accounts for currency transactions (such as obtaining loans and performing operations with securities);

- Non-residents are no longer required to secure performance of their obligations in case of advance payments by residents or deferred payments by non-residents;

- Non-residents are no longer required to obtain ruble denominated loans from residents only through bank accounts with authorized Russian banks;

- Residents and non-residents are no longer required to use rubles as the currency of payment for Russian securities;

- Residents are no longer required to obtain prior registration of their bank accounts with foreign banks; and

- Residents can no longer be required to sell part of their currency proceeds.

The State Duma adopted certain technical amendments to the Law, which became effective on December 31, 2006 and which apply to the relations arising since January 1, 2007. The amendments extended the number of:

- ways of crediting of funds to residents' foreign accounts;

- exempted currency operations between residents;

- currency operations which can be performed by residents without the use of accounts with authorized banks; and

- cases when residents are exempted from the obligation to repatriate currency proceeds received from commercial operations abroad.

Despite significant liberalization of currency operations, certain currency law restrictions continue to apply, including the following:

- Currency operations between residents are still prohibited.  This does not apply to a limited number of operations specifically mentioned in the Law;

- Residents are still required to notify tax authorities of opening of foreign bank accounts, which can be opened only in OECD and FATF member countries, and to provide to tax authorities updates on the status of such accounts, and the ways to credit funds to such accounts are still limited;

- Residents are still required, with a number of exceptions, to ensure that payments due to them from non-residents are credited to their bank accounts with authorized Russian banks, and that funds paid to non-residents for goods and services that have not been provided to the residents are credited back to their bank accounts with authorized Russian banks;

- Residents are still required to prepare and file with their banks transaction passports for certain types of currency operations;

- Residents are required, with a number of exceptions, to conduct payments upon execution of currency operations through accounts opened with Russian authorized banks or with the use of funds credited to accounts with foreign banks opened in accordance with the Law;

- Individuals (residents and non-residents) going abroad can carry foreign or Russian currency in the amount of up to US $ 10,000 in cash at a time (except for the cash which was previously brought to Russia by such individuals) subject to customs declaration;

- Foreign currency and cheques (including travel cheques) denominated in foreign currency can be sold and purchased in Russia only through authorized banks;

41

- Operations in foreign currency or in Russian rubles between non-residents on the Russian territory must be conducted only through accounts with authorized banks;

- Currency operations in Russian rubles between non-residents outside the Russian territory are not allowed; and

- Bank transfers of Russian rubles abroad by non-residents and residents are not generally possible.

*The Banking System.* In addition to being ill-developed, the banking system in Russia and the CIS is subject to two main risks: first, the insolvency of a bank due to concentrated debtor risk and, second, the effect of inefficiency and fraud in bank transfers. In addition, banks have not developed the infrastructure to channel domestic savings to companies in need of finance who thereby can experience difficulty in obtaining working capital.

*Criminality.* Diverse criminal groups often succeed in extorting protection money from companies. Fraud, particularly when coupled with significant bad debtors, may be the cause of business failure. A company's management may be bribed or otherwise pressurized into defrauding their company.

**Management Risks**

*Use of Outside Consultants.* The Investment Manager may engage outside consultants to assist it in its research activities. Such consultants may act as consultants for other managers, funds and accounts and, accordingly, may have conflicts of interest in allocating their time and activity between the Fund and other entities. Additionally, some of the outside consultants may be employed by or hold senior level executive positions at companies or in industries in which the Fund may invest or may be involved in trials relating to such companies. Such outside consultants may be also be subject to confidentiality obligations to their employers or trial sponsors and may violate such obligations if they elect to consult the Investment Manager on issues relating to such companies, industries or trials. As such, the Investment Manager will undertake its best efforts to avoid any discussions with such outside consultants that might give rise to such consultants' violations of their contractual and fiduciary obligations to their clients or employers or other impropriety or the appearance of impropriety. Finally, the performance of the Fund may be negatively affected in the event any of the outside consultants upon which the Investment Manager relies in making its investment decisions for the Fund or any service providers that employ outside consultants terminate their arrangements with the Fund or are otherwise unavailable.

*Limitations on the Directors' and The Investment Manager's Liability and Indemnification.* Pursuant to the Fund's Articles of Association, all current and former Directors will be indemnified out of the assets of the Fund from and against all actions, proceedings, costs, charges, losses, damages and expenses which they or any of them shall or may incur or sustain by reason of any act done or omitted in or about the execution of their duties provided that such Director acted honestly and in good faith with a view to the best interests of the Fund and had no reasonable cause to believe that his conduct was unlawful.

42

The U.S. federal and state securities laws and ERISA impose liabilities under certain circumstances on persons who act in good faith and therefore nothing in the Articles of Association will waive or limit any rights the Fund may have against the Investment Manager under such laws.

The Advisory Agreement contains similar provisions with respect to the liability of the Investment Manager and the Investment Adviser to the Fund and with respect to indemnification. See *"Certain Provisions of the Articles of Association – Directors' Liability; Indemnification"* and *"Management – The Investment Manager and The Investment Adviser."*

*Management Fee and Performance Allocations.*  The Fund pays the Investment Manager a quarterly Management Fee and the Investment Adviser will be allocated an annual Performance Allocation.  See *"Management – Compensation of The Investment Manager."*

As a result of these fees, the returns realized by the Shareholders from the Fund's activities may be substantially less than the returns the Shareholders would realize from engaging in the same activities directly, if they were able to make such investments directly without investing in the Fund.  The Performance Allocation also may create an incentive for the Investment Manager, an affiliate of the Investment Adviser, to make investments that are riskier or more speculative than would be the case in the absence of a financial incentive to the Investment Adviser based on performance of the Fund.

*No Dividends.*  The Fund does not intend to pay any dividends to the Shareholders, but intends to reinvest substantially all of the Fund's income and gain.  Cash that might otherwise be available for distribution is also reduced by payment of Fund obligations and expenses (including fees and expense reimbursements payable to the Investment Manager), and establishment of appropriate reserves.  See *"Certain Provisions of the Articles of Association – Dividends."*

*Limited Ability to Liquidate an Investment in the Shares.*  There are significant restrictions on a Shareholder's right to redeem all or part of its Shares, transfer its Shares and pledge or otherwise encumber its Shares, especially in connection with the Fund's investments in the Special Investments.  Special Investments, which may represent a substantial portion of the Fund's assets, cannot be redeemed by Shareholders until they are disposed of or are deemed to have been disposed of by the Fund (including if, in the sole discretion of the Investment Manager, they no longer qualify as Special Investments).  Except with respect to Shares representing Special Investments, each Shareholder has the right to redeem all or a portion of its Shares (i) as of the close of business on the last Business Day of each calendar quarter following the expiration (or the waiver by the Fund, in accordance with the terms hereof) of the Lock-Up Period, and (ii) on any other date determined by the Directors in their sole and absolute discretion.  Requests for redemptions, which are irrevocable without the approval of the Directors, must be received by the Fund in writing at least 90 calendar days before the proposed Redemption Date.  The Directors, in their sole and absolute discretion, may waive these requirements.  Net Asset Values at a Redemption Date may vary significantly from those at the time an irrevocable redemption request is submitted; a Shareholder will bear the risk of that variance.  See *"Redemption of Shares."*

43

In addition, Shares may not be transferred or pledged except in compliance with significant restrictions on transfer as required by federal and state securities laws and as provided in the Articles of Association. The Articles of Association do not permit a Shareholder to transfer or pledge all or any part of its Shares to any person without the prior written consent of the Directors, the granting of which is in the Directors' sole and absolute discretion. See *"Certain Provisions of the Articles of Association – Transferability of Shares."*

The Fund also has the discretion to deliver redemption proceeds in securities rather than cash. These limitations, taken together, will significantly limit a Shareholder's ability to liquidate an investment in the Fund quickly. As a result, an investment in the Fund would not be suitable for an investor who needs liquidity. See *"Redemption of Shares."*

*Suspension of Redemption and Deferment of Redemption Proceeds.* The Directors may, in their sole and absolute discretion, in certain circumstances declare a suspension of the determination of the valuation of the Fund's property or Shares or the redemption of Shares, in whole or in part. In addition, if redemption requests in respect of a particular Redemption Date exceed 12.5% of the Fund's Net Asset Value or such other (smaller or larger) amount that the Directors, in their sole and absolute discretion, determine would cause a material adverse effect on the Fund, the Directors may suspend or limit such redemptions in such manner and for such period as the Directors, in their sole and absolute discretion, determine. See *"Certain Provisions of the Articles of Association – Suspension of Determination of Net Asset Value, Subscriptions and Redemptions."*

*Effect of Substantial Redemptions.* Substantial redemptions by Shareholders within a short period of time could require the Fund to liquidate its investments more rapidly than would otherwise be desirable, possibly reducing the value of the Shareholders' assets and/or disrupting the Fund's investment strategies. Reduction in the Fund's size could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Fund's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

Tax Risks

*General.* Tax laws are subject to change, and tax liabilities could be incurred by investors as a result of changes thereto. Therefore, investors should consult their own tax advisers to determine the tax consequences of an investment in the Fund, especially in light of their particular financial situations.

*Taxation of Non-U.S. Shareholders.* Unless the Fund engages in a trade or business within the United States, none of the income it earns (except as noted below) or gains it realizes will subject a non-U.S. Shareholder to U.S. federal income tax. The Investment Manager does not intend to have the Fund engage (directly or indirectly) in a trade or business, or enter into any relationship that would be deemed to be a trade or business, within the United States. However, payments to the Fund from U.S. sources of any U.S.-source dividends and of any interest, including interest on cash held in trading accounts, that is not "portfolio interest" (as described under *"Taxation — U.S. Federal Income Taxation — Taxation of the Fund"*) will be subject to a 30% U.S. federal withholding tax, or such lower rate of tax as may be available under an applicable tax treaty

between the United States and the jurisdiction in which a non-U.S. Shareholder is resident. That tax will reduce the total return to the Fund and its Shareholders. The Fund expects that substantially all of its income from U.S. sources will be portfolio interest or gains from the sale of property. Special rules may apply to a Non-U.S. Shareholder that (1) has an office or other fixed place of business in the United States to which such a dividend or gain is attributable, (2) is a former citizen or resident of the United States, a controlled foreign corporation of U.S. persons, a foreign insurance company that holds Shares in connection with its U.S. business, a passive foreign investment company, or a corporation that accumulates earnings to avoid U.S. federal income tax or (3) in the case of an individual, is present in the United States for 183 days or more in the year of such sale, exchange or redemption and certain other requirements are met. These persons in particular are urged to consult their U.S. tax advisors before investing in the Fund. See "Taxation – Taxation of Non-U.S. Shareholders."

*Unrelated Business Taxable Income.* A tax-exempt U.S. Shareholder will not be subject to U.S. federal income tax on its share of the Fund's income or gains such Shareholder recognizes on the sale, exchange or redemption of its Shares, unless that income or those gains constitute UBTI. Because the Fund is classified for federal tax purposes as a partnership and because the Fund may use leverage in both its securities and derivatives trading, a tax-exempt Shareholder's allocable share of the Fund's income may constitute UBTI. In addition, a tax-exempt U.S. Shareholder's gain on the sale, exchange or redemption of its Shares may constitute UBTI if it incurs debt to acquire its Shares, thus making the Shares "debt-financed property." See *"Taxation — U.S. Federal Income Taxation — Taxation of Tax-Exempt U.S. Shareholders."*

*U.S. Federal Taxation of Taxable U.S. Shareholders.* Because the Fund is treated as a partnership for U.S. federal income tax purposes, a Taxable U.S. Shareholder will be subject to U.S. federal tax on its share of the Fund's income. Taxable U.S. Shareholders will also be subject to complex reporting requirements. See *"Taxation — U.S. Federal Income Taxation — Taxation of Taxable U.S. Shareholders."*

THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE ENUMERATION OR EXPLANATION OF THE RISKS INVOLVED IN AN INVESTMENT IN THE FUND.   OFFEREES SHOULD READ THE ENTIRE MEMORANDUM AND CONSULT WITH THEIR OWN ADVISORS BEFORE DECIDING TO PURCHASE SHARES.

## POTENTIAL CONFLICTS OF INTEREST

The Investment Manager and the Investment Adviser are accountable to the Fund as fiduciaries and, consequently, must exercise good faith and integrity in handling the business of the Fund. Nevertheless, in the conduct of such business, conflicts may arise between the interests of the Investment Manager and the Investment Adviser and those of investors, and you should be aware of these conflicts of interest before investing. The Investment Manager, the Investment Adviser, the Administrator, the Custodian and their respective affiliates, which shall be deemed to include, in each case, their respective officers, directors, employees and entities owned by any of the aforementioned parties may face certain actual or potential conflicts of interests in relation to the Fund. These conflicts include, but are not limited to, the following:

*No Obligation of Full-Time Service.* Neither the Investment Manager, the Investment Adviser, nor Mr. Daniloff has any obligation to devote their full time to the business of the Fund. They are only required to devote such time and attention to the affairs of the Fund as they decide is appropriate and they may engage in other activities or ventures, including competing ventures and/or unrelated employment, which result in various conflicts of interest between such persons and the Fund. In particular, Mr. Daniloff devotes a portion of his time to his responsibilities to the Investment Manager and the Investment Adviser and other investment vehicles managed by the Investment Manager.

*Other trading by the Investment Manager and the Investment Adviser.* The Investment Manager and the Investment Adviser and their members, partners, shareholders, officers, employees, agents and affiliates (collectively referred to herein as the "Affiliated Parties") may conduct any other business, including any business within the securities industry, whether or not such business is in competition with the Fund. Without limiting the generality of the foregoing, any of the Affiliated Parties may act as investment adviser or investment manager for others, may manage funds, separate accounts or capital for others and may serve as an officer, director, consultant, partner or stockholder of one or more investment funds, partnerships, securities firms or advisory firms, all of which may have substantially similar investment programs and methods of operation to those of the Fund. Such other entities or accounts may also have investment objectives or may implement investment strategies similar or different to those of the Fund, but the performance of such entities and accounts may diverge from that of the Fund. In addition, such entities and accounts may have negotiated different engagement (including liquidity) terms with the Investment Manager or its affiliates and may have access to additional trading information and supporting analytics as relating to the Investment Manager's investment strategies, which could affect their performance.

The Affiliated Parties may, through other investments, including other investment funds, have interests in the securities in which the Fund invest as well as interests in investments in which the Fund do not invest. The Affiliated Parties may give advice or take action with respect to such other entities or accounts that differs from the advice given with respect to the Fund.

*Trade Allocation.* To the extent legally permissible, the Affiliated Parties are authorized to combine purchase or sale orders on behalf of the Fund together with orders for other funds and accounts managed by the Affiliated Parties and allocate the securities or other assets so purchased or sold, on an average price basis, among such accounts. To the extent a particular investment is suitable for the Fund and other clients of the Affiliated Parties, such investments will be allocated among the Fund the other clients of the Affiliated Parties *pro rata* based on assets under management and/or the objectives and investment guidelines thereof, or in some other manner that the Affiliated Parties determine is fair and equitable under the circumstances to all clients, including the Fund. There may be instances (such as when orders are placed with more than one broker, or, if an order cannot be fully executed under prevailing market conditions), that make it impossible for the Affiliated Parties to average the prices paid. In this case, the Affiliated Parties will allocate the filled orders in an equitable manner. In these circumstances, each account (including the Fund) may pay, in connection with the acquisition of securities by more than one account, the average price per unit acquired, which may be higher than if it had acted alone.

46

*Lack of arms-length negotiation.*  The fees payable by the Fund to the Investment Manager and the Investment Adviser were determined by the Investment Manager and the Investment Adviser and were not arrived at by "arms-length" negotiation.

*Other activities of Directors, Administrator, Custodian and brokers.*  The Directors, the Administrator, the Custodian and any broker appointed by the Fund, may from time to time also act as director, administrator, custodian or prime broker to, or be otherwise involved in, other collective investment schemes which have similar investment objectives to those of the Fund or may otherwise provide discretionary fund management or ancillary administration, or brokerage services to investors with similar investment objectives to those of the Fund.  It is, therefore, possible that any of them may, in the course of their business, have potential conflicts of interests with the Fund.  The Directors believe that each will at all times have regard in such event to its obligations to act in the best interests of the Shareholders of the Fund so far as practicable, having regard to its obligations to other clients, when undertaking any investments where conflicts of interests may arise and they will endeavor to resolve such conflicts fairly.  In addition, members, principals, employees or affiliates of the Investment Manager and the Investment Adviser may serve and receive compensation as directors of companies in which the Fund may invest.  The Fund will not be entitled to receive any portion of such director compensation paid to members, principals, employees or affiliates of the Investment Manager and the Investment Adviser, which may give rise to conflicts of interests in allocating the Fund's assets to companies for which members, principals, employees or affiliates of the Investment Manager and the Investment Adviser act as directors.

*Personal Trading by the Investment Manager, the Investment Adviser and Affiliates.*  The Investment Manager, the Investment Adviser and their principals and affiliates may make trades and investments for their own accounts.  In these accounts, they may use trading and investment methods that are similar to, or substantially different from, the methods used by them to direct the Fund's account.  The records of these personal accounts will not be made available to Shareholders.

*Allocation of management time and services.*  The Fund will not have independent management or employees and will rely on the Investment Manager for investment management.  The Investment Manager believes it has sufficient resources to discharge its responsibilities to the Fund.  However, conflicts of interest may arise in allocating management time, services or functions between the Fund and other entities to which the Investment Manager provides services.  The principals of the Investment Manager and its affiliates will devote such time to the Fund as the Investment Manager determines appropriate.

*Directors affiliated with Investment Manager and the Administrator.*  Elliot Daniloff is a Director of the Fund and the sole principal of the Investment Adviser and the Investment Manager. Peter Hughes is a Director of the Fund and is also affiliated with the Administrator. Thus, they may have a conflict between their duties as Directors and their financial interest in the Investment Manager and the Investment Adviser or the Administrator.  The Directors will be involved in various other ventures and might have similar conflicts.  There are no existing or proposed service contracts between any Director and the Fund.  If a conflict of interest arises, the Directors will endeavor to ensure that the conflict is resolved fairly.

*Use of Third Party Marketers.*  The Investment Manager and the Investment Adviser may enter into fee sharing arrangements with third party marketers or solicitors who refer investors to the Fund.  Such third party marketers may have a conflict of interest in advising prospective investors whether to purchase or redeem Shares.

*Soft Dollars and Directed Brokerage.*  The Investment Manager may be offered non-monetary benefits or "soft dollars" by brokers to induce the Investment Manager to engage such brokers to execute securities transactions on behalf of the Fund.  These soft dollars may take the form of research and other services and may be available for use by the Investment Manager, the Investment Adviser or their affiliates in connection with transactions in which the Fund does not participate.  Brokers may also solicit or refer investors to invest in the Fund.  The availability of these benefits may influence the Investment Manager to select one broker rather than another to perform services for the Fund.  The Investment Manager intends to use its best efforts to assure either that the fees and costs for services provided to the Fund by such brokers are reasonable in relation to the fees and costs charged by other equally capable brokers not offering such services or that the Fund also will benefit from the services.

*Diverse Shareholders.*  The Shareholders may include taxable and tax-exempt entities and persons or entities resident of or organized in various jurisdictions.  As a result, conflicts of interest may arise in connection with decisions made by the Investment Manager that may be more beneficial for one type of Shareholder.  In making such decisions, the Investment Manager intends to consider the investment objectives of the Fund as a whole, not the investment objectives of any Shareholder individually.

*No independent counsel.*  K&L Gates LLP and Mourant Ozannes represent the Investment Manager, the Investment Adviser and the Fund.  The Fund does not have counsel separate and independent from counsel to the Investment Manager and the Investment Adviser.  The Investment Manager and the Investment Adviser may, in the future, retain additional counsel for certain matters separate from counsel to the Fund.  Neither K&L Gates LLP nor Mourant Ozannes represents investors in the Fund.  No independent counsel has been retained to represent investors in the Fund.

## PLAN OF DISTRIBUTION; SUITABILITY STANDARDS

### Plan of Distribution

The Shares being offered hereby will not be registered under the 1933 Act in reliance on the exemption from registration provided by either Regulation D or Regulation S.

The Fund has an authorized share capital of US$50,000 divided into 49,999,000 redeemable, participating, limited voting Shares of US$0.001 par value each and 1,000 voting, non-participating, non-redeemable shares of US$0.001 par value ("Founder Shares").  The Founder Shares are held by the Investment Manager.  In addition, in order to implement the "Performance Allocation," the Fund will also issue "Allocation Class Shares" (as such term is defined the Articles of Association).  The Allocation Class Shares will be held solely by the Investment Adviser and will be allocated the Performance Allocation.  In order to accomplish the foregoing, at the end of each Fiscal Year, the Fund will allocate to the Allocation Shares of the Investment

Adviser from each Series of each Class of Shares an amount equal to the Performance Allocation payable for such Fiscal Year.

The Shares in the Fund are primarily offered in two classes – Class A and Class B.

Class B Shares are available to qualified investors that are Restricted Persons and Class A Shares are available only to other qualified investors; the rights and obligations of the Classes are identical except with respect to their participation (through their investment in the Fund) in "new issues" (*i.e.*, equity securities that are issued in an initial public offering). Unless an exemption is available, Shares in the Restricted Class (Class B) will not participate in any new issue investment made by the Fund.

In addition, the Fund will issue Class R and Class S Shares in respect of Special Investments. If the Fund purchases Special Investments, those Shareholders who are Shareholders on the date the particular Special Investment is purchased will participate in that Special Investment by having the relevant number of Class B or Class A Shares (as the case may be) redeemed and by being issued with a corresponding number of Class R or Class S Shares (as the case may be), as further detailed under *"Certain Provisions of the Articles of Association – Share Capital"* below. "Special Investments" are private or restricted securities that carry substantial risks, the value of which are not readily or reliably ascertainable and/or which have a long-term investment horizon.

Within each Class, Shares are offered in Series. A new Series of Shares of each Class may be issued to each investor on each date that Shares are purchased. The Fund intends to commence operations on November 1, 2008, although in the Directors' discretion it may commence operations at a later time. Once the Fund commences its operations, shareholders in the Fund may be admitted as of the opening of business (9 a.m. Eastern Time) on the first day of a month at the subscription price per Share of each Series of $1,000. The Fund reserves the right to discontinue accepting any initial or additional subscription from its existing or new investors at any time. Proceeds received by the Fund from the sale of Shares will be used by the Fund in its investment program.

Each initial and additional investment by a Shareholder shall separately be subject to a one year "lock-up" period during which such investment may not be redeemed by the Shareholder (the "Lock-Up Period"). In addition, the Directors may issue further classes or sub-classes of Shares with different lock-up periods and related fee or other arrangements.

The Fund may issue additional Classes from time to time.

To purchase Shares in the Fund, a Subscriber with the proper qualifications (including those for participating in the Fund's Un-Restricted Series or Restricted Series) should date, complete and sign the Subscription Agreement. The Subscription Agreement requires the Subscriber to indicate the amount of its subscription, which must be at least US$1 million. The Directors may, in their sole and absolute discretion, accept a smaller amount; however, in no event will the minimum initial subscription amount be less than US$100,000. Each subsequent investment by a Shareholder must be made in the minimum amount of US$500,000 although the Directors may, in their sole and absolute discretion, accept a smaller amount. The Subscription Agreement also

requests information from the Subscriber to determine whether the investor meets the Fund's suitability standards.  See *"Suitability Standards."*

A Subscriber must return a completed copy of the Subscription Agreement, with all signature pages executed, and will be required to provide at least two Business Days' notice to the Fund of its intent to purchase Shares (unless such notice is waived by the Fund).

Subscription Agreements may be sent by facsimile at the investor's risk.  If a Subscription Agreement is sent by facsimile, the original Subscription Agreement must also be sent by mail or internationally recognized courier.  Failure to provide the original Subscription Agreement or failure to complete fully the Subscription Agreement may, in the Directors' sole and absolute discretion, result in the cancellation of an investor's subscription.

Because of money laundering concerns, the Fund will not accept investments made in cash.  For this purpose, cash includes currency, cashier's checks, bank drafts, travelers checks, and money orders.  An investor should deliver the full amount of its subscription by wire transfer of immediately available funds in U.S. dollars to the Fund's account as set forth in the Subscription Agreement or as otherwise agreed to by the Directors.  Upon the Fund's and the Administrator's acceptance of the subscription by the execution of the signature pages of the Subscriber's Subscription Agreement and entry of the Subscriber into the register of members of the Fund, the Subscriber will become a Shareholder.

The Subscription Agreement is irrevocable but is conditional upon acceptance by the Fund and the Administrator. The Directors have the full right to accept or reject a subscription in their sole and absolute discretion and to reduce the minimum subscription amount.  The Directors also have the right to cease accepting subscriptions at any time without notice.  If an investor's subscription is rejected, the Fund will promptly return any funds provided by the investor, without interest, by check or by wire transfer to the account designated from which it came.

## Suitability Standards

The Shares have not been registered under the 1933 Act and, therefore, cannot be sold unless they are subsequently registered under the 1933 Act or an exemption from registration is available.  The Articles of Association also place substantial limits on the transfer of Shares, including that the Shares may not be sold or transferred without the consent of the Directors (which they may grant or deny in their sole and absolute discretion), and substantially limit the ability of Shareholders to redeem their Shares (in particular, with respect to Special Investments which may represent a material and substantial portion of the Fund's portfolio). See *"Certain Provisions of the Articles of Association – Transferability of Shares."*  Therefore, each Shareholder must bear the economic risk of its investment in the Fund for an indefinite period of time.  It is not contemplated that any registration under the 1933 Act will ever be effected or that certain exemptions provided by rules promulgated under the 1933 Act will be available.

Each Subscriber will be required to represent that the Shares are being acquired for its own account, for investment, and not with a view to resale or distribution.  The Shares are suitable investments only for sophisticated investors for whom an investment in the Fund does not constitute a complete investment program, who fully understand and are willing to assume the

risks involved in the Fund's specialized investment strategy, and who have the financial resources necessary to bear the potential loss of their entire investment in the Shares.

Each investor in the Fund that is a "United States person" (as defined in the Code) must be an "accredited investor," as defined in Regulation D under the 1933 Act and a "qualified purchaser," as defined under the 1940 Act.

Each other investor (1) must be a "Non-United States person" within the meaning of CFTC Rule 4.7 and (2) must not be a "U.S. person," as defined in Regulation S under the 1933 Act or a "United States person" as defined in the Code. Detailed definitions of "accredited investor," "qualified purchaser" and "United States person" are contained in the Subscription Agreement.

The Fund is not registered as an investment company under the 1940 Act in reliance on Section 3(c)(7) of the 1940 Act. Accordingly, the provisions of the 1940 Act (which, among other matters, require investment companies to have disinterested directors, require securities held in custody to at all times be individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company and regulate the relationship between the adviser and the investment company) will not be afforded to the Shareholders.

Each Subscriber is urged to consult with its own advisers to determine the suitability of an investment in Shares, and the relationship of such an investment to the Subscriber's overall investment program and financial and tax position. Each Subscriber will be required to represent that, after all necessary advice and analysis, its investment in Shares is suitable and appropriate in light of the foregoing considerations.

### Placement Agents and Placement Fee

The Directors may select one or more placement agents for the Fund from time to time and determine fees or compensation to such agents as appropriate. The Investment Manager and the Investment Adviser may pay a portion or all of the Management Fees and Performance Allocations, respectively, it receives from the Fund to a placement agent, its affiliates or its registered representatives.

## MANAGEMENT

### The Investment Manager and The Investment Adviser

The Fund's investment manager is ED Capital Management, LLC, a Delaware limited liability company.

ED Capital, LLC (the "Investment Adviser"), a Delaware limited liability company, is the investment adviser to the Fund. While the Investment Manager will be primarily responsible for the implementation of the Fund's investment strategy, the Investment Adviser will assist the Investment Manager with certain research and administrative responsibilities.

Pursuant to an Advisory Agreement with the Fund and the Investment Adviser, the Investment Manager implements the Fund's investment strategy.

The Advisory Agreement provides that, to the fullest extent permitted by applicable law, including ERISA, the Investment Manager, the Investment Adviser and their officers, members, employees, affiliates and agents will not be liable to any of the Shareholders or the Fund for any act or omission performed or omitted by such persons in good faith on behalf of the Fund and in a manner reasonably believed by such persons to be within the scope of the authority granted to such persons by the Advisory Agreement, except for acts or omissions constituting bad faith, Gross Negligence, willful misconduct or reckless disregard of such persons' obligations and duties to the Fund. In addition, the Advisory Agreement provides that, to the fullest extent permitted by law, including ERISA, the Investment Manager, the Investment Adviser, their officers, members, employees, affiliates and agents will be indemnified against and held harmless from any and all liabilities, judgments, obligations, losses, damages, claims, actions, suits, or other proceedings (whether under the 1933 Act, the CEA, or otherwise, civil or criminal, pending or threatened, before any court or administrative or legislative body, and as the same are accrued, in which such persons may be or may have been involved as a party or otherwise or with which it, he, or she may be or may have been threatened, while in office or thereafter) and reasonable costs, expenses, and disbursements (including legal and accounting fees and expenses) of any kind and nature whatsoever (collectively, "Losses") that may be imposed on, incurred by, or asserted at any time against such person (whether or not indemnified against by other parties) in any way related to or arising out of the Advisory Agreement, the administration of the Fund's property, or the action or inaction of such person under the Advisory Agreement. However, no such person is entitled to indemnity for Losses with respect to any matter as to which such person is finally adjudicated in any such action, suit, or other proceeding, or otherwise by a court of competent jurisdiction, to have committed an act or omission involving his, her or its own bad faith, willful misconduct, Gross Negligence, or reckless disregard of his, her or its obligations and duties under the Advisory Agreement. The federal and state securities laws impose liabilities under certain circumstances on persons who act in good faith, and therefore nothing in the Advisory Agreement waives or limits any right the Fund may have against the Investment Manager and the Investment Adviser under those laws. No Shareholder will have or incur any personal liability for any indemnity provided such persons under either Advisory Agreement.

The Advisory Agreement will continue until the earliest of such time as (1) the Fund is liquidated, (2) the parties mutually agree to terminate the Advisory Agreement or (3) the Fund, the Investment Manager or the Investment Adviser terminates the Advisory Agreement upon 30 days' prior written notice to the other parties.

The sole principal of the Investment Manager and the Investment Adviser is Elliot Daniloff. Currently the sole manager of the Investment Adviser is Elliot Daniloff.

The biography of the principal of the Investment Manager and the Investment Adviser is set forth below:

*Elliot Daniloff.* Elliot Daniloff is the founder and the managing partner of the Investment Manager, a New York based capital management firm, specializing in Russian and CIS equity and real estate markets and a director of the Investment Adviser. Prior to founding the Investment Manager, Mr. Daniloff held a sales/trading position at a New York office of CentreInvest, a Russian-based brokerage firm. Before that he was employed by several major brokerage firms in New York, including Salomon Smith Barney, UBS-Painewebber and Morgan

Stanley. At these companies Mr. Daniloff worked on various desks where he gained experience trading different strategies in fixed income, equity and convertible securities, as well as derivatives instruments.

Mr. Daniloff received a Bachelor of Business Administration in Finance from the Lubin School of Business at Pace University in New York, NY, in 1999. During the summer of 1998, Mr. Daniloff attended Richmond University in London, England.

## Compensation of The Investment Manager and The Investment Adviser

*Performance Allocation.* The Fund will allocate to the Investment Adviser a Performance Allocation for each Series of each Class generally as of the end of each Fiscal Year. The Performance Allocation for a Series for a Fiscal Year is equal to 20% of the amount, if any, by which the increase in Net Asset Value per Series for that Fiscal Year exceeds the aggregate amount in the Loss Recovery Account for the Series as of the beginning of that Fiscal Year. The Fund's Fiscal Year is the calendar year and the last day of each Fiscal Year shall be the last Business Day of such calendar year. No Performance Allocation shall be made to the Investment Adviser with respect to Special Investments until their disposition or other determination by the Investment Manager, in its sole discretion, that the underlying investments no longer constitute Special Investments.

The Performance Allocation will be made at the Fund level and will be implemented by the issuance of special allocation class shares of US$0.001 par value per share (the "Allocation Class Shares") by the Fund to the Investment Adviser. The Performance Allocation will be allocated to the Allocation Class Shares. Such Allocation Class Shares shall participate in the profits and losses of the Fund and shall not be subject to the Management Fee or Performance Allocation set forth in this Memorandum.

The Allocation Class Shares will be issued initially at US$0.001 par value per share and any subsequent subscriptions of such Allocation Class Shares may at the discretion of the Directors be issued in separate Series at par value per share, each subject to such other price as determined by the Directors in their sole and absolute discretion. The Performance Allocation attributable to the Allocation Class Shares will remain at risk in the Fund. Such Allocation Class Shares may be redeemed at the option of the Investment Adviser or the Directors may pay dividends in respect of the Allocation Class Shares as determined by the Directors in their sole and absolute discretion.

In order to calculate the Performance Allocation, a "Loss Recovery Account" will be established for each Series of each Class, the opening balance of which will be zero. As of the close of business on the last Business Day of each Fiscal Year, the balance in each Series' Loss Recovery Account will be (1) decreased by any increase in Net Asset Value per Series of the Series for that Fiscal Year and (2) increased by any decrease in Net Asset Value per Series of the Series for that Fiscal Year. The balance in a Loss Recovery Account will never be reduced below zero. If a Shareholder redeems Shares of a Series when there is a balance in that Series' Loss Recovery Account, that balance will be reduced in the proportion that the Net Asset Value of the redeemed

Shares bears to the aggregate Net Asset Value per Series of that Series, thereby proportionately reducing the amount that must be recouped before a Performance Allocation may be allocated to the Investment Adviser with respect to the remaining Shares of the Series.

If a Shareholder redeems Shares of a Series of a Class other than as of the close of business on the last Business Day of a Fiscal Year, the date of such redemption will be treated as the last Business Day of the Fiscal Year for such Series. Accordingly, a Performance Allocation will be calculated on the Shares to be redeemed and the redemption proceeds payable to such Shareholder will be reduced by the amount of the Performance Allocation allocable to such Shares, as well as by the accrued Management Fee payable on such Shares. If a Shareholder redeems Shares of more than one Series, the redemption proceeds from each Series will be reduced in the same manner, on a per Series basis.

If the Advisory Agreement is terminated, the Fund will allocate to the Investment Adviser the Performance Allocation for each Series of each Class for the year in which the termination occurs as though the date of termination were the last Business Day of a Fiscal Year.

The Investment Adviser may redeem all or a portion of its Allocation Class Shares as of the last Business Day of each Fiscal Year or such other day as determined by the Directors in their sole and absolute discretion. In the event that the Investment Adviser ceases to act as investment advisor or a redemption of all of the Investment Adviser's Allocation Class Shares is made prior to the last Business Day of a Fiscal Year, the Performance Allocation will be computed as though the termination date or redemption date were the last Business Day of the Fiscal Year.

The Directors may, with the consent of the Investment Manager and the Investment Adviser, waive all or any portion of the Performance Allocation with respect to any Shares in whole or in part, including with respect to Shares held by employees of the Investment Manager and/or the Investment Adviser, either through the issuance of a separate Class or through a rebate of the Performance Allocation.

*Management Fee.* The Investment Manager will receive a quarterly Management Fee equal to 0.5% (2%, annually) of the Net Asset Value of Shares, adjusted for subscriptions made during the calendar quarter. The Management Fee shall be payable by the Fund quarterly and in advance, calculated as of the first day of each quarter. A pro rata Management Fee will be charged to Shareholders on any amounts permitted to be invested during any quarter. The Management Fee will be paid before deduction of any Performance Allocation allocable for the year and regardless of whether any profits are achieved.

The Class R and Class S Shares related to Special Investments shall generally be included in the Net Asset Value of the Fund and shall be valued at the fair market value for the purposes of the Management Fee calculation, other than those Class R and Class S Shares held by a Shareholder who has otherwise redeemed all of its Class B and/or Class A Shares in the Fund, which will be excluded from the Net Asset Value of the Fund for this purpose and with respect to which no Performance Allocation will be allocated until their disposition or other determination by the Investment Manager, in its sole discretion, that the underlying investments no longer constitute Special Investments; however, at the sole discretion of the Board of Directors a reserve could be withheld from the Redemption Price of the Class B and/or Class A Shares redeemed in order to

54

pay the Management Fees with respect to the Class R and/or Class S Shares that remain with the Fund.

The Directors may, in their sole and absolute discretion, but with the consent of the Investment Manager, waive the payment of all or part of the Management Fee payable with respect to any Shareholder for any quarter the Directors determine is appropriate, including with respect to Shareholders who are employees of the Investment Manager, either through the issuance of a separate Class or through a rebate of the Management Fee.

## Fund Expenses

The Fund will pay its own start-up, offering and organizational expenses, such as the cost of preparing the Fund's Articles of Association, the expenses incurred in offering and selling Shares, and other legal, accounting, and administrative, government filing and printing and mailing fees and expenses related thereto. On an ongoing basis, the Fund will bear its ongoing transaction (e.g., brokerage commissions and custody expenses), investment (including any direct or indirect costs of investing potential investments or maximizing return on existing investments), consulting, research and statistical services, administrative, legal, tax preparation, compliance and accounting fees and expenses, expenses related to the purchase and sale of Special Investments, any extraordinary expenses (e.g., litigation expenses) and any expenses for services that the Shareholders require the Directors and/or the Investment Manager to obtain. The Fund will also pay the fees and expenses of its prime brokers and the Administrator. It should be noted that any Fund expense relating specifically to a particular Special Investment will be charged solely to the Series of Class R and/or Class S Shares relating thereto, as determined by the Fund, in its discretion. The Investment Manager will be responsible for and will pay all overhead expenses of an ordinary and recurring nature such as rent, supplies, secretarial expenses, stationery, charges for furniture and fixtures, employee insurance, payroll taxes and compensation of employees.

The Investment Manager and the Investment Adviser (if applicable) will be reimbursed for any expenses it bears on the Fund's behalf as soon as reasonably practicable.

## Directors

The Fund has a Board of Directors, consisting of Elliot Daniloff and Peter Hughes, all of whom act in a non-executive capacity. Mr. Daniloff's biography is provided above at *"Management – The Investment Manager and The Investment Adviser"* and Mr. Hughes's biography is as follows:

*Peter Hughes.* Peter Hughes is the Managing Director of Apex Fund Services Ltd., the Administrator, a specialist Management and Administration company which provides management services to the finance industry, specializing in the administration of collective investment schemes and investment holding companies founded in 2003. He qualified as a chartered accountant in 1994 and is a fellow of the Institute of Chartered Accountants in England in Wales. Between 2000 and 2003 he was Chief Financial Officer of FMG Fund Managers Limited and is currently a Board member of FMG Fund Managers Limited. During 1999 he was

55

a financial analyst with Cazenove Fund Management in London and prior to this a group manager with Hemisphere Management Limited in Bermuda.

## The Administrator

The Fund has appointed Apex Fund Services Ltd. as the Fund's Administrator, registrar and transfer agent, under an Administration Agreement. The Administrator will provide the Fund with certain administrative and clerical services, including processing subscription and redemption documents, communicating with Shareholders, providing periodic reports, accepting subscription payments and remitting redemption proceeds, payment of the Fund's expenses, and other day-to-day administrative tasks. The Administrator will also maintain the accounting records of the Fund and will be responsible for the calculation of the Fund's Net Asset Value and Net Asset Value per Share.

Under the Administration Agreement, the Fund has agreed to indemnify the Administrator and its officers, directors, employees and agents from and against any and all liabilities and expenses whatsoever arising out of the actions of the Administrator or such persons pursuant to the Administration Agreement, other than liability and expense arising out of their willful misfeasance, bad faith or Gross Negligence. The Administration Agreement provides that the Fund or the Administrator can terminate the agreement: (i) on giving not less than 90 days' written notice; and (ii) at any time if the Fund or the Administrator goes into liquidation.

## Custodian

The Fund has appointed ING Bank Eurasia (ZAO) as its main custodian (the "Custodian") pursuant to a custody agreement between the Fund and the Custodian (the "Custody Agreement"). The Custodian generally acts as the main custodian of the Fund's securities. Fees under the Custody Agreement are charged separately. In certain instances other brokers who execute transactions for the Fund may maintain custody of the Fund's assets. The Fund may appoint additional custodians of a particular investment or investments of the Fund, should it deem such appointment appropriate.

The Custodian is part of a group of companies which forms the largest financial institution group ING Groep NV registered in the Netherlands. Its overseas branch network provides banking services by offering a full range of products such as deposits, loans, trade finance, foreign exchange and money market activities, custody services, etc. The Custodian has served clients in Russia since November 1993, and received its full banking license from the Central Bank of Russia on September 13, 1994. As a fully licensed commercial bank, the Custodian offers a wide range of services to institutional investors, including foreign exchange, short-term financing and cash management. Currently, the Custodian is by far the largest custodian with over US$73 billion of assets under custody which services more than 550 foreign and domestic clients. The clientele of the Custodian consists of most global custodians and world wide financial institutions present in the market as well as largest local brokers and companies dealing with securities.

The Fund may also utilize the Custodian, its affiliates and other brokers and dealers for the purpose of executing transactions for the Fund. Accordingly, under a separate agreement, the

Custodian may receive brokerage commissions and/or margin interest related to the securities transactions of the Fund. The Fund is not committed to continue its brokerage and custodial relationship with the Custodian for any minimum period, and may enter into brokerage and custodial relationships with other custodians or brokers.

Through this arrangement, the Custodian will provide, among other things, the following clearing, custodial and record keeping services: (i) settlement of transactions; (ii) the transfer of record ownership of securities; (iii) the receipt and delivery of securities purchased, sold; (iv) custody of securities and funds; (v) participating in tender offers, mergers or other corporate reorganizations; and (vi) maintenance of accounts and records for each transaction.

## EXECUTION OF PORTFOLIO TRANSACTIONS

### Brokerage Arrangements

The Investment Manager is responsible for the placement of the portfolio transactions of the Fund and the negotiation of any commissions paid on such transactions. Portfolio securities normally are purchased through brokers on securities' exchanges or directly from the issuer or from an underwriter or market maker for the securities. Purchases of portfolio instruments through brokers involve a commission to the broker. Purchases of portfolio securities from dealers serving as market makers include the spread between the bid and the asked price. The Investment Manager will not commit to provide any level of brokerage business to any broker. The Investment Manager may utilize the services of one or more introducing brokers who will execute the Fund's brokerage transactions through the broker and custodian who will clear the Fund's transactions. See *"Management – Custodian"* above.

Securities transactions for the Fund may be executed through brokers selected by the Investment Manager in its sole discretion and without the consent of the Fund. In placing portfolio transactions, the Investment Manager will seek to obtain the best execution for the Fund, taking into account the following factors: the ability to effect prompt and reliable executions at favorable prices (including the applicable dealer spread or commission, if any); the operational efficiency with which transactions are effected, taking into account the size of order and difficulty of execution; the financial strength, integrity and stability of the broker; the firm's risk in positioning a block of securities; the quality, comprehensiveness and frequency of available research services considered to be of value; and the competitiveness of commission rates in comparison with other brokers satisfying the Investment Manager's other selection criteria.

The Investment Manager is authorized to pay higher prices for the purchase of securities from or accept lower prices for the sale of securities to brokerage firms that provide it with such investment and research information or to pay higher commissions to such firms if the Investment Manager determines such prices or commissions are reasonable in relation to the overall services provided. Research services furnished by brokers may include written information and analyses concerning specific securities, companies or sectors; market, financial and economic studies and forecasts; statistics and pricing or appraisal services; discussions with research personnel; and invitations to attend conferences or meetings with management or industry consultants. The Investment Manager is not required to weigh any of these factors equally. Information so received is in addition to and not in lieu of services required to be

performed by the Investment Manager, and the Management Fee to be received by the Investment Manager and the Performance Allocation to be received by the Investment Adviser, an affiliate of the Investment Manager, are not reduced as a consequence of the receipt of such supplemental research information. Research services provided by broker-dealers used by the Fund may be utilized by the Investment Manager, the Investment Adviser and their affiliates in connection with their investment services for other clients and, likewise, research services provided by broker-dealers used for transactions of other clients may be utilized by the Investment Manager and the Investment Adviser in performing its services for the Fund. Since commission rates are negotiable, selecting brokers on the basis of considerations which are not limited to applicable commission rates may at times result in higher transaction costs than would otherwise be obtainable.

**Soft Dollar Arrangements**

The term "soft dollars" refers to the receipt by an investment manager of products and services provided by brokers, without any cash payment by the investment manager, based on the volume of brokerage commission revenues generated from securities transactions executed through those brokers on behalf of the investment manager's clients.

In addition to research services, the Investment Manager may be offered other non-monetary benefits by broker-dealers that it may engage to execute securities transactions on behalf of the Fund. These benefits may take the form of special execution capabilities, clearance, settlement, online pricing, block trading and block positioning capabilities, willingness to execute related or unrelated difficult transactions in the future, order of call, online access to computerized data regarding clients' accounts, performance measurement data, consultations, economic and market information, portfolio strategy advice, industry and company comments, technical data, recommendations, general reports, efficiency of execution and error resolution, the availability of stocks to borrow for short trades, custody, travel, record keeping and similar services. These other services may also include payment of all or a portion of the Fund's or the Investment Manager's and the Investment Adviser administrative costs and expenses of operation, such as computer hardware and software charges; newswire and quotation equipment and services (*e.g.*, Reuters, Bloomberg, Bridge, First Call, etc.); data processing charges; periodical subscription fees (*e.g.*, The Financial Times, The Wall Street Journal, The New York Times, Investors Business Daily, etc.); computer equipment used for brokerage or research purposes (*e.g.*, computer hardware, software, PDAs, LANs, etc.) and related technical support, repair and maintenance; telephone and facsimile lines and charges and related equipment, installation, repair and maintenance costs; television and cable services used for research purposes; account record-keeping and related clerical services; printing services; messenger services; postal and courier expenses; car service; expenses incurred in connection with investigating and researching issuers of securities and attending research conferences (*e.g.*, airfare, car rentals, taxi fares, conference fees and related expenses, hotel accommodations and meals); economic consulting services; placement fees and other marketing costs; legal and accounting fees; office rent; office equipment (including rental and repair costs) and supplies; utilities (*e.g.*, electricity, gas, oil, water, etc.); taxes; storage; employee compensation and benefits (including medical, dental and worker's compensation insurance); temporary help; employee recruiting services; and other reasonable expenses as determined by the Investment Manager.

The foregoing benefits may be available for use by the Investment Manager and the Investment Adviser in connection with transactions in which the Fund will not participate. The availability of these benefits may influence the Investment Manager to select one broker rather than another to perform services for the Fund. Nevertheless, the Investment Manager's decision on which brokers to utilize will be driven by a concerted striving for "best execution." Also, the Investment Manager will attempt to assure either that the fees and costs for services provided to the Fund by brokers offering these benefits are reasonable in relation to the fees and costs charged by other equally capable brokers not offering such services or that the Fund also will benefit from the services.

The Investment Manager has the option to use "soft dollars" generated by the Fund to pay for the research and non-research related services described above. The products and services available from brokers include both internally generated items (such as research reports prepared by employees of the broker) as well as items acquired by the broker from third parties (such as quotation equipment). Section 28(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), provides a "safe harbor" to investment managers who use soft dollars generated by their advised accounts to obtain investment research and brokerage services that provide lawful and appropriate assistance to the investment manager in the performance of investment decision-making responsibilities. In the event the Investment Manager elects to use its soft dollars for payment of all or a portion of the Investment Manager's administrative costs and expenses of operation, as more fully described above, such uses of soft dollars are not within the safe harbor afforded by Section 28(e) of the Exchange Act. Each Shareholder, by signing the Fund's Subscription Agreement, will be deemed to acknowledge and agree to the Investment Advisor's use of products and services as set forth above when signing the Subscription Agreement.

The use of brokerage commissions to obtain investment research services and to pay for the administrative costs and expenses of the Investment Manager creates a conflict of interest between the Investment Manager and the Fund, because the Fund pays for such products and services that are not exclusively for the benefit of the Fund and that may be primarily or exclusively for the benefit of the Investment Manager or its affiliates. To the extent that the Investment Manager is able to acquire these products and services without expending its own resources (including Management Fees paid by the Fund), the Investment Manager's use of soft-dollars would tend to increase the Investment Manager's profitability.

Nonetheless, the Investment Manager believes that such soft dollar items may provide the Fund with benefits by supplementing the research and services otherwise unavailable to the Fund.

## DETERMINATION OF NET ASSET VALUE

The Net Asset Value of the Fund is calculated by adding the value of its investments, cash, and other assets and subtracting its accrued liabilities and expenses, all determined in accordance with GAAP, except that the Fund's start-up and organizational expenses may be amortized over a period of not more than five years from the commencement of the Fund's operations. The Fund believes that such treatment is more equitable than expensing the entire amount of the Fund's organizational expenses in the Fund's first year of operation, as required by GAAP. Notwithstanding the foregoing, the Fund will limit the amount of start-up and organizational

expenses that it amortizes so that the audit opinion issued with respect to the Fund's financial statements will not be qualified.

The Fund's liabilities and expenses include reimbursements for expenses of the Director(s), the Investment Manager and the Investment Adviser (if applicable), and accrued Management Fees payable by the Fund. See *"Management - Compensation of The Investment Manager and The Investment Adviser."*

Each class of Class R and/or Class S Shares shall be valued at the fair market value for the purposes of calculating the Management Fee until such time as the Special Investments relating to such class shall have been liquidated or disposed of (including if, in the sole discretion of the Investment Manager, they no longer qualify as Special Investments), after which time, depending upon whether the Class R and/or Class S Shareholder still owns Class B or Class A Shares in the Fund, the (i) proceeds shall be distributed to the Shareholder (net of fees and expenses) or (ii) Class R and Class S Shares shall be exchanged for Class B or Class A Shares, respectively.

The Administrator will calculate the Net Asset Value of the Fund and the Net Asset Value of the Shares in each Series thereof as of each Valuation Time. "Valuation Time" means the close of business on (1) the last Business Day of a calendar month, (2) any Redemption Date (as hereinafter defined) and (3) each other date selected by the Directors in their sole and absolute discretion as of which the Fund's Net Asset Value is determined.

The Fund will establish a separate Investment Account for each Class and Series.  The amount of each Investment Account will be calculated by allocating, for accounting purposes, to the Investment Account (which will initially consist of the aggregate Subscription Amounts for Shares of the appropriate Class or Series) its share of income, expenditures, assets and liabilities attributable to the Class or Series, including Performance Allocations and Management Fees. The Net Asset Value per Series of each Series will be equal to the amount in its Investment Account.  The Net Asset Value per Share of a Series will be calculated by dividing the Net Asset Value per Series of that Series by the number of Shares of that Series issued and outstanding as of the date of the calculation.  See *"Certain Provisions of the Articles of Association – Investment Accounts."*

The following general guidelines apply to the determination of the value of the Fund's investments:

(i)     the value of any cash on hand, on loan, on deposit or on call, bills, demand notes, accounts receivable, prepaid expenses, cash dividends and interest declared or accrued and not yet received shall be deemed to be the full amount thereof unless the Directors shall have determined that any such deposit, bill, demand note or account receivable is not worth the full amount thereof in which event the value shall be deemed to be such value as the Directors consider to be the reasonable value;

(ii)    except in the case of any interest in a managed fund to which paragraph (iii) applies and subject as provided in paragraphs (iv) and (v) below, all calculations based on the value of investments quoted, listed, traded or dealt in on any stock exchange, commodities exchange, futures exchange or over-the-counter market shall be made by reference to the

mid-price, which is the mean between the last available bid and ask price on the principal stock exchange for such investments as at the close of business in such place on the day as of which such calculation is to be made. Where there is no stock exchange, commodities exchange, futures exchange or over-the-counter market all calculations based on the value of investments quoted by any person, firm or institution making a market in that investment (and if there shall be more than one such market maker then such particular market maker as the Directors may designate) shall be made by reference to the mean of the latest bid and asked price quoted thereon, provided always that if the Directors in their discretion consider that the prices ruling on a stock exchange other than the principal stock exchange provide in all the circumstances a good faith estimate of fair value in relation to any such investment, they may adopt such prices;

(iii)    subject as provided in paragraph (iv) and (v) below, the value of each interest in any open-ended unit trust or corporation, open-ended investment company or other similar open-ended investment vehicle (a "managed fund") shall be the last published net asset value per unit, share or other interest in such managed fund (where available) or (if the same is not available) a price calculated by aggregating the last published bid price and the last published offer price therefore (excluding any preliminary or initial charge included in such offer price) and dividing the result by two;

(iv)    if no net asset value, bid and offer prices or price quotations are available as provided in paragraphs (ii) or (iii) above (including in respect of Special Investments), the value of the relevant asset shall be determined from time to time in such manner as the Directors shall determine or as required by applicable law;

(vii)    notwithstanding the foregoing, the Directors may, at their absolute discretion, permit some other method of valuation to be used if they consider that such valuation is a good faith estimate of fair value;

(viii)   any value (whether of a security or cash) otherwise than in US dollars shall be converted into US dollars at the rate (whether official or otherwise) which the Directors shall in their absolute discretion deem appropriate to the circumstances having regard, inter alia, to any premium or discount which they consider may be relevant, and to costs of exchange; and

(ix)     where pricing information regarding the underlying investments of the mutual fund is provided to the person calculating the net asset value by any member of the mutual fund family the person calculating the net asset value shall have an independent verification of such pricing information.

If the Directors resolve that the Fund shall issue further classes or series of Shares it is possible that the method of calculating the net asset value may differ for those other classes or series of Shares.

In performing these calculations, the Directors, the Investment Manager, the Investment Advisor, the Administrator and any of their officers, directors, agents or employees shall be entitled to rely on unaudited valuations and reports received from third parties; shall not be responsible for

verifying either the contents or veracity of such valuations and reports; and in no event shall incur any liability or responsibility for any determination made or other action taken or omitted by them in good faith.

The Fund may temporarily suspend the valuation of its property and, in connection therewith, the redemption of Shares in certain circumstances.  See *"Certain Provisions of the Articles of Association – Suspension of Determination of Net Asset Value, Subscriptions and Redemptions."*

## REDEMPTION OF SHARES

Except with respect to Shares representing Special Investments, each Shareholder has the right to redeem all or a portion of its Shares (i) as of the close of business on the last Business Day of each calendar quarter following the expiration (or the waiver by the Fund, in accordance with the terms hereof) of the Lock-Up Period, and (ii) on any other date determined by the Directors in their sole and absolute discretion (each, a "Redemption Date"), at the Redemption Price per Share of the appropriate Series of the appropriate Class.  All redemption fees will be payable to the Fund.  Requests for redemption must be received by the Fund in writing at least 90 calendar days prior to the Redemption Date specified in the redemption request unless such notice is waived by the Directors.

No redemptions will be permitted with respect to any Class R and Class S Shares until the Special Investments relating thereto have been disposed of or are otherwise deemed to have been disposed of (including if, in the sole discretion of the Investment Manager, they no longer qualify as Special Investments).  Furthermore, a Shareholder who has had all of its Class B and Class A Shares, as applicable, redeemed by the Fund shall nonetheless continue to participate in any Class R and Class S Shares it owns relating to Special Investments not yet disposed of or otherwise deemed to have been disposed of (including if, in the sole discretion of the Investment Manager, they no longer qualify as Special Investments); provided, however, that upon such liquidation or disposal, the Shareholder will be paid the proceeds thereof less the payment and/or allocation of (i) the Performance Allocation, if any, owed thereon to the Investment Adviser and (ii) any applicable expenses relating to such Special Investment from the date of the redemption of such Shareholder's last Class A and/or Class B Shares to the date of liquidation or disposal of such Special Investment, including its *pro rata* share of the Fund's operating expenses and the Management Fee.

Redemption Price per Share means in respect of a Series of a Class an amount calculated by dividing (a) the difference between (i) the value of the Investment Account relating to that Series (after making any adjustments thereto referred as discussed herein) on the Redemption Date as of which the redemption is effective and (ii) the amount of any Management Fees, Performance Allocations or expenses not otherwise reflected in the Investment Account by (b) the number of Shares of that Series in issue at that time (including shares of that Series that are to be redeemed at that time).  For the sole purpose of determining the number of Shares of a Series in issue, Shares of that Series that are to be redeemed on the relevant Redemption Date shall be deemed to be in issue until and including the close of business on the applicable Redemption Date.

Each redemption request must be in the minimum amount of US$100,000 or for all of such Shareholder's Shares, if less, and a Shareholder may not make a redemption request for a partial

redemption if, after implementation thereof, it would hold Shares having an aggregate Net Asset Value of less than US$1 million (although the Directors may, in their sole and absolute discretion, permit a smaller redemption or waive the latter requirement). A redemption request must be in the form attached to the Fund's Subscription Agreement or such other form as is acceptable to the Directors and any request received after 5:00 p.m. (Bermuda time) shall treated as if it was received on the next Business Day.

Once sent, a redemption request cannot be revoked without the Directors' consent, which may be withheld in their sole and absolute discretion, unless redemptions are suspended. Payment of redemption proceeds, under normal circumstances, will generally be made in the following installments: (i) 90% of the estimated Redemption Price with respect to all Shares that are being redeemed will be paid within 30 calendar days after the Redemption Date or, in any event, as soon as practicable, upon completion of the computation of the Fund's Net Asset Value by the Administrator and (ii) the balance of the Redemption Price shall be paid, without interest, as soon as practicable upon completion of the Fund's annual audit.

The Fund may, in the Directors' sole and absolute discretion, pay a redemption (in whole or in part) in Redemption-In-Kind Securities held by the Fund on a *pro rata* basis. The amount and type of Redemption-In-Kind Securities will be selected by the Directors in their sole and absolute discretion. If a redemption is paid in Redemption-In-Kind Securities, the redeeming Shareholder will bear transaction costs if and when it sells such Redemption-In-Kind Securities.

The Directors may, in consultation with the Investment Manager but otherwise in their sole and absolute discretion, in certain circumstances declare a suspension of the determination of the value of an Investment Account, the Redemption Price per Share of a Series of a Class, the redemption of any Series of Shares of a Class (including the right to receive redemption proceeds), the subscription for any Series of Shares of a Class and/or extend the period for payment on redemption, in whole or in part. In addition, if redemption requests in respect of a particular Redemption Date exceed 12.5% of the Fund's Net Asset Value or such other (smaller or larger) amount that the Directors, in their sole and absolute discretion, determine would cause a material adverse effect on the Fund, the Directors may suspend or limit such redemptions in such manner and for such period as the Directors determine. See *"Certain Provisions of the Articles of Association – Suspension of Determination of Net Asset Value, Subscriptions and Redemptions."*

The Directors, in their sole and absolute discretion, may cause the Fund to redeem a Shareholder's Shares, in whole or in part, by giving the Shareholder written notice at least two days before the effective redemption date determined by the Directors.

The Directors have the sole and absolute discretion to withhold or limit the amount of any redemption proceeds payable to a Shareholder if the Directors determine that the Fund is unable to effect such distribution in accordance with the terms of the Articles of Association or that it is required to retain any amount under applicable law or the rules of the SEC or any securities association or self-regulatory organization.

The Directors, in consultation with the Investment Manager, also have the sole and absolute discretion as to (1) the extent to which investments held by the Fund are to be sold to pay any

redemption price and (2) which investments are to be sold for such purpose. The Fund and its Directors will not be liable to a Shareholder for interest on the proceeds of any redemption.

The Directors may, in their sole and absolute discretion, permit redemptions to be made as of any date other than a Redemption Date and/or waive any other redemption requirements contained herein.

## CERTAIN PROVISIONS OF THE ARTICLES OF ASSOCIATION

Set forth below is a summary discussion of certain provisions of the Fund's Articles of Association. This discussion is qualified in its entirety by the provisions of the Fund's Articles of Association, a copy of which is attached hereto as Exhibit A. (Reference is made to the Articles of Association for the definitions of capitalized terms used below that are not otherwise defined herein.)

The Fund's Articles of Association contain the regulations relating to its internal management and establish the rights and obligations of the holders of its shares, in their capacities as such. The Fund's Memorandum of Association provides that the objects for which it is established are unrestricted and it has full power and authority to carry out any object not prohibited by any law.

The holders of the Shares in the Fund will be admitted as Shareholders thereof and entitled to all the rights as Shareholders under the terms of the Articles of Association. The Articles of Association are the governing instruments that contain the rules under which the Fund will be operated and establish the rights and obligations of the holders of the Shares, in their capacities as such.

Upon the Fund's and the Administrator's acceptance of the subscription by the execution of the signature pages of the Subscriber's Subscription Agreement and entry of the Subscriber into the register of members of the Fund, the Subscriber will become a Shareholder. See *"Plan of Distribution; Suitability Standards – Plan of Distribution."*

### Dividends

The Fund does not intend to pay dividends with respect to Shares, although the Directors may, in their sole and absolute discretion, declare dividends in relation to one or more Classes of Shares at any time. Therefore, a Shareholder will need to redeem all or a portion of its Shares to realize any cash proceeds from its investment. See *"Redemption of Shares."* The Directors when paying dividends to the Shareholders may make such payment either in cash or in specie.

### Registered Office

The Fund's registered office is located at c/o Mourant Ozannes Corporate Services (Cayman) Limited, Harbour Centre, P.O. Box 1348, Grand Cayman KY1-1108, Cayman Islands.

### Share Capital

The Fund has an authorized share capital of US$50,000 divided into 49,999,000 redeemable, participating, limited voting Shares of US$0.001 par value each, and 1,000 voting, non-

participating, non-redeemable shares of US$0.001 par value each. Shares are redeemable at the option of the holder in accordance with the terms set out in this Memorandum and the Articles of Association and are subject to compulsory redemption in certain circumstances. The Founder Shares are held by the Investment Manager.

Subject to the terms of the Articles of Association, Shares may be issued at the sole and absolute discretion of the Directors and there are no preemption rights on the issue of additional Shares or any other Class.

The Fund may increase or reduce (with the approval of the Cayman Islands Courts, in certain circumstances) its authorized share capital. The Fund may from time to time issue additional Classes of Shares. The specific terms of any such classes may be set forth in a supplement or supplements to this Memorandum. Classes of Shares may differ in terms of permitted subscription and redemption dates and notice periods, minimum and maximum aggregate subscription amount, types of investment strategies utilized, Management and Performance Allocations (including no fees), functional currency, hedging of currency risk, investor eligibility requirements and in other respects.

Shares will be issued in Classes, with separate Series within each Class. A new Series may be issued to each investor on each date that Shares of a Class are purchased and designated by the investor, month and year of purchase. The Fund is currently offering for subscription its Class A and Class B Shares. Class S and/or Class R Shares will, from time to time, be issued by the Fund to existing Shareholders in exchange for their Class A and Class B Shares (respectively). Upon the designation of an investment (at the time acquisition or at any time thereafter) by the Investment Manager as a "Special Investment", a pro-rata portion of each current Shareholder's Class A or Class B Shares having an aggregate Net Asset Value equal to the value (generally, the fair market value) of the Special Investment will be redesignated and converted by way of compulsory redemption of the relevant Shares and reissue of Class S or Class R Shares (as appropriate) to the Shareholder whose Shares were compulsorily redeemed. The Shares so redeemed will be cancelled and the Directors will effect all adjustments necessary to give effect to the foregoing including allocating the value (generally, the fair market value) of the applicable Special Investment to the Class R and/or Class S Shares (as appropriate). No compulsory redemption of Class B or Class A Shares pursuant to the designation of an investment as a Special Investment will require prior notice to be given to Shareholders. Upon a complete or partial disposition or a deemed disposition (by the Fund) of a Special Investment, the Class R and/or Class S Shares of each holder thereof shall be redesignated as and converted (by way of compulsory redemption and the issue of the relevant class of Shares to the Shareholder) to Class B or Class A Shares (respectively) at the Net Asset Value of the respective classes of Shares so redeemed and issued. No compulsory redemption of Class R and/or Class S Shares pursuant hereto will require prior notice to be given to Shareholders.

Additionally, the Fund may, as determined by the Directors, offer shares of different classes having different rights and obligations and/or paying fees different from the Shares offered hereby.

Any issued and outstanding Series of a Class (other than those Shares of the Initial Series of each Class) may be redesignated and converted by way of reissue and redemption into the Initial

Series of Shares of a Class (after accrual or allocation of any Performance Allocation, as described under *"Compensation of The Investment Manager and The Investment Advisor"*) at the end of each calendar year, or at such other time as the Directors in their sole and absolute discretion see fit, at the prevailing Net Asset Value per Share of the Initial Series of the relevant Class. However, no redesignation and conversion, by way of redemption and reissue, will occur with respect to a Series of a Class if, at the end of the calendar year, either:

      (a)    the Net Asset Value of such Series is below its Prior High NAV; or

      (b)    the Net Asset Value of the Initial Series of the relevant Class is below its Prior High NAV.

"Prior High NAV" means, with respect to any Series of any Class, the Net Asset Value of that Series as of the first Business Day immediately following the date as of which the last Performance Allocation with respect to such Series was allocated (or, if no Performance Allocation has yet been allocated with respect to such Shares, the Net Asset Value of such Series immediately following the initial offering of such Shares).

The Directors may also adopt additional resolutions that allow for the equalization of Shares.

None of the Shares of the Fund are under option, or agreed, conditionally or unconditionally to be put under option.

## Investment Accounts

There will be established for each Class and Series of Shares a separate Investment Account in the books and records of the Fund, or of an administrator, custodian or prime or principal broker to the Fund, to which the following provisions will apply:

      (1)    Until the allotment of any Class or Series of Shares subsequent to the initial Class or Series, the Investment Account will comprise all assets and liabilities of the Fund; and thereafter

      (2)    The proceeds from the allotment and issuance of Shares of a particular Class or Series and the assets and liabilities and income and expenditure attributable to that Class or Series of Shares will be applied to the Investment Account established for such Class or Series of Shares subject to the provisions of the Articles of Association;

      (3)    In the case of an asset which the Directors do not consider is attributable to a particular Investment Account, the Directors will have the sole and absolute discretion to determine the basis upon which any such asset will be allocated between Investment Accounts and the Directors will have the sole and absolute discretion and power at any time and from time to time to vary such allocation;

      (4)    Where assets not attributable to any Investment Account give rise to any net profits, the Directors may in their sole and absolute discretion allocate the assets representing such net profits to any Investment Account;

(5)     Where assets are attributable to a specific Investment Account and any asset is derived from another asset (whether cash or otherwise), such derivative asset will be applied to the Investment Account from which the related asset was derived and on each revaluation of an investment the increase or diminution in the value thereof (or the relevant portion of such increase or diminution in value) will be applied to the relevant Investment Account;

(6)     The Directors will have the sole and absolute discretion to determine the basis upon which any liability including expenses will be allocated between or among Investment Accounts (including conditions as to subsequent re-allocation thereof if circumstances so permit or require) and will have power at any time and from time to time to vary such basis and charge expenses of the Fund against either revenue or the capital of any Investment Account;

(7)     The Directors may make debits or credits of assets to any Investment Account if, as a result of a creditor proceeding against certain of the assets of the Fund or otherwise, a liability would be borne in a different manner from that in which it would have been borne under paragraph (6) above, or in any similar circumstances;

(8)     In the event that the Fund, in the sole and absolute discretion of the Directors, participates in new issues, any profits and losses from such new issues will be allocated to Investment Accounts only in accordance with the rules of FINRA. The Directors shall have the discretion to debit from the Investment Account(s) maintained in respect of the new issues investments a use of funds charge in respect of new issue investments and credit such amount to each Investment Account *pro rata* based on the Net Asset Values of each Investment Account for the applicable accounting period; and

(9)     Save as otherwise provided in the Articles of Association, the assets allocated to an Investment Account will be applied solely in respect of the Shares of the Class or Series to which such Investment Account relates and no holder of Shares of that Class or Series will have any claim or right to any asset allocated to any other Investment Account.

The determination of the value of an Investment Account can be suspended.  See *"Certain Provisions of the Articles of Association – Suspension of Determination of Net Asset Value, Subscriptions and Redemptions."*

**Variation of Rights**

Rights attached to any Class or Series (unless otherwise determined by the terms of issue of the Shares of that Class or Series) may, whether or not the Fund is being liquidated only be materially varied or abrogated with the consent in writing of the holders of two-thirds of the issued Shares of that Class or Series, or with the sanction of a resolution passed by Shareholders holding at least two-thirds of all the Shares of that Class or Series then in issue at a separate meeting of the holders of the Shares of that Class or Series.  The rights conferred upon the holders of the Shares of any Class or Series shall not, unless otherwise expressly provided by the

67

terms of issue of the Shares of that Class or Series, be deemed varied or abrogated by the following:

    (1)    the creation, allotment or issue of further shares ranking *pari passu* with the Shares or subsequent to the Shares;

    (2)    the redemption or repurchase of any Shares; or

    (3)    the passing of a Directors' resolution to change or vary any investment objective, investment technique and strategy and/or investment policy in relation to any Class, any modification of the fees payable to any service provider to the Fund, or any transparency available to Shareholders, any change to the minimum investment in Shares of that Class or Series, or any change to a Valuation Time.

**Suspension of Determination of Net Asset Value, Subscriptions and Redemptions**

The Directors may, in consultation with the Investment Manager, but otherwise in their sole and absolute discretion when they deem appropriate, declare a suspension of the determination of the value of an Investment Account, the Redemption Price per Share of a Series of a Class, the redemption of any Series of Shares of a Class (including the right to receive redemption proceeds), the subscription for any Series of Shares of a Class and/or extend the period for payment on redemption, in whole or in part, upon the occurrence of any of the following circumstances, and in each case for the whole or any part of a period:

    (1)    when any exchange or OTC or other market on which any of the Fund's investments is quoted, traded, or dealt in is closed (other than for holidays or customary weekends) or trading thereon has been restricted or suspended;

    (2)    when, as a result of events, conditions, or circumstances, disposal of the Fund's assets or other transactions in the ordinary course of the Fund's business involving the sale, transfer, delivery, or withdrawal of the Fund's securities and other investments and financial instruments is not in the Directors' sole and absolute discretion considered reasonably practicable, and/or if the Directors do not, in their sole and absolute discretion, believe that any such sale, transfer, delivery, or withdrawal is generally in the best interests of the Shareholders of that particular Class or Series;

    (3)    when there has been a breakdown in any of the means employed in determining the price or value of any of the Fund's investments or when for any other reason the value of any of the Fund's investments or other assets in the Directors' opinion cannot be reasonably or fairly be ascertained and when the use of such means has been restricted or suspended for whatever reason;

    (4)    when the Fund, the Administrator, one of its prime brokers, its custodian, or the Investment Manager is unable for any reason to repatriate funds required for the purpose of making payments on redemption or during which any transfer of funds involved in the realization or acquisition of assets or when payments due on

redemption of Shares cannot in the opinion of the Directors be effected on normal conditions;

(5)    when .proceeds of any sale or redemption of Shares cannot be transmitted to or from the Fund's accounts for any reason; and/or

(6)    if the Fund is dissolved.

In addition, if redemption requests with respect to the Fund on a particular Redemption Date exceed 12.5% of the Fund's Net Asset Value or such other (smaller or larger) amount that the Directors, in their sole and absolute discretion, determine would cause a material adverse effect on the Fund, the Directors may suspend or limit such redemptions in such manner and for such period as the Directors in their sole and absolute discretion determine. The Fund will withhold payment of redemption proceeds to any Shareholder some or all of whose Shares have been tendered for redemption until after any suspension has been lifted. Notice of any suspension will be given to any Shareholder who has tendered some or all of its Shares for redemption and to whom full payment of the redemption proceeds has not yet been remitted. If a Shareholder does not withdraw a redemption request following notification of a suspension, the redemption will be effected as of the next Redemption Date after such suspension is ended, unless the Directors determine otherwise in their sole and absolute discretion, on the basis of the Redemption Price per Share as of that Redemption Date.

## Dissolution and Liquidation

The Fund will be liquidated upon the happening of any of the following events:

(1)    the passing of a Special Resolution to that effect, passed by the holders of the Founder Shares;

(2)    the bankruptcy or insolvency of the Fund; or

(3)    as otherwise provided by Cayman Islands law.

Upon the liquidation of the Fund, the Directors or the persons appointed by the Shareholders to wind up the Fund's affairs ("Liquidator") will take account of the Fund's assets and liabilities. Generally, the assets will be liquidated as promptly as is consistent with obtaining their fair market value, and their proceeds, to the extent sufficient, will be applied and distributed in the following order:

(1)    to the payment of the Fund's debts and liabilities to creditors, including Shareholders who are creditors, to the extent otherwise permitted by law, other than liabilities for which reasonable provision for payment has been made and liabilities for dividends to Shareholders, and of the expenses of liquidation;

(2)    to the establishment of any reserves that the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Fund arising out of or in connection with the Fund;

69

(3)    to Shareholders in satisfaction of liabilities for dividends under the law of the Cayman Islands; and

(4)    any balance then remaining will be distributed to each Shareholder *pari passu* according to the amount such Shares would receive on a redemption pursuant to the Articles of Association on the Redemption Date immediately preceding the date of liquidation or winding up.

**Reorganization into a Master Feeder Structure**

The Fund may, without the Shareholders' consent, (i) invest all or a portion of the Fund's property in interests or shares issued by an entity formed to serve as a master fund or (ii) cause the Fund, if organized in a master/feeder fund structure, to withdraw or redeem its property from the master fund and cause the Fund to invest in property directly in securities and other financial instruments or in another master fund. In addition, the Fund may make various elections for federal income tax purposes that could result in certain items of income, gain, loss and deduction being treated differently for tax and accounting purposes, in particular, the Fund may make an election to treat the Fund or such master fund may make an election to treat the master fund as either a partnership or an association taxable as a corporation for U.S. tax purposes.

**Books and Records; Fiscal Year**

The Fund will keep books and records of account in accordance with GAAP, except that the Fund's organizational expenses may be amortized over a period of not more than five years from the commencement of the Fund's operations. The Fund's books and records will be maintained at the offices of the Administrator, at Apex Fund Services, Ltd., TJ Pearman Building, 3 Burnaby Street, Hamilton HM12, P.O. Box 2460 HMJX, Bermuda. The Directors will have access to all books and records maintained by the Administrator and will maintain copies of the same.

The Fund's "Fiscal Year" is the calendar year. However, the Fund's last Fiscal Year will end on the date its affairs are wound up.

**Directors' Liability; Indemnification**

Pursuant to the Fund's Articles of Association, all current and former Directors will be indemnified out of the assets of the Fund from and against all actions, proceedings, costs, charges, losses, damages and expenses which they or any of them shall or may incur or sustain by reason of any act done or omitted in or about the execution of their duties provided that such Director acted honestly and in good faith with a view to the best interests of the Fund and had no reasonable cause to believe that his conduct was unlawful.

The U.S. federal and state securities laws and ERISA impose liabilities under certain circumstances on persons who act in good faith and therefore nothing in the Articles of Association will waive or limit any rights the Fund may have against the Investment Manager under such laws.

70

The Advisory Agreement contains similar provisions with respect to the liability of the Investment Manager and the Investment Adviser and with respect to indemnification.

**Transferability of Shares**

A Shareholder may not transfer or pledge all or any of its Shares without the Directors' prior written consent, the granting of which is in the Directors' sole and absolute discretion.  The Shares have not been, and are not expected to be, registered under non-U.S. or U.S. federal or state securities laws.  Any purported transfer of a Share or Shares that is not in compliance with the foregoing will be void and of no effect.  The Fund and its agents will not be entitled or required to recognize any legal, equitable, or other claim or interest in the Fund on the part of any such purported transferee, whether or not any of them has express or other notice of such claim or interest.

The registration of transfers may be suspended at such times and for such periods as the Directors may, from time to time in their sole and absolute discretion determine.

**Cayman Islands Mutual Funds Law**

A Cayman Islands open-ended investment fund is exempted from the ambit of the Mutual Funds Law if its participating shares are held by not more than fifteen investors, the majority of whom are capable of appointing or removing the directors of the fund.  The Fund is not currently required to register as a "mutual fund" under the Mutual Funds Law because the Fund does not have more than 15 investors, and a majority of investors of the Fund is entitled to appoint and remove the directors.

The Fund may determine to accept more than 15 investors.  In that event, the Fund would register as a "mutual fund" with the Cayman Islands Monetary Authority ("CIMA") pursuant to section 4(3) of the Mutual Funds Law and thereupon become subject to, among other things, the following obligations: (a) to file with CIMA prescribed details of the Fund's offering document and any changes to it, (b) to file annually with CIMA accounts audited by an approved auditor and a Fund Annual Return and (c) to pay a prescribed initial and annual registration fee, which is currently CI$2,500 (approximately US$3,660).

If the Fund should register with CIMA as a "mutual fund," it would be subject to the supervision of CIMA, which could at any time instruct the Fund to have its accounts audited and to submit the results to CIMA within such time as it specifies.  In addition, CIMA could ask the Directors to give CIMA such information or explanation in respect of the Fund as CIMA may reasonably require to enable it to carry out its duties under the Mutual Funds Law.  The Directors would be required to give CIMA access to or provide at any reasonable time all records relating to the Fund, and CIMA could copy or take an extract of a record to which it is given access.  Failure to comply with these requests from CIMA could result in substantial fines being imposed on the Directors, and in CIMA applying to the court to have the Fund wound up.  Notwithstanding the foregoing, registration of the Fund as a "mutual fund" would not imply that CIMA has passed upon or approved this Memorandum or the offering of Shares hereunder.

CIMA is prohibited by the Monetary Authority Law (as amended) of the Cayman Islands from disclosing any information relating to the affairs of a mutual fund other than disclosure required

for the effective regulation of a mutual fund or when required to do so by law or by a court. CIMA may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors. CIMA's powers include the power to require the substitution of directors, to appoint a person to advise a mutual fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of a mutual fund. There are other remedies available to CIMA including the ability to apply to the court for approval of other actions.

## Anti-Money Laundering Regulations

As part of the Fund's and the Administrator's responsibility for the prevention of money laundering, the Fund and the Administrator (including its affiliates, subsidiaries or associates) will require a detailed verification of the applicant's identity and the source of payment. Depending on the circumstances of each application, a detailed verification might not be required where:

> (a)      the applicant is a recognized financial institution which is regulated by a recognized regulatory authority and carries on business in a country listed in Schedule 3 of the Money Laundering Regulations (as amended) of the Cayman Islands (a "Schedule 3 Country"); or

> (b)      the application is made through a recognized intermediary which is regulated by a recognized regulatory authority and carries on business in a Schedule 3 Country. In this situation the Fund may rely on a written assurance from the intermediary that the requisite identification procedures on the applicant for business have been carried out; or

> (c)      the subscription payment is remitted from an account (or joint account) held in the applicant's name at a bank in the Cayman Islands or a bank regulated in a Schedule 3 Country. In this situation the Fund may require evidence identifying the branch or office of the bank from which the monies have been transferred, verify that the account is in the name of the applicant and retain a written record of such details.

The Fund and the Administrator reserve the right to request such information as is necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Administrator will refuse to accept the application and the subscription monies relating thereto.

If any person who is resident in the Cayman Islands (including the Administrator) has a suspicion that a payment to the Fund (by way of subscription or otherwise) contains the proceeds of criminal conduct that person is required to report such suspicion pursuant to The Proceeds of Crime Law, 2008 of the Cayman Islands.

By subscribing, Shareholders consent to the disclosure by the Fund and the Administrator of any information about them to regulators and others upon request in connection with money laundering and similar matters both in the Cayman Islands and in other jurisdictions.

## REPORTS

Each Shareholder will receive the following: (i) annual financial statements of the Fund audited by an independent certified public accounting firm generally within 120 days of (or as promptly as reasonably possible after) the end of the Fund's Fiscal Year, (ii) in the discretion of the Investment Manager, a monthly letter from the Investment Manager discussing the results of the Fund for the previous month, and (iii) other reports as determined by the Investment Manager in its sole discretion.

## TAXATION

*This discussion was written to support the promotion or marketing of the transactions or matters addressed herein. It is not intended or written to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on a taxpayer. A taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.*

### General

Shareholders should consult their own tax advisers as to the consequences of an investment in the Fund under the tax laws of the United States, or any other country of which a Shareholder is a resident or citizen, including the consequences of the receipt of dividends from the Fund and the sale, redemption, or exchange of Shares.

The following discussion summarizes certain, although not all, U.S. federal income tax and Cayman Islands tax considerations relating to an investment in the Fund.   This summary provides only a general discussion and does not represent a complete analysis of all consequences, many of which may depend on individual circumstances, such as the residence or domicile of a Shareholder.   The summary of U.S. federal income tax considerations is based on the Code, the regulations thereunder ("Regulations"), and judicial and administrative interpretations thereof, all as of the date of this Memorandum.   No assurance can be given that future legislation, Regulations, administrative pronouncements, and/or court decisions will not significantly change applicable law and materially affect the conclusions expressed herein.   Any such change, even though made after a Shareholder has invested in the Fund, could be applied retroactively.   Moreover, the effects of any state or local, or foreign tax law (other than certain provisions of Cayman Islands tax law), or of federal tax law other than income tax law, are not addressed in these discussions and, therefore, must be evaluated independently by each prospective investor.

No ruling has been requested from the Internal Revenue Service ("Service") or any other federal, state, or local agency with respect to the U.S. federal income tax matters discussed below.   This summary does not in any way either bind the Service or the courts or constitute an assurance that the income tax consequences discussed herein will be accepted by the Service, any other U.S. federal, state, or local agency, or the courts.

THIS SUMMARY IS INCLUDED FOR GENERAL INFORMATION ONLY.   NOTHING HEREIN IS OR SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO ANY INVESTOR.   ACCORDINGLY, EACH PERSON CONSIDERING AN INVESTMENT IN

THE FUND SHOULD CONSULT HIS, HER, OR ITS OWN TAX ADVISER TO UNDERSTAND FULLY THE POSSIBLE FEDERAL INCOME AND OTHER TAX CONSEQUENCES TO IT OF SUCH AN INVESTMENT.

## Cayman Islands Taxation

There is no direct taxation of the Fund in effect in the Cayman Islands and, therefore, interest, dividends and gains received, revised, accumulated and made by the Fund will not be subject to any tax in the Cayman Islands. The Fund is an exempted company under Cayman Islands law. The Fund has applied for and obtained from the Governor-in-Council of the Cayman Islands an undertaking that, in accordance with Section 6 of the Tax Concessions Law (as amended) of the Cayman Islands, for a period of 20 years from the date of issue of the undertaking, no law thereafter enacted in the Cayman Islands imposing any tax or duty to be levied on profits, income, gains or appreciation will apply to the Fund or its operations. No capital or stamp duties are levied in the Cayman Islands on the issue, transfer or redemption of Shares. The Fund will be required to pay an annual charge payable to the Registrar of Companies calculated on the nominal amount of the authorized share capital of the Fund, which charge is currently approximately US $732 per annum.

## U.S. Federal Income Taxation

Introduction

The tax aspects of an investment in the Fund are complicated, and the Investment Manager strongly recommends that prior to any decision to invest therein each investor consult with professional advisers familiar with the investor's tax situation and the tax laws and regulations applicable to investment in partnerships. The Fund is not intended and should not be expected to provide any tax shelter.

The following discussion summarizes certain, although not all, federal income tax considerations relating to an investment in the Fund. This summary provides only a general discussion and does not represent a complete analysis of all income tax consequences of an investment in the Fund, many of which may depend on individual circumstances, such as the residence or domicile of a Shareholder. It is based on the Internal Revenue Code of 1986, as amended ("Code"), the regulations thereunder ("Regulations") and judicial and administrative interpretations thereof, all as of the date of this Memorandum. No assurance can be given that future legislation, Regulations, administrative pronouncements and/or court decisions will not significantly change applicable law and materially affect the conclusions expressed herein. Any such change, even though made after a Shareholder has invested in the Fund, could be applied retroactively. Moreover, the effects of any state (other than certain aspects of Georgia tax laws), local or foreign tax law, or of federal tax law other than income tax law, are not addressed in these discussions and, therefore, must be evaluated independently by each prospective investor.

No ruling has been requested from the Internal Revenue Service ("Service") or any other federal, state or local agency with respect to the matters discussed below, nor has the Investment Manager asked its counsel to render any legal opinions regarding any of the matters discussed below. This summary does not in any way either bind the Service or the courts or constitute an

assurance that the income tax consequences discussed herein will be accepted by the Service, any other federal, state or local agency or the courts.

THIS DISCUSSION WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN. IT IS NOT INTENDED OR WRITTEN TO BE USED, AND IT CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER. A TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**Fund Taxation**

**Classification of the Fund.** The Fund has elected to be treated as a partnership for U.S. federal income tax purposes.  Accordingly, it is expected that the Fund will be treated as a partnership, and not as associations or publicly traded partnerships taxable as corporations, for U.S. federal income tax purposes.  If either the Fund were treated as a corporation for U.S. federal income tax purposes, then (1) its taxable income would be subject to corporate income tax, (2) distributions of that income, other than on certain redemptions, would be treated as dividend income by its Shareholders (to the extent of the Fund's current or accumulated earnings and profits) and (3) its Shareholders would not take into account their distributive shares of the Fund income, gains, losses and deductions.

Because of the Fund's expected treatment as a partnership for U.S. federal income tax purposes, the Fund's income, gains, losses, deductions and expenses will depend upon the corresponding items recognized by the Fund.  Thus, any reference to, and description of, the federal income tax aspects of the Fund's investment practices and activities, in effect, take into account the investment practices and activities of the Fund.

**Publicly Traded Fund Status.**  Under the Code, a "publicly traded partnership" generally is treated as a corporation.  A partnership is a publicly traded partnership if interests therein (1) are traded on an established securities market (as defined under the applicable Regulations, referred to below as the "PTP Regulations") or (2) are readily tradable on a secondary market (or the substantial equivalent thereof) ("readily tradable").  The Shares (equivalent to "partnership interests" in the ensuing discussion) will not be listed for trading on an established securities market, and the Fund will use its best efforts to ensure that its Shares will not be readily tradable.

The PTP Regulations include a "private placement safe harbor" under which partnership interests can avoid being treated as readily tradable.  The PTP Regulations provide that this safe harbor applies if (1) the partnership interests were issued in a transaction or transactions not requiring registration under the 1933 Act and (2) the partnership has no more than 100 partners.  For purposes of determining the number of partners, a person owning a partnership interest through a partnership, grantor trust or S corporation (a "flow-through entity") is counted as a partner only if substantially all the value of that person's interest in the flow-through entity is attributable to the underlying partnership and a principal purpose for using a tiered structure was to satisfy the 100-partner condition.  Because this offering of Shares is not required to be registered under the 1933 Act, if the Fund has no more than 100 partners (as determined in accordance with the rules

regarding "flow-through" entities noted above) the Fund will meet this "private placement" safe harbor and thus would not be treated as a publicly traded partnership for federal tax purposes.·

Even if the Shares were treated as readily tradable and the Fund thus was treated as a publicly traded partnership, it nevertheless would not be treated as a corporation for federal tax purposes for any taxable year in which (1) it was not registered under the 1940 Act and (2) at least 90% of its gross income for that year (and each preceding year from the first year in which it was a publicly traded partnership) consisted of qualifying income. "Qualifying income" is defined to include interest (except interest "derived in the conduct of a financial business"), dividends, gain from the sale or disposition of a capital asset, and income that would qualify for a regulated investment company (mutual fund) or real estate investment trust. The Fund will limit their gross income from "non-qualifying income" to no more than 10% of its gross income. Because the Fund will not be registered under the 1940 Act by virtue of complying with Section 3(c)(1) thereof and should satisfy the qualifying income requirement each year, even if the Fund were considered a publicly traded partnership, it should not be treated as a corporation for federal tax purposes. Thus, the Fund should be taxed as a partnership.

### General Principles of Fund Taxation

A partnership is not subject to federal income tax. A partnership, however, must file a federal information return in which it reports its items of income, gain, loss and deduction for each taxable year. Each partner in a partnership includes its allocable share of the partnership's items in determining its taxable income. Thus, each Shareholder of the Fund must take into account its allocable share of the Fund's items. A Shareholder will be subject to tax on its distributive share of the Fund's taxable income regardless of whether any distribution of cash or property is made to it. Each Shareholder's distributive share of such items will be determined pursuant to the Fund Agreement or otherwise in accordance with the Shareholder's respective interest in the Fund. Limitations that may apply to a Shareholder's ability to deduct its share of the Fund's losses or expenses include a basis limitation under Section 704(d) of the Code, passive loss limitations under Section 469 of the Code, "at risk" limitations under Section 465 of the Code, investment interest limitations under Section 163(d) of the Code, limitations on the deductibility of miscellaneous itemized deductions under Section 67 of the Code, a reduction in the deductibility of certain itemized deductions under Section 68 of the Code, and limitations under the alternative minimum tax. Shareholders should consult their own tax advisors with specific reference to their own situations.

Distributions.  A distribution by a partnership to a partner generally is not taxable to the partner except to the extent the distribution consists of cash (and, in certain circumstances, marketable securities) and exceeds the partner's adjusted basis of its interest in the partnership immediately before the distribution. (See "– Basis" below.) A Shareholder who receives a distribution of property other than cash may recognize gain if such Shareholder contributed appreciated property (other than the property being distributed) to the Fund within seven years before the distribution. In addition, a Shareholder who has contributed appreciated property to the Fund may recognize gain if such property is distributed to another Shareholder within seven years after the property was contributed. Ordinarily, any such excess will be treated as gain from a sale or

exchange of the Shareholder's interest. However, the Fund does not generally intend to make distributions to its Shareholders.

Basis. A Shareholder's basis of its Share is important in determining (1) the amount of gain it will realize on the sale or other disposition of the interest, (2) the amount of non-taxable distributions (including any decrease in the Shareholder's share of the Fund's liabilities) that it may receive from the Fund and (3) its ability to utilize its distributive share of any tax losses of the Fund. A Shareholder's initial tax basis of its Share will equal its cost for the Share (which, to the extent that the Shareholder contributes property other than cash, will be limited to the Shareholder's basis in the contributed property) plus its share of the Fund's liabilities at the time of purchase. In general, a Shareholder's "share" of those liabilities will equal the sum of (i) the entire amount of any otherwise nonrecourse liability of the Fund as to which the Shareholder or an affiliate is the creditor (a "partner nonrecourse liability") and (ii) a share, based in part on profit-sharing ratios, of any nonrecourse liabilities of the Fund that are not partner nonrecourse liabilities as to any partner.

A Shareholder's tax basis of its Share will be (1) increased by (a) its allocable share of the Fund's taxable income and gain and (b) any additional contributions by the Shareholder to the Fund and (2) decreased (but not below zero) by (a) its allocable share of the Fund's tax deductions and losses and (b) any distributions by the Fund to the Shareholder. For this purpose, an increase in a Shareholder's share of the Fund's liabilities will be treated as a contribution by the Shareholder to the Fund and a decrease in that share will be treated as a distribution by the Fund to the Shareholder.

Allocations of Income and Loss. A partner's distributive share of a partnership's items of income, gain, loss or deduction for federal income tax purposes generally is determined in accordance with the provisions of the partnership agreement. An allocation under the partnership agreement may be disregarded, however, if the allocation does not have "substantial economic effect." An allocation to a partner that does not cause or increase a deficit balance in the partner's capital account has economic effect if (1) partners' capital accounts are determined and maintained in accordance with the Regulations, (2) distributions on liquidation of the partnership are to be made in accordance with the partners' positive capital account balances and (3) the partnership agreement includes certain protective allocation provisions. Subject to special rules regarding certain shifting or transitory allocations, the Regulations provide that the economic effect of an allocation will be substantial if there is a reasonable possibility that the allocation will substantially affect the dollar amount to be received by the partners, independent of tax consequences.

Shareholders should be aware that at any particular point in time, the tax consequences of an investment in the Fund may vary significantly, and even inversely, from the performance of the Fund as reflected in a Shareholder's Capital Account. For example, while the overall performance of the Fund may reflect losses, sales may be primarily of securities which have appreciated, therefore generating tax liabilities. To the extent the Investment Manager is unable to satisfy requests for withdrawals through distributions in-kind, requests for withdrawals will increase securities transactions and may accelerate the recognition of gain allocable to non-withdrawing Shareholders.

**Taxation of Operations**

The tax consequences to investors of the Fund's trading activities in securities and derivatives are very complex. Prospective investors should consult with tax advisers who have substantial expertise with this aspect of the tax law.

*Limitation on Deduction of Fund Expenses.* If the Fund is treated as a trader in securities, each noncorporate Shareholder would be able to deduct is share of the Fund's expenses, other than interest expense, as business expenses under Section 162 of the Code, rather than as investment expenses under Section 212 of the Code. If these expenses were considered investment expenses under Section 212 of the Code, these expenses would constitute "miscellaneous itemized deductions" and would be deductible by noncorporate Shareholders only to the extent that the expenses, when combined with other miscellaneous itemized deductions of the Shareholder, exceeded 2% of the Shareholder's adjusted gross income for the particular taxable year. Further, Section 68 of the Code would impose additional limitations on these deductions; the amount disallowed varies based on the taxpayer's adjusted gross income.

The Service could challenge any expense deducted by the Fund on the ground that the expense is a capital expenditure, which must either be amortized over an extended period or indefinitely deferred. The Service could also challenge the treatment of the Fund's expenses on the grounds that the amount of the expense is unreasonable in relation to the value of the services performed, the goods acquired or the other benefits to the Fund.

The Fund will pay out of its assets certain legal, accounting and other expenses of its organization. Any such organizational expenses must generally be capitalized (rather than currently deducted) and may be amortized over a period of 180 months. Those expenses related to the sale of Shares (including brokerage and finders fees, if any, paid by the Fund) must be capitalized and cannot be amortized.

*Limitation on Deductibility of Capital Losses and Investment Interest.* Prospective Shareholders should consult their own tax advisors regarding the deductibility of capital losses, as well as the limitations on a noncorporate taxpayer's deductibility of interest paid or accrued on indebtedness allocable to property held for investment (whether by the Fund with respect to its investments or by the Shareholder with respect to a Share).

*Limitation on Deductibility of Passive Activity Losses.* Section 469 of the Code restricts individual, certain other non-corporate and certain closely-held corporate taxpayers from using trade or business losses incurred by partnerships and other businesses in which the taxpayer does not materially participate to offset income from other sources. Therefore, such losses cannot be used to offset salary or other earned income, active business income or "portfolio" income (i.e., dividends, interest, royalties and non-business capital gains) of the taxpayer. However, losses and credits suspended under Section 469 of the Code may be carried forward indefinitely and may be used in later years to offset income from passive activities. Moreover, a fully taxable disposition by a taxpayer of its entire interest in a passive activity will allow the deduction of any suspended losses attributable to that activity. These so-called "passive activity loss" limitations

should not apply to limit the deductibility by Shareholders of their distributive share of any losses of the Fund because the activities of the Fund should be treated as giving rise only to "portfolio" income and deductions allocable to "portfolio" income. A Shareholder that is otherwise subject to the passive activity loss rules will not be permitted to offset against the Shareholder's share of the Fund's income and gain any losses or other deductions generated by the Shareholder's investments in "passive activities" prior to the time the Shareholder disposes of his or her interests in such passive activities.

Application of Basis and "At Risk" Limitations on Deductions. The amount of any loss of the Fund that a Shareholder is entitled to include in its income tax return is limited to its adjusted tax basis in its Share as of the end of the Fund's taxable year in which such loss occurred. Similarly, a Shareholder that is subject to the "at risk" limitations (generally, non-corporate taxpayers and closely held corporations) may not deduct losses of the Fund to the extent that they exceed the amount such Shareholder has "at risk" with respect to its Share at the end of the year. The amount that a Shareholder has "at risk" will generally be the same as its adjusted basis as described above, except that it will generally not include any amount attributable to liabilities of the Fund or any amount borrowed by the Shareholder on a non-recourse basis. Losses denied under the basis or "at risk" limitations are suspended and may be carried forward in subsequent taxable years, subject to these and other applicable limitations.

*Alternative Minimum Tax.* The extent, if any, to which the federal alternative minimum tax will be imposed on any Shareholder will depend on the Shareholder's overall tax situation for the taxable year. Prospective investors should consult with their tax advisors regarding the alternative minimum tax consequences of an investment in the Fund.

Investments in Foreign Corporations. An investment by the Fund in a foreign corporation that is classified as a "passive foreign investment company" or a "controlled foreign corporation" may result in adverse U.S. federal income tax consequences to taxable U.S. Shareholders, including, but not limited to, conversion of capital gain into ordinary income, current taxation on earnings of such foreign corporations, interest charges on deferred tax liabilities, and reporting requirements. Similar issues may arise if the Fund invests in a foreign tax-transparent entity that is treated as a foreign corporation for U.S. federal income tax purposes.

Dividends and interest received, and gains realized, by the Fund on foreign securities may be subject to income, withholding or other taxes imposed by foreign countries and U.S. possessions that would reduce the total return on its investments. Tax conventions between certain countries and the United States may reduce or eliminate these foreign taxes, however, and many foreign countries do not impose taxes on capital gains in respect of investments by foreign investors. A Shareholder might be able to claim a foreign tax credit with respect to any foreign income taxes paid by the Fund that are not refunded, or might deduct those taxes, in determining the Shareholder's federal income tax liability. If a Shareholder claims a foreign tax credit, there can be no assurance, however, that the Service will accept such claim, in whole or in part.

*Foreign Currency Gains or Losses.* Under Section 988 of the Code, gains and losses of the Fund on the acquisition and disposition of foreign currency (e.g., the purchase of foreign currency and subsequent use of the currency to acquire investments) generally will be treated as ordinary

income or loss.  Moreover, under Section 988, gains or losses on disposition of debt securities denominated in a foreign currency, to the extent attributable to fluctuation in the value of the foreign currency between the date of acquisition of the debt security and the date of disposition, will be treated as ordinary income or loss.  Similarly, gains or losses attributable to fluctuations in exchange rates that occur between the time the Fund accrues interest or other receivables or accrues expenses or other liabilities denominated in a foreign currency and the time the Fund actually collects such receivables or pays such liabilities may be treated as ordinary income or ordinary loss.

The Fund may acquire foreign currency forward contracts, enter into foreign currency futures contracts, and acquire put and call options on foreign currencies.  Generally, foreign currency futures contracts and option contracts that qualify as "Section 1256 contracts" (see "— Section 1256 Contracts" below) will not be subject to ordinary income or loss treatment under Section 988.  However, if the Fund acquires foreign currency futures contracts or option contracts that are not Section 1256 contracts, or any foreign currency forward contracts, any gain or loss realized by the Fund with respect to such instruments will be ordinary, unless (1) the contract is a capital asset in the hands of the Fund and is not a part of a straddle and (2) the Fund makes an election (by the close of the day the transaction is entered into) to treat the gain or loss attributable to such contract as capital gain or loss.

*Section 1256 Contacts.*  Certain futures, foreign currency contracts and listed non-equity options (such as those on a securities index) in which the Fund invests may be subject to Section 1256 of the Code ("Section 1256 contracts").  Any Section 1256 contracts the Fund holds at the end of each taxable year generally must be "marked-to-market" (that is, treated as having been sold at that time for their fair market value) for federal income tax purposes, with the result that unrealized gains or losses will be treated as though they were realized.  Sixty percent of any net gain or loss recognized on these deemed sales, and 60% of any net realized gain or loss from any actual sales of Section 1256 contracts, will be treated as long-term capital gain or loss, and the balance will be treated as short-term capital gain or loss.  The Fund may elect not to have the foregoing rules apply to any "mixed straddle" (that is, a straddle, clearly identified by the Fund in accordance with the Regulations, at least one (but not all) of the positions of which are Section 1256 contracts).

*Constructive Sales.*  If the Fund has an "appreciated financial position" – generally, an interest (including an interest through an option, futures contract, forward contract or short sale) with respect to any stock, debt instrument (other than "straight debt") or partnership interest the fair market value of which exceeds its adjusted basis – and enters into a "constructive sale" of the position, it will be treated as having made an actual sale thereof, with the result that gain will be recognized at that time.  A constructive sale generally consists of a short sale, an offsetting notional principal contract, a futures contract or a forward contract entered into by the Fund or a related person with respect to the same or substantially identical property.  In addition, if the appreciated financial position is itself such a short sale or such a contract, acquisition of the underlying property or substantially identical property will be deemed a constructive sale.  In general, however, a transaction will not be considered a constructive sale if it is closed by the Fund within 30 days after the end of the taxable year in which it was originally entered into and the Fund holds the related appreciated financial position unhedged for 60 days after that closing

80

(i.e., at no time during that 60-day period is the Fund's risk of loss regarding that position reduced by reason of certain specified transactions with respect to substantially identical or related property, such as having an option to sell, being contractually obligated to sell, making a short sale or granting an option to buy substantially identical stock or securities).

*Straddles and Wash Sales.* Offsetting positions the Fund enters into or holds in any actively traded security, option, futures contract or forward contract may constitute a "straddle" for federal income tax purposes. Straddles are subject to certain rules that may affect the amount, character and timing of the Fund's gains and losses with respect to positions of the straddle by requiring, among other things, that (1) loss realized on disposition of one position of a straddle be deferred to the extent of any unrealized gain in an offsetting position until the latter position is disposed of, (2) the Fund's holding period in certain straddle positions not begin until the straddle is terminated (possibly resulting in gain being treated as short-term rather than long-term capital gain) and (3) losses recognized with respect to certain straddle positions, which otherwise would constitute short-term capital losses, be treated as long-term capital losses. The Service may treat certain positions in securities held (directly or indirectly) by a Shareholder and its indirect interest in similar securities held by the Fund as "straddles" for federal income tax purposes. The application of the "straddle" rules in such a case could affect a Shareholder's holding period for the securities involved and may defer the recognition of losses with respect to such securities.

Applicable Regulations also provide certain "wash sale" rules, which apply to transactions where a position is sold at a loss and a new offsetting position is acquired within a prescribed period, and "short sale" rules applicable to straddles. Different elections are available to the Fund, which may mitigate the effects of the straddle rules, particularly with respect to mixed straddles.

*Short Sales.* Gain or loss realized by the Fund from a short sale of property generally will be considered a capital gain or loss if the property used to close the short sale constitutes a capital asset in the Fund's hands. Except for certain situations in which the property used by the Fund to close a short sale has a long term holding period on the date of the short sale, special rules will apply that generally will treat the gains on short sales as short term capital gains. These rules may also terminate the holding period of "substantially identical property" held by the Fund. Moreover, a loss on a short sale will be treated as a long term capital loss if, on the date of the short sale, the Fund has held "substantially identical property" for more than one year.

*Dissolution and Liquidation of the Fund.* On dissolution of the Fund, its assets may be sold, which may result in the realization of taxable gain or loss to its Shareholders. Distributions of cash in complete liquidation of the Fund generally will cause recognition of gain or loss – which will generally be capital gain or loss to a Shareholder if it holds its Share as capital assets – to the extent, if any, that the Shareholder's adjusted basis of its Share is less or greater than the amount of cash received. Any capital gain or loss will be treated as long-term if the Share were held for more than one year.

If liquidating distributions consist wholly or partly of assets other than cash, the Fund will not recognize any gain or loss on the distributions and a Shareholder that receives such a distribution generally will not recognize any loss on the distribution and will have a basis in the non-cash

assets equal to the adjusted basis of its Share reduced by the amount of cash the Shareholder receives in the distribution.

**Redemption or Transfer of Shares**

If a Shareholder redeems or, with the Investment Manager's consent, sells or exchanges its Share, it will realize gain or loss equal to the difference between the amount realized from the redemption, sale or exchange (including any reduction in its share of the Fund's liabilities) and its adjusted basis of its Share. That gain or loss will be treated as capital gain or loss (taxed as described above), except to the extent attributable to the Shareholder's share of the Fund's inventory in the case of a sale or exchange of Shares (or "substantially appreciated inventory" in the case of a distribution in redemption of a Shareholder's Share) or unrealized receivables or if the Shareholder is considered a "dealer."

*Tax Elections and Returns*

The Fund may make various elections for federal income tax purposes that could result in certain items of income, gain, loss and deduction being treated differently for tax and accounting purposes. Elections permitted under the Code that may affect the determination of the Fund's income, the deductibility of expenses, accounting methods and the like must be made by the Fund and not by its Shareholders, and these elections will be binding in most cases on all Shareholders.

Code section 754 permits a partnership to elect to adjust the basis of partnership property on the sale or exchange of an interest in the partnership or on a partner's death and on certain distributions of property by the partnership to a partner. These adjustments are mandatory if the aggregate bases of partnership assets exceed their fair market value by more than $250,000 at the time of the sale or exchange, or if a distribution of partnership property results in a reduction in the basis of the partnership's assets of more than $250,000. If such a basis adjustment were made by the Fund, a transferee of a Share would be treated, for purposes of computing gain, as though it had acquired a direct interest in the Fund's assets, and the Fund would be treated, on certain distributions to Shareholders, as though it had obtained a new cost basis of its assets. The Fund may, in its sole and absolute discretion, make a section 754 election. If the Fund determines not to do so, and the Fund is not otherwise required to adjust the bases of its assets, a transferee of a Share in the Fund may be subject to tax on a portion of the income from the disposition of Fund assets that, as to it, constitutes a return of capital if the purchase price of its Share exceeds its share of the Fund's adjusted basis of its investments.

The Fund will file an annual partnership information return with the Service reporting the results of its operations. After the end of each calendar year, the Fund will distribute to its Shareholders federal income tax information reasonably necessary to enable each Shareholder to report its distributive share of the Fund's partnership items. Each Shareholder must treat partnership items reported on the Fund's returns consistently on the Shareholder's own returns, unless the Shareholder files a statement with the Service disclosing the inconsistency.

**Taxation of Tax-Exempt U.S. Shareholders**

Subject to numerous exceptions, employee benefit plans, charitable organizations, and certain other organizations that otherwise are exempt from federal income tax (collectively "exempt organizations") nonetheless are subject to that tax on their unrelated business taxable income ("UBTI"). Generally, UBTI means the gross income derived by an exempt organization from a trade or business that it regularly carries on, the conduct of which is not substantially related to the exercise or performance of its exempt purpose or function, less allowable deductions directly connected with that trade or business. If the Fund regularly carries on a trade or business that is unrelated with respect to an exempt organization Shareholder, then in computing its UBTI the Shareholder must include its share of (1) the Fund's gross income from the unrelated trade or business, whether or not distributed, and (2) the Fund's allowable deductions directly connected with that gross income. Whether a trade or business is substantially related to the exercise or performance of an organization's exempt purpose or function is a question of fact.

UBTI generally does not include dividends, interest, payments with respect to securities loans, and gains from the sale of property (other than property held for sale to customers in the ordinary course of a trade or business). Nonetheless, a percentage of the income on, and gain from the disposition of, "debt-financed property" is UBTI; debt-financed property generally is income-producing property (including securities) the use of which is not substantially related to the exempt organization's tax-exempt purposes and with respect to which there is an "acquisition indebtedness" at any time during the taxable year (or, if the property was disposed of during the taxable year, the 12-month period ending with the disposition). Acquisition indebtedness includes debt incurred to acquire property, debt incurred before the acquisition of property if the debt would not have been incurred but for the acquisition, and debt incurred subsequent to the acquisition of property if the debt would not have been incurred but for the acquisition and at the time of acquisition the incurrence of debt was foreseeable. The portion of the income from debt-financed property attributable to acquisition indebtedness is equal to the ratio of the average outstanding principal amount of acquisition indebtedness over the average adjusted basis in the property for the year. The Fund may borrow for investment purposes or to meet redemption requests. Any such borrowing will generally cause the Fund to have "debt financed property."

The federal tax rate applicable to an exempt organization Shareholder on its UBTI generally will be either the corporate or trust tax rate, depending on the Shareholder's form of organization, although generally the first $1,000 of UBTI is not subject to tax. The Fund is required to report to each of its exempt organization Shareholders information as to the portion, if any, of the Shareholder's income and gains from the Fund for any year that will be treated as UBTI; the calculation of that amount is highly complex, and there can be no assurance that the Fund's calculation of UBTI will be accepted by the Service. An exempt organization will be required to make payments of estimated federal income tax with respect to its UBTI.

The application of the UBTI rules may vary with respect to certain types of exempt organizations. For example, a charitable remainder trust, which generally is exempt from federal income tax, will be subject to an excise tax equal to the amount of any UBTI that it earns. Before investing, a prospective exempt organization investor should consult its tax adviser with respect to the tax consequences of receiving UBTI from participation in the Fund.

The Investment Manager may form a separate feeder fund, classified as a corporation for U.S. federal tax purposes, for investments by tax-exempt U.S. investors. Dividends, if any, paid by such a fund to a tax-exempt U.S. shareholder or gains such a shareholder recognizes on the sale, exchange, or redemption of its shares should not constitute UBTI unless the tax-exempt U.S. shareholder incurs debt to acquire the shares.

### Taxation of Non-U.S. Shareholders

Unless the Fund engages in a trade or business within the United States, none of the income it earns or gains it realizes (except as noted below) will subject a non-U.S. Shareholder to U.S. federal income tax. The Investment Manager does not intend to have the Fund engage in a trade or business, or enter into any relationship that would be deemed to be a trade or business, within the United States. The Fund's trading in stocks or securities for its own account will not constitute engaging in a U.S. trade or business (unless it is deemed to be a dealer in stocks or securities). As a result, the Fund anticipates, although there can be no assurance, that its net income and gains will not subject a non-U.S. Shareholder to U.S. federal income tax. If the Fund were considered to be engaged in a U.S. trade or business, a non-U.S. Shareholder would be required to file a U.S. federal income tax return and pay tax on its allocable share of the Fund's income that was treated as effectively connected with that U.S. trade or business. In the case of a non-U.S. Shareholder that is a foreign corporation, an additional 30% branch profits tax might be imposed. In addition, in such event the Fund would be required to withhold taxes from the income or gain allocable to such non-U.S. Shareholder. Any amounts so withheld would reduce amounts otherwise distributable to such non-U.S. Shareholder.

A non-U.S. Shareholder's allocable share of income from U.S. sources of any dividends and any interest, that is not either paid with respect to an obligation with an original maturity of 183 days or less or "portfolio interest" (see the following paragraph) will be subject to 30% U.S. federal withholding tax, unless such rate is reduced under an applicable tax treaty and such non-U.S. Shareholder establishes that it is entitled to the benefits of such treaty.

Portfolio interest is any interest paid on a debt obligation in registered form issued after July 18, 1984 by a U.S. person, provided that, (1) in the case of debt issued by a corporation, the Shareholder does not actually or constructively own 10% or more of the total combined voting power of all classes of the issuer's stock that are entitled to vote, (2) in the case of debt issued by a partnership, the Shareholder does not actually or constructively own a 10% or more capital or profits interest in the issuer and (3) the non-U.S. Shareholder provides the Fund with certain documentation as to its non-U.S. status, including IRS Form W-8BEN or a suitable substitute therefore.

A non-U.S. Shareholder will not be subject to U.S. federal income tax on its allocable share of gains the Fund recognizes on the sale or exchange of stock and other securities. Special rules may apply to a non-U.S. Shareholder that (1) has an office or other fixed place of business in the United States to which such gain is attributable or (2) is a former citizen or resident of the United States, a controlled foreign corporation of U.S. persons, a foreign insurance company that holds Shares in connection with its U.S. business, a passive foreign investment company, or a corporation that accumulates earnings to avoid U.S. federal income tax, or (3) in the case of an

individual non-U.S. Shareholder, is present in the U.S. for 183 days or more in the year of such sale, exchange or redemption and certain other requirements are met. These persons in particular are urged to consult their U.S. tax advisers before investing in the Fund.

## Audits

The Fund, like all partnerships, will be subject to a risk of audit by the Service. Any adjustments made to the Fund's information return pursuant to such an audit will require each Shareholder to file an amended federal income tax return for each year involved and might result in audits of and adjustments to the Shareholders' returns relating to non-Fund-related as well as Fund-related items. In addition, the Fund and the Shareholders could incur substantial legal and accounting costs in contesting and litigating any Service challenge, regardless of the outcome.

The Code contains special provisions for audits of partnerships by the Service. Pursuant to these provisions, the tax treatment of a partnership's income and deductions generally will be determined at the partnership level in a single proceeding, rather than by individual audits of the partners, and no deficiency resulting from such an audit may be assessed against a partner until the correctness of any challenge by the Service to any of the partnership's federal returns is determined at the administrative or judicial level. The Investment Manager will act as the Fund's "tax matters partner" and will have authority, subject to certain restrictions, to act on behalf of the Fund in any such proceeding.

## Tax Shelter Regulations

Certain rules require taxpayers to disclose -- on their federal income tax returns and, under certain circumstances, separately to the Office of Tax Shelter Analysis -- their participation in "reportable transactions" and require "material advisors" to maintain investor lists with respect thereto. These rules apply to a broad range of transactions, including transactions that would not ordinarily be viewed as tax shelters, and to indirect participation in a reportable transaction (such as through a partnership). For example, a Shareholder that is an individual will be required to disclose a tax loss resulting from the sale or exchange of his or her Share if the loss exceeds certain thresholds.

An excise tax and additional disclosure requirements may apply to certain tax-exempt entities that are "parties" to certain types of reportable transactions (referred to as "prohibited tax shelter transactions"). A notice issued by the Service in February 2007 provides that a tax-exempt investor in a partnership will generally not be treated as a "party" to a prohibited tax shelter transaction, even if the partnership engages in such a transaction, if the tax-exempt investor does not facilitate the transaction by reason of its tax-exempt, tax indifferent or tax-favored status.8 There can be no assurance, however, that the Service or Treasury Department will not provide guidance in the future, either generally or with respect to particular types of investors, holding otherwise.

Failure to comply with the disclosure requirements for reportable transactions or prohibited tax shelter transactions can result in the imposition of penalties. Prospective investors are urged to

consult with their own tax advisers with respect to the effect of these rules on an investment in the Fund.

## Possible Legislative or Other Changes

The Code, with respect to all of the foregoing matters and other matters that may affect the Fund or its partners, is constantly subject to change by Congress. In recent years there have been significant changes in the Code, many of which are being reconsidered by Congress and interpretations of which are being considered by the Service and the courts. It is not possible at this time to predict whether or to what extent any changes in the Code or interpretations thereof will occur. Prospective investors should note that the Fund will not undertake to advise investors of any legislative or other developments. Such investors should consult their own tax advisers regarding pending and proposed legislation or other changes.

## State and Local Taxation

In addition to the federal income tax considerations summarized above, prospective investors should consider potential state and local tax consequences of an investment in a Share. A Shareholder's distributive share of its Fund's taxable income or loss generally will be required to be included in determining the Shareholder's taxable income for state and local tax purposes in the jurisdiction in which it is resident. However, state and local laws may differ from the federal income tax law with respect to the treatment of specific items of income, gain, loss, and deduction.

Prospective Shareholders are urged to consult with their own tax advisers with respect to state and local income tax consequences.

## United Kingdom taxation of the Fund

It is intended that the affairs of the Fund will be conducted so that it will be resident for taxation purposes outside the United Kingdom and will not be liable to United Kingdom taxation on its worldwide profits and gains.

## Indirect taxation of the Fund

The Fund may invest and trade in various countries, in which the Fund may be subject to withholding, capital gains, income or other taxation at the Fund level.

## Shareholders of the Fund

Because the Shareholders will likely be resident for tax purposes in various countries, no attempt is made herein to summarize the tax consequences for every Shareholder. The foregoing discussion is only a summary of certain tax considerations relating to the Fund. It does not purport to be a comprehensive description of all the tax considerations that may be relevant to any particular Shareholder. There can be no assurance the views expressed herein will be accepted by the relevant tax authorities. The discussion does not address the U.S. federal income

tax consequences applicable to tax-exempt investors, insurance companies or others subject to special rules, and does not address any aspect of state or local taxation. The discussion is based on current law, which may be subject to change, possibly with retroactive effect.

## EU Savings Directive

Dividends and other distributions of income made by the Fund, together with payment of the proceeds of sale and/or redemption of Shares in the Fund, may in the future (depending on the investment portfolio of the Fund) be subject to the withholding tax and/or information providing regime imposed by EU Council Directive 2003/48/EC of 3 June 2003 on taxation of savings income in the form of interest payments, where payment is made to a Shareholder who is an individual resident for tax purposes in a Member State of the European Community (or a "residual entity" established in a Member State) by a paying agent resident in another such Member State. Certain other jurisdictions (including Switzerland) have, or are proposing to introduce, an equivalent withholding tax and/or information providing regime in respect of payments made through a paying agent established in such jurisdictions.

## Russian Taxation of the Fund

Provided that the Fund does not carry out any activity in Russia through a permanent establishment, it will be taxable in Russia only in respect of income that is considered Russian source income which in itself is subject to Russian withholding tax. However, there can be no assurance that the Fund in the future will be treated as if not having a permanent establishment in Russia. Laws or the interpretation of the law in Russia might be changed which might force the Fund to be subject for tax in Russia as a Russian resident. Buying Russian local shares by non-residents is not currently treated as a commercial activity in the territory of the Russian Federation. In the event of retroactive changes to Russian tax laws which affect the value of the Fund's portfolio, no restatement of the Net Asset Value will occur. The Fund will use its reasonable efforts to mitigate any residual risk of being regarded as having a permanent establishment in Russia.

Under the provisions of the "Profit Tax Chapter" of the Tax Code of the Russian Federation, any dividends payable by a Russian company direct are subject to a 15% withholding tax. The 15% tax rate is applicable to all passive income, which also includes coupon payments for bonds. The rate can be reduced if a client is domiciled in a country having a Double Taxation Treaty with Russia.

Any gains derived by the Fund on the disposal of shares in a Russian company or derivatives of such shares will not be subject to Russian withholding tax provided that no more than 50% of the Russian company's assets consists of immovable property in Russia. Gains derived by the Fund on the disposal of shares or derivatives of such shares in a Russian company where more than 50% of the assets are represented by immovable property in Russia would be subject of a Russian withholding tax of either 20% on the proceeds from the sale of such investment or 24% of the proceeds less certain expenses. In this case the withholding tax cannot be reduced by any double tax treaty. In the absence of double tax treaty protection, if the shares are sold to another

foreign legal entity having no registered presence in Russia, there is no mechanism for such legal entity to withhold the Russian tax.

Any gains derived by the Fund on the disposal of securities other than shares or their derivatives should not be subject to Russian withholding taxes. However, there is a risk, due to lack of clarity on the current legislation, that such gains could be *prima facie* treated as subject to Russian withholding tax of 20%.

### ERISA CONSIDERATIONS

**THIS DISCUSSION WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN. IT IS NOT INTENDED OR WRITTEN TO BE USED, AND IT CAN NOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER. A TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### General

The fiduciary responsibility standards and prohibited transaction restrictions of ERISA apply to most employee retirement and welfare benefit plans maintained by private corporate employers ("ERISA plans"). Although ERISA does not (with certain exceptions) apply to certain types of plans, such as individual retirement accounts, plans covering only self-employed individuals (*i.e.*, sole proprietors and partners) and their respective spouses, or corporate plans covering only a corporation's sole shareholder and his or her spouse, these plans (as well as most ERISA plans) are subject to the prohibited transaction excise tax provisions of Section 4975 of the Code, which are substantially similar to the prohibited transaction restrictions of ERISA. Neither ERISA nor Section 4975 of the Code applies to employee benefit plans established or maintained by government entities, plans established and maintained by churches or certain entities associated with churches, plans maintained outside the U.S. primarily for the benefit of nonresident aliens, and certain other plans excluded by statute.

The following summary of certain aspects of ERISA and Section 4975 of the Code is based upon the statutes, judicial decisions, and regulations and rulings of the U.S. Department of Labor ("DOL") in existence on the date hereof. This summary is general in nature and does not address every issue under ERISA or Section 4975 of the Code that may be applicable to the Fund or a particular investor. Accordingly, each prospective investor should consult with its own counsel in order to understand such issues affecting the Fund or the Shareholders.

### Investment Considerations

The assets of the Fund will be invested in accordance with the investment policies and objectives described in this Memorandum. Accordingly, an authorized fiduciary of an employee benefit plan proposing to invest in the Fund should, in consultation with its advisors, consider whether the investment would be consistent with the terms of the plan's governing documents and applicable law. The fiduciary of an ERISA plan, for example, should give appropriate

consideration to, among other things, (i) the role that an investment in the Shares would play in the plan's portfolio, taking into consideration whether the investment is designed reasonably to further the plan's purposes, the risk and return factors associated with the investment, the composition of the plan's total investment portfolio with regard to diversification, the liquidity and current return of the plan's portfolio relative to its anticipated cash flow needs, and the projected return of the plan's portfolio relative to its objectives, (ii) the fact that the Shareholders may consist of a diverse group of investors (possibly including taxable and tax-exempt entities) and that the Investment Manager necessarily will not take the investment objectives of any particular Shareholder that are not consistent with those of the Fund into account in managing Fund investments, (iii) limitations on the plan's right to redeem or transfer Shares, (iv) the implications arising from whether or not the assets of the Fund are treated as "plan assets" for purposes of ERISA and Section 4975 of the Code, and (v) the tax effects of an investment in Shares.

As described elsewhere in this Memorandum, the Investment Adviser will be entitled to receive a Performance Allocation. The appropriate fiduciary of an investing ERISA plan should satisfy itself that the Performance Allocation meets applicable requirements of ERISA, taking DOL guidance regarding such fee arrangements into account. The fiduciary of an investing plan, whether or not subject to ERISA, will be required to represent, among other things, that it understands the Performance Allocation arrangements and has obtained information (or has had the opportunity to request additional information) regarding such arrangements and the risks associated with them, as necessary to enable the fiduciary to conclude that the Performance Allocation arrangements are reasonable and consistent with the interests of the plan.

NONE OF THE INVESTMENT MANAGER, INVESTMENT ADVISER OR THE FUND IS RESPONSIBLE FOR DETERMINING, AND NONE OF THEM MAKES ANY REPRESENTATION REGARDING, WHETHER A PURCHASE OF SHARES IS A PRUDENT OR SUITABLE INVESTMENT FOR ANY EMPLOYEE BENEFIT PLAN.

### Prohibited Transactions

A purchase of Shares by an employee benefit plan having a relationship with the Investment Manager or any of its affiliates outside the Fund could, under certain circumstances, be considered a transaction prohibited under ERISA, Section 4975 of the Code, or, in some circumstances, applicable state law. In addition, the prohibited transaction restrictions of ERISA prohibit an ERISA plan fiduciary from causing the plan to engage in a transaction if the fiduciary knows or should know the transaction would involve a "party in interest" of the plan. "Parties in interest" of an ERISA plan include, among others, persons providing services to the plan and certain affiliates of such persons. Transactions between ERISA plans and parties in interest that are prohibited include, among others, any direct or indirect sale or exchange of property between the plan and a party in interest and any transfer of plan assets to, or use of plan assets by or for the benefit of, a party in interest. Section 4975 of the Code prohibits substantially similar transactions between plans subject to that Section and "disqualified persons" of such plans, defined to include substantially the same persons as parties in interest for ERISA purposes. Although the Investment Manager believes that the Fund should not be considered a party in interest (or disqualified person) with respect to investing ERISA plans (or plans subject to

Section 4975 of the Code), the application of ERISA, Section 4975 of the Code, or applicable state laws depends upon the particular facts and circumstances of each situation.

Accordingly, an authorized fiduciary of an investing plan will be required to represent, among other things, that the plan's purchase and holding of Shares will not be a transaction prohibited under ERISA, Section 4975 of the Code, or applicable state law, for which no exemption applies. Such fiduciary also will be required to represent that neither the Investment Manager nor any of its affiliates, agents, or employees (i) exercises any authority or control with respect to the management or disposition of assets of the plan used to purchase the Shares, (ii) renders investment advice for a fee (pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions and that such advice will be based on the particular investment needs of the plan), with respect to such assets of the plan, or has the authority to do so, or (iii) is an employer maintaining or contributing to, or any of whose employees are covered by, the plan.

"Plan Assets"

Regulations issued by the DOL describe when the assets of an entity are to be treated as "plan assets" for purposes of ERISA and Section 4975 of the Code. The regulations provide that, if an ERISA plan or a plan subject to Section 4975 of the Code acquires an "equity interest" (such as the Shares) in a certain type of private investment entity (such as the Fund), and if benefit plan investors in the aggregate hold 25% or more of the value of any class of equity interests in the entity, the entity's assets will be treated as "plan assets" for purposes of ERISA's fiduciary responsibility standards and prohibited transaction restrictions and the parallel prohibited transaction excise tax provisions of Section 4975 of the Code. ERISA defines the term "benefit plan investor" for purposes of this computation to include employee benefit and other plans subject to ERISA and/or Section 4975 of the Code, as well as private investment funds and other entities whose underlying assets are treated as "plan assets" of such plans. (In addition, assets of the general account of an insurance company may, in certain circumstances, be considered "plan assets.") ERISA and the regulations require that any equity interests held by a person having discretionary authority or control over the assets of the entity or providing investment advice for a fee with respect to such assets or any affiliate of such person (as defined in the DOL regulations), other than interests held by such person through a benefit plan investor, be disregarded in making the 25% computation.

In order to avoid treatment of the Fund's assets as "plan assets" for purposes of ERISA or Section 4975 of the Code, the Fund intends to restrict aggregate investments by benefit plan investors to less than 25% of the value of each class of Shares, not including Shares held by the Investment Manager (or any other person having discretionary authority or control over Fund assets or providing investment advice for a fee with respect to such assets) or any affiliate of the Investment Manager (as defined in the DOL regulations), other than Shares held by such person through a benefit plan investor. Because the 25% test is ongoing, the Fund not only may restrict initial or additional investments by benefit plan investors, it also may require existing benefit plan investors to redeem all or part of their Shares if other investors redeem. The Fund will effect such rejections or mandatory redemptions in such manner as the Directors, in their sole discretion, determine to be reasonable and appropriate under the circumstances.

Although it is not expected that the assets of the Fund will be treated as "plan assets," if at any time benefit plan investors were to hold 25% or more of the value of any class of the Fund's Shares, the Investment Manager and any other person having or exercising discretionary authority over the Fund or its assets would be a "fiduciary" (as defined in ERISA) with respect to investing ERISA plans and would be subject to the obligations and liabilities imposed on fiduciaries by ERISA. If the Investment Manager, with the advice of counsel, reasonably concludes that the assets of the Fund are, or are likely to become, "plan assets" for purposes of ERISA or Section 4975 of the Code, and that continued operation of the Fund under arrangements existing at the time would violate ERISA or would cause any Shareholder to be deemed to be a party to any transaction that violates the prohibited transaction restrictions of ERISA or Section 4975 of the Code for any reason other than as a result of an action taken exclusively by the Shareholder, the Investment Manager intends to take such steps as are necessary or appropriate to avoid such result, including proposing to the Directors amendments to the Fund's governing documents to ensure compliance with ERISA and Section 4975 of the Code, as applicable. However, if and for so long as the Fund's assets are treated as "plan assets" for purposes of ERISA and Section 4975 of the Code, the Investment Manager also will take such steps as it may determine are necessary to manage the Fund's assets in accordance with the applicable requirements of ERISA.

## Considerations for Non-Plan Shareholders

Prospective investors that are not ERISA plans or subject to the prohibited transaction provisions of Section 4975 of the Code should note that, if and for so long as the Fund's assets are treated as "plan assets" for purposes of ERISA and Section 4975 of the Code, the Fund may be prevented from engaging in a transaction with a party in interest of an investing plan subject to ERISA or a disqualified person of a plan subject to Section 4975 of the Code, unless an exemption applies, even though the Fund includes investors not subject to ERISA or Section 4975 of the Code. Moreover, this summary does not include a discussion of any laws, regulations, or statutes that may apply to prospective investors that are not employee benefit plans or state statutes that impose fiduciary responsibility requirements in connection with the investment of assets of governmental plans and other plans not subject to ERISA or Section 4975 of the Code. Such investors should consult their own professional advisers about these matters.

**FIDUCIARIES OF EMPLOYEE BENEFIT PLANS SHOULD CONSULT WITH THEIR OWN COUNSEL AS TO THE CONSEQUENCES UNDER ERISA, SECTION 4975 OF THE CODE, OR OTHER APPLICABLE LAW OF AN INVESTMENT IN THE FUND.**

**THE SALE OF SHARES TO AN EMPLOYEE BENEFIT PLAN IS IN NO RESPECT A REPRESENTATION BY THE DIRECTORS, THE INVESTMENT MANAGER OR THE FUND THAT AN INVESTMENT IN THE SHARES MEETS APPLICABLE LEGAL REQUIREMENTS WITH RESPECT TO INVESTMENTS BY EMPLOYEE BENEFIT PLANS GENERALLY OR ANY EMPLOYEE BENEFIT PLAN IN PARTICULAR.**

## ACCOUNTING

The Fund has retained BDO Tortuga, Cayman Islands, as its auditors.

## ADDITIONAL INFORMATION

Each prospective investor is invited to meet with representatives of the Fund and the Investment Manager to discuss with them, and to ask questions of and receive answers from them, concerning the terms and conditions of this offering of Shares, and to obtain any additional information, to the extent that any of those persons possesses that information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein.