# Exhibit 2

# THE CAYMAN ISLANDS LAW REPORTS 2008

*Editor in Chief*
ALAN MILNER, O.B.E., M.A., LL.M., Ph.D.
of Gray's Inn, Barrister; Attorney-at-Law
Emeritus Fellow of Trinity College, Oxford

*Editor*
JAMES McCARTHY, B.A.

*Production Editor*
SARAH SMITH, B.A.

*Consulting Editors*
RAMON D. ALBERGA, O.B.E., Q.C., M.A.
COLIN D. McKIE, M.A., Attorney-at-Law

**LAW REPORTS INTERNATIONAL**
Oxford 2009

[2008 CILR 87]

UNILEVER PLC v. ABC INTERNATIONAL

MOLSON COORS BREWING COMPANY v. ABC INTERNATIONAL

GRAND COURT (Smellie, C.J.): February 19th, 2008

*Civil procedure—judgments and orders—summary judgment—summary judgment may incorporate declaration that plaintiff not bound by agreement to arbitrate and injunction restraining defendant from further vexatious and oppressive efforts to compel arbitration*

The plaintiffs sought a declaratory order and injunctive relief in respect of ongoing litigation between themselves and the defendant.

In consolidated actions, the plaintiffs applied for a declaratory order, under the Grand Court Rules, O.14, to the effect that none of them was bound by an agreement, allegedly between themselves and the defendant, Arab Business & Commerce International ("ABCI"), nor were they bound to engage in arbitration in respect of contractual disputes, and for injunctive relief restraining ABCI from further attempts to compel them to arbitrate.

ABCI, a company incorporated and registered in the Cayman Islands, had made several attempts to enter into arbitration with the plaintiffs, a group of well-known international companies, under an arbitration clause in an agreement made between the defendant and Diversey Ltd. (a company not itself party to these proceedings, then part of the Diversey division of the Molson Group, which was party to the present proceedings) in 1988. Diversey Ltd. had, in the early 1980s, sought to sell its products in Saudi Arabia but in order to trade there foreign companies needed a local sponsor. Diversey Ltd. had, therefore, reached an agreement in 1983 with a Prince Bandar, who traded under the name of Arab Business & Commerce Saudi ("ABCS"). ABCI was also party to this agreement, under which it undertook to assist and oversee ABCS in its sponsorship of Diversey Ltd., for a commission payable back to ABCS. In 1988, a new agreement, very similar to the 1983 agreement, was made between Diversey Ltd. and ABCI which contained the arbitration clause the subject of the present proceedings. This agreement made ABCS the local sponsor of Diversey Ltd., responsible for its running, while ABCI was to oversee the whole operation and monitor the performance of ABCS, which was then headed by a Dr. Bouden, to whom Prince Bandar had delegated responsibility.

By 1991, ABCS, and in particular Dr. Bouden, had been failing to perform its obligations for some time, culminating in the dismissal of Dr. Bouden by Prince Bandar. However, by this time Diversey Ltd. considered the 1988 agreement to have been terminated and the Diversey division of the Molson Group confirmed this position in a letter dated July 19th, 1992. After that, the ownership of Diversey Ltd. was transferred several times, with the Molson Group selling the company to Unilever, resulting in the creation of DiverseyLever, which was subsequently bought by the Johnson Group. ABCI had, since 1998, attempted to commence arbitration with these companies, the plaintiffs, in respect of their failure to perform their obligations, pursuant to the arbitration clause in the 1988 agreement, which it believed was never terminated.

The plaintiffs submitted that (a) the agreement was considered by Diversey Ltd. to have been terminated in 1991 and evidence, dated 1992, existed which established this position; (b) as the agreement ceased to exist, any transfer of the ownership of Diversey Ltd. between the plaintiffs was irrelevant and this was so even if it were held that the agreement still operated, as any obligations under it had not been transferred or assigned in any way to any of the plaintiffs upon any transfer of ownership since the agreement, and mere ownership was not enough to bind them to any clause of the agreement in the absence of privity; since "group enterprise theory" was not a doctrine recognized by either Cayman or English law, there was no basis for any contractual relationship between ABCI and the plaintiffs; and (c) ABCI clearly wished to extend its claim to any entity even remotely linked to Diversey Ltd., many of which did not even exist at the time of the agreement, and an injunction against it was necessary to prevent further vexatious arbitration attempts.

The defendant made no submissions, filed no evidence, despite three separate opportunities to do so, and was unrepresented, all of which was unexplained. However, its previous defence had been that (a) the 1988 agreement had not been terminated and was therefore still in operation; (b) under the "group enterprise theory," the plaintiffs were bound to the arbitration agreement as a result of the various transfers of the ownership of Diversey Ltd. and re-assignments of the obligations under the agreement since 1988; and (c) the court did not have jurisdiction to adjudicate in the dispute.

Held, granting the applications:

(1) A declaratory order would be made to the effect that the plaintiffs were not bound by the arbitration clause of the 1988 agreement and were therefore not bound to arbitrate in regard to disputes under the agreement. There was no jurisdictional reason why summary judgment containing a declaration of this nature could not be given under the Grand Court Rules, O.14. As ABCI had filed no evidence, in contrast to the array of evidence filed by the plaintiffs, the court had to proceed on the basis of that unchallenged evidence alone. The agreement had been terminated by 1991 and there was in any case no basis for alleging any contractual relationship

between the plaintiffs and ABCI, since none of them had been privy to the agreement, no obligations under the agreement had been transferred or assigned in any way to any of the plaintiffs upon any transfer of ownership of Diversey Ltd., and "group enterprise theory" was not a doctrine recognized by either Cayman or English law. The appropriate doctrine was that of privity and there was no privity in this case (para. 5; paras. 21–22; para. 40; para. 48; para. 50; para. 54).

(2) An injunction would be granted to restrain ABCI from attempting to force further arbitration upon the plaintiffs as it had shown no substantial case against them and clearly wished to pursue any entity even remotely linked to Diversey Ltd. with vexatious and oppressive attempts to force them into arbitration. The court had inherent jurisdiction to grant summary judgment incorporating such an injunction, since such injunctions could be granted when appropriate and necessary to avoid injustice, as was the case here, provided that the court was satisfied that the defendant was unable to establish a proper defence. Although ABCI did retain the right to apply to stay the proceedings under the Foreign Arbitral Awards Enforcement Law (1999 Revision), it had failed to do so (para. 20; paras. 40–41; para. 44; para. 47; para. 52; para. 54).

Cases cited:
(1) *Airbus Indus. G.I.E.* v. *Patel*, [1999] 1 A.C. 119; [1998] 1 Lloyd's Rep. 631; [1998] C.L.C. 702, referred to.
(2) *Bonython* v. *Commonwealth of Australia*, [1951] A.C. 201; (1950), 94 Sol. Jo. 821, followed.
(3) *Catanho* v. *Brown & Root (U.K.) Ltd.*, [1981] A.C. 556; [1980] 3 W.L.R. 991; [1981] 1 All E.R. 143; [1981] 1 Lloyd's Rep. 113; (1981), 124 Sol. Jo. 884, referred to.
(4) *Insurco Intl. Ltd.* v. *Voluntary Purchasing Group Inc.*, 1994–95 CILR 402, referred to.
(5) *KTH Capital Management Ltd.* v. *China One Fin. Ltd.*, 2004–05 CILR 213, referred to.
(6) *Kitts* v. *Moor & Co.*, [1895] 1 Q.B. 253; (1894–95), 39 Sol. Jo. 96, referred to.
(7) *Leco Instruments (UK) Ltd.* v. *Land Pyrometers Ltd.*, [1982] R.P.C. 133, referred to.
(8) *Liberia (Republic)* v. *Gulf Oceanic Inc.*, [1985] 1 Lloyd's Rep. 539, applied.
(9) *Metal Scrap Trade Corp. Ltd.* v. *Kate Shipping Co. Ltd. (The "Gladys")*, [1990] 1 W.L.R. 115; [1990] 1 All E.R. 397; [1990] 1 Lloyd's Rep. 297; (1990), 134 Sol. Jo. 261, referred to.
(10) *Peterson Farms Inc.* v. *C & M Farming Ltd.*, [2004] 1 Lloyd's Rep. 603; [2004] EWHC 121 (Comm), referred to.
(11) *Shell-Mex & B.P. Ltd.* v. *Manchester Garages Ltd.*, [1971] 1 W.L.R. 612; [1971] 1 All E.R. 841; (1971), 115 Sol. Jo. 111, referred to.
(12) *Société Nationale Indus. Aerospatiale* v. *Lee Kui Jak*, [1987] A.C.

THE CAYMAN ISLANDS LAW REPORTS                    2008 CILR

871; [1987] 3 W.L.R. 59; [1987] 3 All E.R. 510; (1987), 131 Sol. Jo. 842, referred to.
(13) *Zuiderent* v. *Christiansen*, 2004–05 CILR N [23], referred to.

*P. Brook Smith, Q.C.* and *Ms. J. Stewart* for the plaintiffs;
The defendant did not appear and was not represented.

1  SMELLIE, C.J.: I have before me two applications, one in each cause, which were directed by an order made on June 6th, 2007 to be heard together. In them, the plaintiffs (that is, all the plaintiffs except the Kimberly-Clark Corporation) seek judgment under the Grand Court Rules, O.14, for declaratory and injunctive relief against the defendant, ABC International ("ABCI"). The declaratory order sought would be to the effect that none of the plaintiffs is bound to arbitrate, in the context of several attempts by ABCI (through the International Chamber of Commerce in Paris) to arbitrate against them. The injunctive orders would restrain ABCI from further attempts to arbitrate about the same or similar allegations of contractual obligations on the part of the plaintiffs to submit to arbitration.

2  The plaintiffs are companies which are variously and disparately part of well-known and substantial international commercial organizations (the Molson, Unilever, Johnson and Nalco groups of companies, based in various parts of the world), and four individuals associated with the Johnson Group. ABCI is a company incorporated and registered in the Cayman Islands. Its representative, at all material times, has been a Dr. Majid Bouden.

**Background**

3  The central issue is the purported reliance by ABCI upon an arbitration clause in an agreement dated April 1st, 1988 ("the agreement") which concerned the supply of certain products into Saudi Arabia and which replaced an earlier agreement entered into in 1983.

4  The only express parties to the agreement were ABCI and an English company named Diversey Ltd. (registered as Company No. 1990306) which was in 1988 part of the "Diversey" division of the Molson Group. Diversey Ltd. is not one of the plaintiffs in these actions.

5  In the absence of any apparent privity of contract between ABCI and the plaintiffs, the latter insist that they are not, and never were, parties to the agreement and so are not bound by the arbitration clause in it. Thus, they assert that there is no proper basis whatsoever upon which ABCI can force them to submit to arbitration. And it follows, if the court agrees, that there can be no proper defence to their claims for declaratory and injunctive relief now.

GRAND CT.            UNILEVER V. ABC INTL. (Smellie, C.J.)

6  The facts in this case are taken from the affidavit evidence filed on behalf of the plaintiffs. This is particularly so in respect of the affidavit of Mr. Christopher Wilkes. As the English solicitor of the plaintiffs, Mr. Wilkes explains that his affidavit draws together the facts and evidence relevant to the position of each of the plaintiffs into one central document. This is on the basis that he has been involved with the plaintiffs and their predecessor companies for many years and has developed a closer knowledge of the background, than probably anyone else currently involved. As to matters of which he has no first-hand knowledge, he has received information verified by other officers of the plaintiffs and on which he relies. Those other officers have sworn affidavits of their own. Fully a dozen affidavits have been filed on behalf of the plaintiffs supported by hundreds of pages of documentary exhibits. Wilkes affirms that the facts contained in the plaintiffs' writ, statement of claim, ABCI's defence and further and better particulars of the statement of claim, are true to the best of his knowledge and belief.

7  Before turning to summarize the relevant background evidence, as taken primarily for present purposes from Wilkes's affidavits, I am obliged here to note the contrasted position of ABCI on whose behalf no evidence whatsoever has been filed. This is notwithstanding the fact that the defendant acknowledged service of the plaintiff's writ through its then local attorneys (Associated Advocates Chambers) on June 23rd, 2006, filed its defence on July 4th, 2006, its amended defence on July 28th, 2006 and re-amended defence on December 17th, 2006—following up on its requests for further and better particulars which were honoured by the plaintiffs on two separate occasions.

8  The failure of ABCI to file evidence in support of its defence, which failure remains unexplained, is all the more sanctionable as it flies in the face of an order made by its consent on June 6th, 2007 requiring that it file any evidence in response to the plaintiffs' evidence by no later than July 4th, 2007. Moreover, in light of its failure to meet that deadline, a further order was made on September 3rd, 2007 (ABCI being then represented by the different firm of Solomon Harris) when, among other things, the following was stipulated by the court:

> "The plaintiffs may apply to the court at the hearing of the summary judgment applications [those now before me] for a determination whether any evidence filed by the defendant in defence of the summary judgment application shall be admissible if such evidence is not served by the defendants promptly . . ."

9  Far from seeking to comply with that further opportunity fully to defend against these applications, ABCI failed to instruct its new attorneys and they have successfully applied to come off the record. It had thus become quite

91

apparent that ABCI would not seek to comply. The reasonable inference was that ABCI wished to stall the proceedings by its absence.

10 The hearing therefore proceeded without the defendant and without any evidence filed on its behalf. Subsequent attempts by Dr. Bouden to communicate in writing directly with the court in the absence of the plaintiffs, have been ignored by me as being improper. I return now to the narrative of the background.

**The plaintiffs**

11 The positions of the plaintiffs within the various corporate groups are of significance. Many simply did not exist at the time of the agreement, a fact which goes to the heart of the "group enterprise theory" upon which ABCI had earlier relied for attaching contractual obligation to the plaintiffs absent anything to show that they were express parties to the agreement. That theory—more properly termed "hypothesis"—has since been disavowed by ABCI in its defence—although on close examination it still seems to underpin it—and will be considered further below.

12 The individual plaintiffs in Cause 325 of 2006—Mr. S. Curtis Johnson III, Mrs. Helen Johnson-Leopold and Mr. Clifton Louis—are each directors of Johnson Diversey Inc. (one of the Johnson plaintiffs and which did not exist until 1997) and are each beneficial owners of shares in Commercial Markets Holdco Inc. (another Johnson plaintiff and which did not exist until 1999). Mrs. Imogene Johnson, the seventh plaintiff in Cause 325 of 2006, is a beneficial holder of shares in that latter Johnson plaintiff.

13 The two Molson plaintiffs respectively in Cause 211 and Cause 325—each being part of the Molson Group—are Molson Inc. (registered in Canada) and Molson Coors Brewing Co. (a Delaware holding company which, until 2005, had simply headed the Coors Beer Group).

14 The two Unilever plaintiffs are both in Cause 211—Unilever Plc. (registered in England) and Unilever N.V. (registered in the Netherlands)—and are together simply the parent holding companies of the Unilever Group. They sit at the twin pinnacles of the Anglo-Dutch "Unilever Group." As such, the evidence is that neither has been concerned with the execution or performance of any operational level agreements by any subsidiary and neither company owns or controls any operational assets.

15 Mr. Robert Leek, the corporate counsel for the Unilever Group, explains in his affidavit that because of the nature of the relationship between the two Unilever plaintiffs and their subsidiaries within the group, there is no question of either company having performed or executed or benefited from the agreement as averred by ABCI. He confirms that neither company has ever had any direct involvement with

GRAND CT.            UNILEVER V. ABC INTL. (Smellie, C.J.)

any agency arrangements of their subsidiaries and, specifically, none with ABCI.

16  As to the further assertion by ABCI in its defence—that the agreement was "assigned" and/or "transferred" to certain Johnson Group members in or around 2002—Mr. Leek denies any basis upon which that could have happened. Two primary reasons are given: first, the sale of the "Diversey Lever" business to the Johnson Group by the Unilever Group took place through a US company (Conopco Inc.) in respect of which there could be no basis for contending that it ever received any assignment or transfer of the agreement (or any other agreement with ABCI for that matter). Secondly, the agreement had been considered by Diversey Ltd. to have been terminated in 1991 (for reasons to be considered below) and long before even the acquisition of the "Diversey" business by the Unilever Group had taken place—that which was later acquired by the Johnson Group.

17  There are six Johnson plaintiffs, each being part of the Johnson Group and are variously plaintiffs in Causes 211 and 325. In Cause 211, the companies are Johnson Diversey Holdings Inc. (incorporated in Delaware in 2001); Johnson Diversey Inc. (incorporated in Delaware in 1997) and Johnson Diversey Gulf FZE (incorporated in Dubai in 1997). In Cause 325, the companies are Johnson Diversey Europe B.V. (incorporated in the Netherlands in 2002) and Commercial Markets Holdco Inc. (incorporated in Wisconsin in 1999).

18  There are two Nalco plaintiffs, each being part of the Nalco Group and both of them plaintiffs in Cause 325. They are Nalco Holdings Co. (incorporated in Illinois in 2004) and Nalco Saudi Co. Ltd. (incorporated in Saudi Arabia no later than 1978 where it has been doing business since then).

19  The defendant ABCI avers in its defence that the Nalco plaintiffs "executed" and "benefited" from the agreement and that the agreement was "assigned and transferred to, executed and performed" by the Nalco plaintiffs.

20  These averments against the Nalco plaintiffs are specifically addressed by their vice-president and general counsel, Mr. Stephen Landsman, in his affidavit. His response, which is unrefuted and deserves to be accepted, describes what are perhaps the most absurd of all the circumstances created by the allegations of the defendant ABCI seeking to extend as far as possible the tentacles of its claim to compel any entity, even remotely linked to the Diversey Group, to arbitrate. The following narrative, which is unavoidably full, comes from paras. 6–14 of Mr. Landsman's affidavit:

"The Nalco plaintiffs

  6.(a) *Nalco Holdings Co.*
Nalco Holdings Co. was established in June 2004 and is a company registered in Illinois, USA. It is a publicly-traded holding company of the Nalco group of companies who provide products and services in respect of water treatment applications for industrial, institutional and other uses.

  (b) *Nalco Saudi Co. Ltd.*
Nalco Saudi Co Ltd. is a company registered in Saudi Arabia and is jointly owned by Nalco Co. (a subsidiary of Nalco Holding Co.), the majority shareholder, and a Saudi national as sponsor. Since 1978, Nalco Saudi Co. Ltd. has provided water treatment products and services to the oil industry in Saudi Arabia.

7. I understand from Mr. Wilkes that the 1988 Agreement which ABC International relies upon as containing an arbitration clause binding the Nalco plaintiffs was terminated in 1991/1992.

8. I understand from its defence that ABCI alleges that the Nalco plaintiffs 'executed' and 'benefited' from the 1983 Agreement and that the 1983 and 1988 Agreements were 'assigned and transferred to, executed, performed and benefited from' by the Nalco plaintiffs (para. 45 of the defence).

9. From my questions to the employees of Nalco Saudi and my review of the corporate document database, it appears that prior to 1996 (*i.e.* several years after the termination of the 1988 Agreement) the Nalco Group had no connection whatsoever with any Molson or Diversey business and had no relationship at all with ABCI. From my review, there is no indication of any Nalco company ever executing any agreements with ABCI or otherwise having any business relationship with or knowledge of ABCI.

10. The business of Nalco Saudi Co. Ltd. in Saudi Arabia was exclusively related to providing services for the oil industry. This relationship pre-dates the 1983 Agreement by several years and the 1988 Agreement by almost 10 years. I have specifically enquired of employees of Nalco Saudi Co. whether, prior to commencement of the purported ICC arbitration proceedings naming Nalco plaintiffs, they had ever even heard of (let alone had any connection or contractual relationship with) ABC International and their response is that they had not. I am not aware of anyone at Nalco Saudi

> Co. Ltd. who had any familiarity with ABCI before the commencement of the purported ICC arbitration proceedings.
>
> 11. Moreover, the business of Nalco Saudi Co. Ltd. appears to have nothing at all to do with the subject-matter of the 1988 Agreement.
>
> 12. On June 28th, 1996, Molson Inc. sold its Diversey Water Technology business to the Nalco Chemical Co. (n/k/a Nalco Co.) a subsidiary of Nalco Holding Co. This transaction occurred many years after the termination of the 1988 Agreement with ABC International. The Diversey Water business purchased by Nalco from Molson included no business whatsoever conducted in or connected with Saudi Arabia, being wholly concerned with business in North America and Europe, particularly in the United States, United Kingdom and Italy, relating to treatment of industrial water.
>
> 13. It is fair to say that receiving the ICC proceedings has caused a great deal of confusion at Nalco not least because no one had ever heard of ABC International and because Nalco does not and has never had any connection whatsoever with the Diversey business in Saudi Arabia which is said to be the subject of ABC International's claims.
>
> 14. In particular, as for the alleged assignment or transfer whether as a result of Nalco's acquisition of the Diversey Water business or otherwise, these allegations are completely without foundation. As I have explained, the Diversey Water business acquired by Nalco in 1996 from Molson had nothing whatsoever to do with Saudi Arabia or with ABC International. Accordingly, I am aware of no factual basis whatsoever upon which the Nalco plaintiffs could be said to have become bound by the 1988 Agreement or the arbitration clause contained therein."

21 In summary, the picture emerging from the foregoing narratives of the circumstances of the plaintiffs is one of a complete lack of basis for the assertion of a contractual relationship with the defendant ABCI.

22 The picture shows a confusion of identity as between individuals having beneficial interests in corporations and the corporations themselves. It shows also in many cases that as the corporations were not at the time even in existence, they could not have been privy to the agreement (or the predecessor 1983 agreement). It shows, finally, that even where certain that the plaintiff corporations were in existence, for other legal

THE CAYMAN ISLANDS LAW REPORTS 2008 CILR

reasons they simply could not or were not privy to the agreement. Nor, as has been specifically pleaded in reply to the defence and amended defence, could they be or were they party to any transfer, assignment, execution or performance of the agreement. And, finally in this regard, even if there could have been some "benefit" from the agreement (which is denied) this could only have been by virtue of controlling interests through subsidiaries or affiliates.

The agreement

23  I must now outline some more of the factual background relating specifically to the coming into being of the agreement and its averred termination in 1991/1992. I here note my gratitude to Mr. Brook Smith, Q.C. for the helpful summary in his written submissions which, from my reading of the affidavits, accurately sets out the plaintiffs' case in this regard.

24  "Diversey" has for many years been a well-known brand name for sanitary products sold the world over. As is common with many major international companies, operations in bringing "Diversey" products to the marketplace were conducted from time to time through various "Diversey" companies, incorporated in different parts of the world.

25  In the mid-1970s these Diversey companies formed part of the Molson Group, as a "Diversey" division. One such company, the English company Diversey Ltd., was then looking to sell its products in Saudi Arabia. In order to trade on their own account within Saudi Arabia, foreign companies were, however, required to have a local sponsor or agent to assist them in their trade.

26  In 1983, agreements came to pass between Diversey Ltd. and such a local sponsor—a Prince Bandar (who used the trading name of "ABC Saudi," operating a "Diversey division"—amongst other operations—within ABC Saudi), and between Diversey Ltd. and ABCI. ABCI was to assist ABC Saudi, in return for a cut of the commission payable to ABC Saudi.

27  In 1988 a new arrangement of which the agreement became a pivotal part, was put in place as between Diversey Ltd. (that company which was incorporated in England as company no. 1990306—not one of the plaintiffs) and ABCI. Thus the arbitration clause which the agreement contains was between Diversey Ltd. and ABCI. In order to fulfil the sponsorship role required under Saudi law, the agreement was coupled with a further local agency agreement between Diversey Ltd. and ABC Saudi, under which ABC Saudi was appointed local agent for Diversey Ltd.

28  Under the agreement, ABCI, in return for its cut in the commission payable to ABC Saudi, was to assume the role of overseeing the recruitment of the appointed local agent, ongoing supervision and monitoring of

GRAND CT.                    UNILEVER V. ABC INTL. (Smellie, C.J.)

the agent's performance, advising Diversey Ltd. in relation to its business in Saudi Arabia, and advising and assisting the local agent towards maximizing sales of Diversey products in the Kingdom. As principal of the local agent ABC Saudi, Prince Bandar delegated the running of the "Diversey Division" within ABC Saudi to Dr. Bouden. Thus, Dr. Bouden was having to earn the share of the commission payable to his company—ABCI, the defendant.

29  Documents exhibited to Mr. Wilkes's affidavit show that the 1988 arrangements came to an end in 1991. From November 1991, Dr. Bouden had no authority to act as manager of ABC Saudi's "Diversey Division." By 1991, ABCI had for some time been failing to perform its obligations under the agreement, and the culmination was notification by Diversey Ltd. to ABCI that the agreement was considered terminated. For one thing, Dr. Bouden—the singular and moving force behind ABCI—had spent long periods outside Saudi Arabia, for reasons connected with a dispute he had with the National Bank of Tunisia, a dispute which had involved his detention in that country and, it appears, the avoidance of a lengthy prison term by the payment by him of some $7m.

30  For present purposes, I need only record the contents of two documents evidencing the foregoing. The first is an undated letter (but written, it seems, shortly after the date to which it refers) from Prince Bandar to the general manager, Diversey Ltd., in the following terms (as translated from Arabic):

> "We would like to notify you that Dr. Abdul Majeed Bin Sadiq Bouden, Tunisian national, who is sponsored by us, is no longer acting as representative of the Arab Business and Commerce Est. and that his employment relation with the Est. has been terminated as of November 1st, 1991. Therefore, we hereby confirm that any future contracts or business transactions should be performed by me personally."

31  The second is a letter dated July 19th, 1992 to ABCI at its registered office in Grand Cayman from Mr. Eric Trimble, the vice-president, secretary and general counsel of Diversey, at its world headquarters; and copied personally to Dr. Majid Bouden, president of ABCI:

> "I act for Diversey Ltd., a subsidiary of the Diversey Corporation.
>
> ABC International ('ABC') is a party to an Agreement with Diversey Ltd. dated April 1st, 1998 ('the Agreement').
>
> ABC has been in breach of its obligations under the Agreement since August 1991, and in fact has been and remains incapable of remedying this breach or performing any of its continuing obligations under the Agreement. Diversey Ltd. has previously advised you of this breach (which you have acknowledged).

97

THE CAYMAN ISLANDS LAW REPORTS                    2008 CILR

> This letter is to confirm Diversey Ltd.'s previous advice to you that the Agreement was terminated as of and from August 1991, by reason of your irreparable breach thereof."

32  Apart from a general denial (in paras. 12 and 31 of its amended defence) that the agreement was ever terminated, the defendant has made no attempt to refute the specific assertions contained in those letters.

33  Paragraph 12 of the amended defence is instructive insofar as it pleads ongoing reliance upon the arbitration provisions of the agreement in any event, in these terms:

> ". . . [T]he allegation of termination of the agency agreement is denied. In any event if, which is not admitted, this was the case such determination has no effect on the existence, validity and scope of the arbitration agreement, which in any event remains in force by virtue of the principles of autonomy of the arbitration clause and the right to act thereunder."

34  Thus, in seeking to deny the jurisdiction of this court to grant the plaintiffs the relief sought, ABCI's ultimate response is that the plaintiffs must all submit to the jurisdiction of the ICC on the basis of a group enterprise theory now jettisoned in favour of allegations of assignments, transfers, execution of or benefit from an agreement which, even if long ago determined, still binds because of a surviving autonomous arbitration clause. I think such a proposition needs only to be stated to be exposed as patently and irredeemably flawed.

**ABCI's arbitration attempts**

35  Since March 1998, an ICC arbitration (No. 9914) has been proceeding, initiated by ABCI, and to which the sole respondent is a company named DiverseyLever Ltd., a company registered in England and Wales. That respondent is not one of the plaintiffs. Nor, for that matter, is it the same as Diversey Ltd. which was the entity that actually entered into the 1988 agreement. There is, in any event, from the point of view of the plaintiffs, no impediment to that arbitration continuing, and it is unaffected by these causes of action. The plaintiffs are not parties to that arbitration, nor have they ever been. They say that all claims which ABCI wishes to pursue against the plaintiffs are already being pursued against DiverseyLever Ltd. in that effective arbitration.

36  In its submissions to the arbitral tribunal in that case, ABCI asserted its case against DiverseyLever Ltd. as the co-contracting party to the agreement by virtue of it having "substituted itself" into that agreement and adopted the "whole of the contractual obligations." Thus, on the face of those submissions, ABCI, one might think, hopelessly contradicted the basis upon which it variously seeks to assert that the plaintiffs have

GRAND CT.                    UNILEVER V. ABC INTL. (Smellie, C.J.)

otherwise become parties to the agreement. Nonetheless, for years now ABCI has been trying to add to that sole effective arbitration by seeking to arbitrate against a host of other parties, including the plaintiffs. Mr. Wilkes explains that the latest attempt is the fourth time that ABCI has raised an arbitration request—the others having been Nos. 12528, 13329 and 14428—before the ICC.

**The jurisdiction of this court to deal with these applications**

37  I will now address the contention in para. 6 of ABCI's amended defence that this court has no jurisdiction to adjudicate in the dispute between the parties. ABCI is incorporated in the Cayman Islands and has been properly served by the plaintiffs with these causes of action. It has, however, made no application to strike out or stay either cause, on any ground. This is notwithstanding that it would have standing to seek to do so by virtue of s.4 of the Foreign Arbitral Awards Enforcement Law (1999 Revision), on the basis as asserted by ABCI, that the plaintiffs, as parties to the agreement, have agreed to refer the dispute to arbitration.

38  Moreover, ABCI has actively submitted to the jurisdiction of this court by its acknowledgement of service and by its own substantive defence by which it has joined issue on the matters raised in both causes. Given all the foregoing, ABCI's assertion in its defence that the jurisdiction of this court is ousted because the dispute is the subject of arbitration under the jurisdiction and rules of the International Court of Arbitration of the ICC, is misconceived.

39  In the words of Oliver, L.J. in *Liberia (Republic) v. Gulf Oceanic Inc.* (8) ([1985] 1 Lloyd's Rep. at 544):

> "The High Court has, of course, a general jurisdiction to entertain actions for declarations regarding matters which are in dispute between parties. It can declare that a party is or is not bound by a particular contract. It can declare what the meaning of a contract is or determine, by declaration, whether a particular arrangement is or is not a binding contract . . . It seems to me to be a perfectly ordinary action for a declaration commenced in reliance on the Court's general jurisdiction to make declarations, and the mere fact that its purpose is to ascertain whether or not an arbitration clause is binding does not, in my judgment, put it into some special sacrosanct category of proceeding . . ."

40  These pronouncements were endorsed by the House of Lords in *Metal Scrap Trade Corp. Ltd. v. Kate Shipping Co. Ltd. (The "Gladys")* (9). Nor is there in principle, any reason why such declaratory or injunctive relief may not be obtained by way of Grand Court Rules, O.14 summary judgment proceedings. It is also settled law that O.14 summary judgment can be granted particularly in respect of a claim for a declaration: *Leco Instruments*

THE CAYMAN ISLANDS LAW REPORTS                    2008 CILR

*(UK) Ltd.* v. *Land Pyrometers Ltd.* (7) and for injunctive relief: *Shell-Mex & B.P. Ltd.* v. *Manchester Garages Ltd.* (11). Injunctive relief may be granted "where it is appropriate to avoid injustice," including where, on a balance of convenience, it is just to restrain a claimant from pursuing foreign instead of local proceedings and where the restraint would not deprive him of any legitimate juridical advantage to which he would otherwise be entitled by proceeding in a foreign jurisdiction: *Catanho* v. *Brown & Root (U.K.) Ltd.* (3).

41   More specifically, it is well established that the court has inherent jurisdiction to restrain a defendant from proceeding to arbitration where action is brought—as here—by a party contending that it is not bound by a supposed arbitration agreement: *Kitts* v. *Moor & Co.* (6) (where the injunction was granted pending the resolution of the dispute over the validity of the arbitration agreement itself). And see, more generally, Gee, *Commercial Injunctions*, 5th ed., para. 14.040, at 427.

42   In the circumstances of this case, there can, of course, be no deprivation of a juridical advantage to arbitrate before the ICC where there is no contractual obligation to do so and, moreover, where no proper issues of *forum conveniens* can therefore arise: see, for example, *Insurco Intl. Ltd.* v. *Voluntary Purchasing Group Inc.* (4) (where there were strong factors pointing to Texas as the proper forum).

43   The declaratory and injunctive relief which is sought here is *in personam*, solely against ABCI, and I emphasize not against any arbitral tribunal or body. Since ABCI is amenable to the jurisdiction of this court, an injunction will be an effective remedy. It would restrain ABCI's pursuit of attempted arbitration, not any legal proceedings which may be taken elsewhere (and none such has been brought to my attention). ABCI is incorporated here and, as already noted, jurisdiction to bring this action against it here is founded as of right: see *KTH Capital Management Ltd.* v. *China One Fin. Ltd.* (5).

44   Finally, the relief sought here would not prevent ABCI continuing to pursue (as it may wish to do) the current arbitration proceedings (No. 9914) which it has initiated against DiverseyLever Ltd. With all the foregoing in mind in support of the plaintiffs' applications, the court must however, be very careful in granting declaratory or injunctive relief under the Grand Court Rules, O.14—as it would in giving any other kind of final relief by way of summary judgment—to satisfy itself that the defendant is unable to establish a *bona fide* defence. As is stated at 1 *The Supreme Court Practice 1999*, para. 14/04/02, at 171:

> "The purpose of Order 14 is to enable a plaintiff to obtain summary judgment without trial, if he can prove his claim clearly, and if the defendant is unable to set up a bona fide defence, or raise an issue against the claim which ought to be tried ...

GRAND CT.           UNILEVER V. ABC INTL. (Smellie, C.J.)

'When the Judge is satisfied not only that there is no defence but no fairly arguable point to be argued on behalf of the defendant it is his duty to give judgment for the plaintiff' (per Jessel, M.R., *Anglo-Italian Bank v. Wells* (1878), 38 L.T. at 201)."

And see *Zuiderent v. Christiansen* (13).

45 Having regard to all the foregoing, my conclusions are as follows: I accept that this court has jurisdiction to try the action and to grant the kind of declaratory and injunctive relief the plaintiffs seek. In this regard, I note that ABCI is a Cayman company and has submitted to the jurisdiction of this court in both sets of proceedings.

46 I also note that on the authority of *Bonython v. Commonwealth of Australia* (2) the law of England and Wales was the governing law of the agreement as it had its closest and most real connection with England, where it was negotiated and executed in the English language and to which jurisdiction the principal obligations related or concerned. I note also in this regard that the laws of England and Wales are substantially the same as those of the Cayman Islands on the subject of contractual obligations.

47 If there is to be doubt about that finding as to English law as the governing law, I note that, as there is no other candidate for governing law put forward by the defendant ABCI, I would be obliged to conclude that in any event, the laws of the Cayman Islands would apply as the "default" law of the agreement. Finally in this regard, I also note that ABCI has taken no steps to stay these proceedings as it could have done, had it proper basis for so doing, under the Foreign Arbitral Awards Enforcement Law (1999 Revision) of the Cayman Islands.

48 On these summary judgment applications, the evidence of the plaintiffs stand uncontroverted because the defendant ABCI has failed to propound any evidence of its own to refute that of the plaintiffs. This is despite earlier orders of the court giving directions and setting deadlines for the filing of evidence. The result is that I must proceed on the basis of the evidence of the plaintiffs as establishing the matters of fact to which it speaks. Their evidence is unchallenged and so deserves to be accepted as true in every respect.

49 I have nonetheless paid close regard to ABCI's defences filed in the actions. I note however, that even its pleaded claim does not explain an acceptable factual basis for its various averments of assignment, transfer, execution or performance of the agreement on the part of any of the plaintiffs.

50 ABCI's implicit assertion of the "group of companies doctrine" or "group enterprise theory" has not been advanced by it in its defences. Those hypotheses would not, in any event, have availed ABCI of a proper

basis for compelling the plaintiffs to arbitrate under the governing law of the agreement (English and/or Cayman law) as they do not constitute a doctrine recognized at English or Cayman law: *Peterson Farms Inc. v. C & M Farming Ltd.* (10).

51   Under both English and Cayman law, the common intent to be ascribed to parties to an agreement would be that expressed in the agreement. This includes the identification of the parties to the agreement which would be a question of substantive law cognisable of the principle that the creation of a corporate structure is, by definition, designed to create separate legal entities for entirely legitimate purposes and which are not to be presumptively defeated by the ascription of any general agency or other contractual relationship between them, in the absence of any evidence to support such relationship.

52   There is no other cogent basis presented in support of ABCI's defences. ABCI has shown no sustainable case for arbitration against any of the plaintiffs. It follows from those findings and I so conclude, that ABCI's attempts to compel the plaintiffs to submit to arbitration—notwithstanding that it already has an extant effective arbitration underway as against DiverseyLever Ltd. (Arbitration No. 9914)—are vexatious and oppressive in the meaning of *Société Nationale Indus. Aerospatiale v. Lee Kui Jak* (12) and *Airbus Indus. G.I.E. v. Patel* (1).

53   I am satisfied, on the authorities of *Liberia (Republic) v. Gulf Oceanic Inc.* (8); *Metal Scrap Trade Corp. Ltd. v. Kate Shipping Co. Ltd.* (9); *Leco Instruments (UK) Ltd. v. Land Pyrometers Ltd.* (7); *Shell-Mex & B.P. Ltd. v. Manchester Garages Ltd.* (11); *Catanho v. Brown & Root (U.K.) Ltd.* (3); and *Kitts v. Moor & Co.* (6), that declaratory and injunctive relief may be granted where such relief is appropriate to avoid injustice. In the present context, this is first, by way of declaration, to ascertain whether or not an arbitration clause is binding upon parties properly before the court and secondly, by way of injunction, to restrain a party from seeking to compel another who is not so bound to submit to arbitration.

54   I grant the relief sought here—which is solely as against ABCI (seeking to impinge in no wise upon the jurisdiction of the ICC)—first of all, declaring that the plaintiffs are not bound by the agreement and are not bound by its provisions for arbitration, and, secondly, restraining the defendant ABCI from seeking to compel the plaintiffs to submit to arbitration under the agreement. I am available to hear further submissions as to the costs of these proceedings.

*Applications granted.*

Attorneys: *Walkers* for the plaintiffs.