# Exhibit 8

C. A.

1949

SEAFORD
COURT
ESTATES
LD.
v.
ASHER.

Denning L.J.

of this burden to the landlord. It should do this by asking what a willing tenant would agree to pay and a willing landlord would agree to accept in respect of it. Just as in the earlier cases the courts were able to assess the value of the "fair "wear and tear" clause, and of a "cooker," so they can assess the value of the hot water clause and translate it fairly in terms of rent; and what applies to hot water applies also to the removal of refuse and so forth. I agree that the appeal should be allowed, and with the order proposed by Asquith L.J.

*Appeal allowed.*
*Case referred to county court judge to determine whether the burden transferred to landlords is over-valued at 75l. per annum. If so, plaintiffs' claim to be correspondingly reduced. Counterclaim dismissed subject to any over-valuation.*
*Leave to defendants to appeal to House of Lords.*

Solicitors: *Griffinhoofe & Brewster; Kennedy, Ponsonby and Prideaux.*

H. C. G.

C. A.

1949

May 24, 25, 26, 27;
June 3.

Tucker,
Somervell and
Denning L.JJ.

SMITH AND SNIPES HALL FARM LD. v.
RIVER DOUGLAS CATCHMENT BOARD.

*Land drainage—River—Flooding—Agreement under seal by drainage board with landowner to widen, deepen and make good the banks of river and maintain completed work for all time—Contribution by landowner to cost of work—New banks unable to stand strain of greater inflow of water—Bursting of bank—Serious flooding and damage to crops—Duty of board—Liability of board to covenantee's successor in title and persons holding title under him—Covenant running with the land—Law of Property Act, 1925 (15 Geo. 5, c. 20), s. 78, sub-s. 1—Land Drainage Act, 1930 (20 & 21 Geo. 5, c. 44), ss. 6, 34.*

In 1938, by an agreement under seal, the defendant catchment board, as the relevant drainage authority under the Land Drainage Act, 1930, covenanted with the owners of certain lands which were subject to flooding, situate between the Leeds and Liverpool Canal and the River Douglas, and adjoining the Eller Brook in the parish of Lathom, Lancashire, that in consideration of the landowners contributing to the cost the board would replace the

2 K. B.        KING'S BENCH DIVISION.                              501

then defective outfall from the Low Meadows, situate near the
junction of the Eller Brook with the River Douglas, by a new
outfall, widen and deepen, and make good the banks of, the Eller
Brook, take over the control of the brook, and maintain for all
time the work when completed. In 1940, Mrs. S., one of the
covenantees under the said agreement, transferred her land, known
as Low Meadows, to the first plaintiff, together with the benefit
of the agreement, and in 1944 the plaintiff company was incor-
porated and rented the said land as yearly tenants under an oral
agreement. From time to time breaches had occurred in the
banks of the brook (which from reasons of economy had been
constructed of soil taken from the bed of the brook, without a
clay core) and had been repaired by the board, but in the autumn
of 1946 the brook burst its banks and flooded the land of the
plaintiffs to a depth of over five feet. On a claim by the plaintiffs
against the defendant board for damages in tort and for breach
of contract :—

*Held*, that the defendant board was in breach under the contract
and that such breach had caused the damage complained of; that
the language of the agreement was such that it affected the value
of the land per se and showed an intention that the obligation
should attach thereto, into whosesoever's hands the land should
come; that the covenant by the board ran with the land and by
virtue of s. 78 of the Law of Property Act, 1925, it could be
enforced at the suit of the covenantee and her successors in title
and of the persons deriving title under her or them.

Decision of Morris J. [1948] W. N. 414, reversed.

C. A.

1949

SMITH
AND
SNIPES
HALL
FARM LD.
*v.*
RIVER
DOUGLAS
CATCHMENT
BOARD.

APPEAL from Morris J.

By an agreement under seal dated April 25, 1938, Mrs.
Ellen Smith, then the owner of certain lands liable to flooding
and known as Low Meadows, situated between the Eller
Brook and the Douglas River in Lancashire, and ten other
landowners in the locality, agreed with the defendant
catchment board, as the relevant drainage board under the
Land Drainage Act, 1930, that in consideration of the board's
widening, deepening and making good the banks of the brook,
taking over control thereof, and maintaining for all time the
work when completed, they (the landowners) would contribute
to the cost. In order that they should have the necessary
powers under s. 6 and s. 34 of the Land Drainage Act, 1930,
the board applied to the Minister of Agriculture and Fisheries
to make the Eller Brook a "main river," which he did by
varying the map of the catchment area under s. 5 of the Act.
The material recitals contained in the said agreement were
as follows: " Whereas (1) certain lands belonging to the
" parties of the first eleven parts hereto (hereinafter called

C. A.
1949
SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.

"the landowners) situate between the Leeds and Liverpool
"Canal and the River Douglas and adjoining the Eller Brook
"in the parish of Lathom in the county aforesaid are liable
"to flooding. (2) The board is a drainage board duly con-
"stituted under the Land Drainage Act, 1930, and the lands
"subject to flooding lie within the catchment area of the
"board. (3) A proposal has been made that the board in
"order to improve the drainage of the land liable to flood
"and to prevent future flooding should undertake the widen-
"ing, deepening, improvement and future maintenance of the
"Eller Brook from its junction with the River Douglas to
"Brook Bridge, Carr Lane, Burscough aforesaid, to which the
"board have agreed subject to the landowners paying a
"proportion of the cost thereof. (4) The landowners have
"agreed to contribute towards the cost of the works to be
"carried out by the board as hereinafter contained, and
"(5) For the purpose of giving effect hereto the board have
"applied to the Minister of Agriculture and Fisheries to make
"Eller Brook a 'main river' under the control of the board."

The work under the agreement was carried out by the board on the lines of a plan prepared by their engineer, and was practically completed by August 12, 1940. On April 1 of that year the first plaintiff, John Bruce Smith, took a conveyance from Mrs. Ellen Smith of her land, which was expressly stated to be conveyed with the benefit of the agreement of April 25, 1938. In May, 1944, the second plaintiffs, a company controlled by the first plaintiff, was incorporated and occupied the land in question under an oral agreement as yearly tenants. Flooding of a minor character, due to breaches of the banks of the brook still occurred from time to time, and in September, 1946, owing to the severe conditions which prevailed and the much greater volume of water which flowed into it, the brook burst its banks, and Low Meadows, of which some 250 acres had been brought under cultivation, were inundated and damage resulted.

The plaintiffs claimed damages (i) in tort and (ii) for breach of the contract of April 25, 1938, in that in order to save expense the defendants had constructed the banks of soil taken from the bed of the river, which contained a considerable amount of sand, and had failed to give the banks a clay core, so that they were inadequate to withstand the pressure of the greater volume of water flowing into the brook as a result of the drainage work. The plaintiffs contended that the covenant

2 K. B.   KING'S BENCH DIVISION.   503

contained in the agreement of 1938 ran with the land, and that by virtue of s. 78 of the Law of Property Act, 1925 (1), it could be enforced by both the plaintiffs.

Morris J. gave judgment for the defendants. Applying the principles enunciated in *East Suffolk Rivers Catchment Board v. Kent* (2), he was of opinion that no liability in law attached to the board in tort, and that having made good the banks of the Eller Brook, though not as good as they might have made them, and having in fact done maintenance work on them, although that work was unsuccessful, there had been no breach of contract. In his view the contractual obligations of the board were not to be regarded as covenants running with the land and s. 78 of the Law of Property Act did not affect the question as to what were covenants relating to the land of a covenantee.

The plaintiffs appealed.

*Gerrard K.C.* and *Baucher* for plaintiffs.
*Nield K.C.* and *Youds* for defendants.

The arguments of counsel sufficiently appear from the judgments of the court.

TUCKER L.J. having stated the facts and read the material recitals in the agreement of April 25, 1938, continued: In so far as the plaintiffs' claim is based on breach of contract, it is alleged that by the agreement of April 25, 1938, the defendants agreed for a monetary consideration to execute certain works and to maintain for all time the work when completed, and that there being no specification incorporated in the agreement there was an implied obligation on the part of the defendant board to use reasonable care and skill in the execution and maintenance of the work, having regard to the purpose for which it was required. It is said, and I do not think this was contested, that the duty of the board under this contract, voluntarily entered into for a monetary consideration,

<div style="margin-left: 2em;">

C. A.
1949

SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.

</div>

---

(1) Law of Property Act, 1925, s. 78, sub-s. 1: "A covenant "relating to any land of the "covenantee shall be deemed to "be made with the covenantee "and his successors in title and "the persons deriving title under "him or them, and shall have "effect as if such successors and "other persons were expressed."

(2) [1941] A. C. 74, 86, 95, 102, 104 and 106.

C. A.
1949
SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.

Tucker L.J.

is not to be measured by the standard to be taken for the purpose of ascertaining its liability in tort in the performance of its statutory powers under the Land Drainage Act, 1930. Its duty is accordingly not limited to avoiding the creation of new danger or damage in the performance of work which it had the power but was under no duty to carry out. Nor can it, I think, be relevant in this connexion to consider the financial resources of the board or its other commitments. The board must be presumed to have taken all these matters into account before it fixed the contributions to be paid by the landowners as consideration for its undertaking to perform the work and maintain it for all time. I think, therefore, it is clear that the plaintiffs are right in their contention as to the measure of the defendants' duty under the contract. I pass, therefore, to consider whether the plaintiffs established a breach of this duty.

[His Lordship then referred to the evidence of the experts called on either side, and also to the minutes of the defendant board in which it was recorded that the board's engineer had reported that the bank was "a bad one under any conditions." He continued:] There was some rather vague evidence given with regard to the difficulty of obtaining hard core and the increased cost which would have resulted from its use, but it fell far short of what would have been required to prove that the board had taken all steps which could reasonably have been expected of them in order to perform their contractual obligations, nor did the evidence establish that the rainfall in the months preceding September, 1946, was such that properly constructed banks could not have withstood the strain. That there would have been some overflow over the banks is, of course, a very different matter from the bursting of the banks. Having regard to the effect of the evidence to which I have already referred, it appears to me to be clear that the board were in breach of their contractual duty, and that a more detailed reference to the evidence is not called for.

On this aspect of the case Morris J. expressed himself as follows: " In construing the contract, it is, in my judgment, " relevant to have in mind the general position and powers " of the board. It is also pertinent to note that the contract " does not lay down any details as to methods to be used or " of material to be used or of standards to be attained. The " contract can hardly mean that the board were guaranteeing " that there would be no future flooding, nor can it mean that

2 K. B.      KING'S BENCH DIVISION.                             505

"the board were undertaking to do the work in the most
"expensive manner, or with the surest and best methods.
"If the parties had wished to stipulate, for example, for a
"clay core in the banks of the Eller Brook, they could have
"done so. The contractual obligations are expressed some-
"what generally, and the board were not presented with
"specifications of requirements. The phrase 'make good the
"'banks' is not one of precision. The board did proceed to
"widen and deepen, and they did make good the banks of the
"Eller Brook. It is true that they did not make the banks
"as good as they might have been, or as good as they needed
"to have been in order to withstand severe flood conditions,
"but they endeavoured to make good the bank. Similar con-
"siderations apply in regard to the suggestion that the board
"failed to 'maintain' the work to Eller Brook. When the
"incidents occurred prior to September, 1946, the board
"did not fail to act, but undertook certain remedial measures.
"The fact that ultimately it was decided that the only effective
"measure was to put in a clay core does not, in my judgment,
"establish that previously there had been a failure to
"maintain." Then the learned judge, after referring to the
particulars in paragraph 4 of the statement of claim, where
it is said that in the maintaining of the work after completion,
materials suitable to the work of maintenance were not used,
proceeded: "While it is true that the work of maintenance
"undertaken before September, 1946, did not succeed in
"preventing the bank from bursting in the adverse con-
"ditions which developed, it does not follow from this that
"the board must be convicted of a failure to maintain. Though
"the board was unsuccessful in its labours, the evidence does
"not suggest that the board was trifling with the situation
"or that it was heedless or inactive. It may well be, and
"perhaps experience has shown, that in the long run it would
"have been wiser and cheaper to have earlier employed the
"more costly measures which later were adopted. But the
"contract did not contain a guarantee that the new bank
"would stand all tests. A failure to maintain the completed
"work is, therefore, not shown." I am not quite clear
from this what in the learned judge's view was the
measure of the defendants' obligations under the contract,
but he appears to have absolved the board from liability
on the ground that it was not trifling with the situation
or heedless or inactive. However this may be, for the reasons

C. A.
1949
SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.

Tucker L.J.

C. A.
1949

SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.

Tucker L.J.

already stated, I think on the undisputed evidence and the judge's findings the board were in breach under the contract, and that such breach caused the damage complained of.

It remains to consider whether, in these circumstances, the plaintiffs, or either of them, can sue in respect of this breach. It is said for the defendants that the benefit of the covenant does not run with the land so as to bind a stranger who has not and never had an interest in the land to be benefited and there being no servient tenement to bear the burden. Further, it is contended that such a covenant must by the terms of the deed in which it is contained relate to some specific parcel of land, the precise extent and situation of which can be identified by reference to the deed alone. It is first necessary to ascertain from the deed that the covenant is one which "touches or concerns" the land, that is, it must either affect the land as regards mode of occupation, or it must be such as per se, and not merely from collateral circumstances, affects the value of the land, and it must then be shown that it was the intention of the parties that the benefit thereof should run with the land. In this case the deed shows that its object was to improve the drainage of land liable to flooding and prevent future flooding. The location of the land is described as situate between the Leeds and Liverpool Canal and the River Douglas and adjoining the Eller Brook. In return for lump sum payments the board covenants to do certain work to the banks of the Eller Brook, one of such banks being in fact situate upon and forming part of the plaintiffs' lands, and to maintain for all time the work when completed. In my view the language of the deed satisfies both tests. It affects the value of the land per se and converts it from flooded meadows to land suitable for agriculture, and shows an intention that the benefit of the obligation to maintain shall attach thereto into whosesoever hands the lands shall come.

With regard to the covenantor being a stranger the case of *The Prior* is referred to in *Spencer's* case (1), in these words: " In the case of a grandfather, father and two sons, the grand- " father being seised of the manor of D, whereof a chapel was " parcel: a prior, with the assent of his convent, by deed " covenanted for him and his successors, with the grandfather " and his heirs, that he and his convent would sing all the week

(1) (1368) 1 Sm. L. C. 10th ed. pp. 56, 73, 13th ed. 51, 65, 73.

2 K. B.       KING'S BENCH DIVISION.       507

"in his chapel, parcel of the said manor, for the lords of the "said manor and his servants, etc.; the grandfather did "enfeoff one of the manor in fee, who gave it to the younger "son and his wife in tail; and it was adjudged that the "tenants in tail, as terre-tenants (for the elder brother was "heir), should have an action of covenant against the prior, "for the covenant is to do a thing which is annexed to the "chapel, which is within the manor, and so annexed to the "manor, as it is there said." The notes to *Spencer's* case (1) state: "When such a covenant (namely, covenants running "with the land made with the owner of the land to which they "relate) is made it seems to be of no consequence whether the "covenantor be the person who conveyed the land to the "covenantee or be a mere stranger." In volume 4 of Bythewood & Jarman's Conveyancing, 4th ed., at p. 268, the following passage from the third report of the Real Property Commissioners is quoted with approval: "Expressions found "in some books would lead to the opinion that, in considering "this class of covenant with reference to the benefit of them, "there is a distinction between those cases where the "covenantor is a party by whom the estate is, or has been, "conveyed, and those in which he is a stranger to the estate. "We think the authority of Lord Coke on this point (which is "express (Co. Litt 384*b*)) sufficient to warrant us in disregarding "this distinction."

In *Rogers* v. *Hosegood* (2), Farwell J. in a passage where he refers, amongst others, to *The Prior's* case—and I quote from Farwell J.'s judgment because, although this case went to the Court of Appeal, his judgment was approved, and the Court of Appeal had to deal with a rather different point— after stating what are the requirements in order that the covenant may run with the land, proceeds: "It is not contended "that the covenants in question in this case have not the first "characteristic, but it is said that they fail in the second. "I am of opinion that they possess both. Adopting the "definition of Bayley J. in *Congleton Corporation* v. *Pattison* (3) "the covenant must either affect the land as regards mode of "occupation, or it must be such as per se, and not merely "from collateral circumstances, affects the value of the "land. It is to my mind obvious that the value of Sir J. "Millais's land is directly increased by the covenants in

(1) (1368) 1 Sm. L. C. 10th ed. pp. 56, 73, 13th ed. 51, 65, 73.
(2) [1900] 2 Ch. 388, 395.
(3) (1808) 10 East. 130, 135.

C. A.

1949

SMITH
AND
SNIPES
HALL
FARM LD.
*v.*
RIVER
DOUGLAS
CATCHMENT
BOARD.

Tucker L.J.

C. A.
1949

SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.

Tucker L.J.

"question. If authority is needed, I would refer to *Mann* v. *Stephens* (1), a case very similar to the present; *Vyvyan* v. *Arthur* (2); *The Prior's* case (3); *Fleetwood* v. *Hull* (4); *White* v. *Southend Hotel Co.* (5). I see no difficulty in holding that the benefit of a covenant runs with the land of the covenantee, while the burden of the same covenant does not run with the land of the covenantor."

In this state of the authorities it seems clear, despite some dicta tending to the contrary view, that such a covenant if it runs with the land is binding on the covenantor though a mere stranger, and that this point will not avail the defendant board. As to the requirement that the deed containing the covenant must expressly identify the particular land to be benefited, no authority was cited to us and in the absence of such authority I can see no valid reason why the maxim "Id certum est quod certum reddi potest" should not apply, so as to make admissible extrinsic evidence to prove the extent and situation of the lands of the respective land owners adjoining the Eller Brook situate between the Leeds and Liverpool Canal and the River Douglas.

On this part of the case the learned judge said: "In my judgment the contractual obligations of the board are not to be regarded as covenants running with the land. They do not differ from obligations which by agreement a firm of contractors might agree to discharge in reference to some particular land. The catchment board do not own any land and there is no question of any obligation in relation to or connexion with any land of theirs. The circumstances are different from those in the case of *Shayler* v. *Woolf* (6). Section 78 of the Law of Property Act does not affect the question as to what are covenants relating to the land of a covenantee. Furthermore, much of the reasoning of Lindley L.J. in *Austerberry* v. *Corporation of Oldham* (7), is applicable. Although work might have to be done on the land which formerly belonged to Mrs. Ellen Smith, and now belongs to the first plaintiff, equally it might be that for the effectual preventing of flooding of low meadows work on the banks of Eller Brook at some place considerably higher

---

(1) (1846) 15 Sim. 377.
(2) (1823) 1 B. & C. 410; 25 R. R. 437.
(3) 1 Sim. L. C. 10th ed. 55, 13th ed. 51, 65, 73.
(4) (1889) 23 Q. B. D. 35.
(5) [1897] 1 Ch. 767.
(6) [1946] Ch. 320.
(7) (1885) 29 Ch. D. 750, 780, 781.

" up the brook might have to be undertaken." I do not find anything in the judgments in *Austerberry* v. *Corporation of Oldham* (1) which conflicts with the law as I have endeavoured to set it out above, and I have accordingly arrived at the conclusion that the covenant by the board in the agreement of April 25, 1938, is one which runs with the land referred to therein, which land is capable of identification, and that it is binding on the defendant board; and, further, that by virtue of s. 78 of the Law of Property Act, 1925, it can be enforced at the suit of the covenantee and her successors in title and the persons deriving title under her or them, so that both the plaintiff Smith and the plaintiff company can sue in respect of the damage resulting to their respective interests therein by reason of the defendants' breach of covenant.

For these reasons, I would allow this appeal, and remit the assessment of damages to an official referee. Having regard to the conclusion I have reached on the contractual aspect of the case, I find it unnecessary to express any view with regard to the application of the principles laid down in *East Suffolk Catchment Board* v. *Kent* (2), to the work carried out by the defendant board, had it been performed solely in the exercise of its statutory powers and in the absence of the agreement of April, 1938.

C. A.

1949

SMITH AND SNIPES HALL FARM LD.
v.
RIVER DOUGLAS CATCHMENT BOARD.

Tucker L.J.

SOMERVELL L.J. The plaintiffs in this action claimed in contract and in tort for damages done by floods in the early part of September, 1946, caused by water flowing through a breach made in the walls containing a stream or river known as the Eller Brook. The learned judge held that the claim under both heads failed. He considered first the claim in tort. I have come to the conclusion that the claim in contract succeeds, and on that view it is unnecessary to consider the claim in tort.

The first question is: what was the obligation of the defendants under the agreement? They had, in my opinion, to construct banks which might reasonably be expected both by their height and their strength to prevent flooding. The construction of such a bank was the purpose for which the landowners paid their money. If they had been told that the bank to be constructed was one doomed to failure in the event of floods, or a bad bank under any conditions, they would presumably have kept their money for some other and more

(1) 29 Ch. D. 750, 780, 781.    (2) [1941] A. C. 74.

VOL. II. 1949.        2 M                           2

C. A.
1949
─────
SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.
─────
Somervell L.J.

useful purpose. The phrase "doomed to failure" was one used of the outer banks, as constructed, by Mr. Waters, one of the plaintiffs' witnesses. The learned judge saw no reason to doubt the general reliability of Mr. Waters and of Mr. Ashcroft, the other witness on this subject for the plaintiffs. That does not mean he accepted everything they said. The evidence on both sides as to these banks can be shortly summarized. Mr. Ashcroft said the outer banks had no reasonable chance of standing up to their work. Mr. Waters regarded the banks as inadequate, as doomed to failure. So far as the defendants are concerned, when there was a burst in January, 1944, a statement appears in their minutes that "the bank is a bad one under any conditions." Mr. Eaton, the defendants' engineer, agreed with that. He said of the work when originally done: "I knew it was dangerous," he adds, "but I was well satisfied with what we had done." He assented to a leading question put by counsel for the defendants that the bank was the best that could be produced with the money available. The question of the financial resources of the defendants seems to me to have little or no relevance to their liability under the agreement. If a party, whether a catchment board or individual, undertakes for consideration to produce a certain result, it is no answer, if a claim is based on his failure to produce that result, for him to show that he had not the money. Everyone was agreed that with extra expense a reasonably strong bank could have been constructed. This is in fact now being done. If I have rightly construed the contract, then, in my view, there was on this evidence, as accepted by the learned judge a breach. The learned judge held that whatever might be the liability under the agreement the plaintiffs could not sue upon it. It was not therefore necessary for him to deal in detail with the question of breach. He expresses his opinion that there was no breach, but I think, though I am not certain, that this was on the basis of a different construction of the contract.

If, therefore, Mrs. Ellen Smith had remained in possession, she could have recovered damages. Does the covenant run with the land, so that the first plaintiff can sue on it? If the answer to this is "Yes," has s. 78 of the Law of Property Act, 1925, enabled the second plaintiffs to sue in that that section covers not only successors in title of the covenantee but persons deriving title under either? We are con-

cerned here with the question whether the benefit of a covenant runs with the land benefited as against the original covenantor. The learned judge said this: "In "my judgment the contractual obligations of the board are "not to be regarded as covenants running with the land. "They do not differ from obligations which by agreement "a firm of contractors might agree to discharge in reference "to some particular land." In the ordinary case a firm of contractors who had undertaken to construct and thereafter maintain certain works would receive for the latter service an annual sum. Such a contract clearly would not run with the land so as to bind a transferee to continue to pay the annual sum. The defendants also differ from a firm of contractors, in that they have a statutory power to do such work as is in question here on other people's land. If one seeks the intention of the parties in the agreement, I should have thought it was plain that the benefit of the covenant was intended to run with the land. If it was not, a landowner who sold a month after the agreement had no legal right which he could transfer and claim value for. If one assumes a single landowner who transferred the land, the defendants, having taken his money, would be under no liability to the transferee, and I do not see how the transferor could establish any damage. The undertaking is to maintain "for all time "the work when completed," and not to maintain "so long "as you remain owner."

In *Rogers* v. *Hosegood* (1) Farwell J. said: "Covenants "which run with the land must have the following "characteristics: (1.) they must be made with a cove- "nantee who has an interest in the land to which "they refer; (2.) they must concern or touch the land." Both these conditions seem to me to be satisfied. The learned judge goes on to say that in addition there must be an intention that the covenant should so run. I have already dealt with this. It is said, rightly, that the land intended to be protected must be described so as to be ascertainable with reasonable accuracy. It was submitted that it was not so described in this case. It is true that evidence outside the instrument itself would be necessary to show what were the parcels covered by the agreement. This was true of the agreement in *Rogers* v. *Hosegood* (1), where the covenant was with named owners (a partnership) . . . . "to all or any of

<div style="margin-left: 2em;">

C. A.

1949

SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.

Somervell L.J.

</div>

(1) [1900] 2 Ch. 388, 395.

C. A.
1949

SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.

Somervell L.J.

" their lands adjoining or near to the said premises." There are many cases in which the lands to be benefited are not identified by descriptions with reference to a map or plan. There is another point. What is the scope of the covenant? Suppose the breach through which A's land was damaged occurred in the banks where they run through B's lands, can A sue? In my view, he could. Under the agreement the lands to be drained and protected are treated as a unit, though, of course, not in single ownership. The covenant as to widening and deepening is clearly a covenant with each owner that the brook will be widened and deepened throughout the whole length covered by the agreement and not merely that portion of the brook which adjoins his lands.

On the question whether the covenant ran with the land Mr. Nield submitted that if the benefit of a covenant is to run with the land it must either be with a previous owner, or as against the owner of another parcel. The authorities do not seem to me to support these propositions. Mr. Nield also relied on *Formby* v. *Barker* (1). That case was dealing with a different point. In that case a vendor had parted with the whole of his land, the purchaser agreeing to restrict its user. The vendor's executor sought to enforce the covenant. It was held that the covenant was personal and the principle of *Tulk* v. *Moxhay* (2), inapplicable. In that case the vendor having parted with all his land, there was no land with which the benefit of the covenant could run. The sentences on which Mr. Nield relied must be read with regard to the type of covenant with which the case was concerned. On the basis that the benefit of the covenant ran with the land, Mr. Nield did not argue that the cause of action was restricted to the first plaintiff. I therefore think that the appeal should be allowed, and that the claim based on the agreement succeeds. It is unnecessary to consider what would have been the position if the plaintiffs had had no contract to rely on. The learned judge considered that the claim would have failed on the principles laid down in *East Suffolk Rivers Catchment Board* v. *Kent* (3). Various questions might have arisen. Was there a failure to take reasonable or ordinary care? Does the main principle in the *East Suffolk* case apply where damage is caused by a negligent defect in works constructed? If any duty was owed to the plaintiffs it might well be less onerous than the

(1) [1903] 2 Ch. 539.  (3) [1941] A. C. 74.
(2) (1848) 2 Ph. 774.

duty which the defendants assumed under the contract. Was the danger to the plaintiffs' land increased or diminished, or increased in some respects and diminished in others? I express no opinion on these points beyond saying that the issues raised would, in my opinion, have not been easy.

DENNING L.J. There is in Lancashire a river called Eller Brook, which is liable to overflow its banks and flood the adjoining land. In 1938, in order to prevent the flooding, eleven owners of land through which the river ran made an agreement with the local catchment board, whereby the board undertook to widen, deepen and make good the banks of the river, and thereafter to maintain them, and the landowners paid a contribution towards the cost. The board did the work and practically completed it by 1940, but they did it so unskilfully that, in the opinion of experts, it was from the first doomed to failure. The landowners, of course, did not know this and set about cultivating the land. The low meadows, which had been rough marshland, were broken up and brought under the plough. Crops were sown and harvested. But the banks of the river were not strong enough to stand serious floods. In 1944 they burst. The breach on that occasion was soon closed, but the board's engineer was aware of the danger. He reported to the board that "the bank is a bad " one under any conditions." In 1945 there was another burst near by, and he reported that "this bank is largely " composed of sand. I propose to put a machine on to " strengthen it as soon as one is available." But apparently he did nothing, or at any rate nothing effective. The landowners and their tenants went on cultivating the land. They did not know that the banks were doomed to failure. Then in 1946 the worst happened. Serious floods arose, the banks burst, the fields were flooded, and the crops ruined. This action is brought by a tenant of the fields against the board to recover the value of the crops he has lost. The present owner joins in the action, claiming his loss of rent, but the substantial claim is by the tenant company.

On those facts it is my opinion that the board broke their contract. It was an implied term that they should do the work with reasonable care and skill, so as to make the banks reasonably fit for the purpose of preventing flooding. The proper way of doing this, according to the experts, was to put a clay core in the banks, or to make them very much

C. A.

1949

SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.

C. A.
1949
———
SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.
———
Denning L.J.

wider, but they did not do either. It may be that the board had not sufficient funds available to carry out such works; but that seems to me to be an irrelevant consideration, or, at any rate, just as irrelevant in the case of a public board as in the case of a private contractor. No private contractor who was engaged to make works for a specific purpose could excuse himself for bad results by saying that he had not sufficient money to erect proper works. It follows, therefore, that if the original landowner with whom the agreement was made had himself cultivated the fields, and suffered damage by the breach, he could recover from the board. But he sold the land and he has suffered no damage. The damage has been suffered partly by the man who purchased the land, but principally by the tenants, and the question is whether they can sue on the contract.

Mr. Nield says that the plaintiffs cannot sue. He says that there is no privity of contract between them and the board, and that it is a fundamental principle that no one can sue upon a contract to which he is not a party. That argument can be met either by admitting the principle and saying that it does not apply to this case, or by disputing the principle itself. I make so bold as to dispute it. The principle is not nearly so fundamental as it is sometimes supposed to be. It did not become rooted in our law until the year 1861 (*Tweddle v. Atkinson* (1), and reached its full growth in 1915 (*Dunlop v. Selfridge* (2)). It has never been able entirely to supplant another principle whose roots go much deeper. I mean the principle that a man who makes a deliberate promise which is intended to be binding, that is to say, under seal or for good consideration, must keep his promise; and the court will hold him to it, not only at the suit of the party who gave the consideration, but also at the suit of one who was not a party to the contract, provided that it was made for his benefit and that he has a sufficient interest to entitle him to enforce it, subject always, of course, to any defences that may be open on the merits. It is upon this principle, implicit if not expressed (i.) that the courts, ever since 1368, have held that a covenant made with the owner of land for its benefit can be enforced against the covenantor, not only by the original party, but also by his successors in title. (See *The Prior's case*, which is set out by Lord Coke in his work on Littleton,

(1) (1861) 1 B. & S. 393.	(2) [1915] A. C. 847.

at p. 384a, and in his report of *Spencer's* case (1)) ; (ii.) that the Courts of Common Law in the seventeenth and eighteenth centuries repeatedly enforced promises expressly made in favour of an interested person ; (See *Dutton* v. *Poole* (2), approved by Lord Mansfield in *Martyn* v. *Hind* (3)) ; (iii.) that Lord Mansfield held that an undisclosed principal is entitled to sue on a contract made by his agent for his benefit, even though nothing was said about agency in the contract ; (See *Rabone* v. *Williams* cited in *George* v. *Clagett* (4)) ; and (iv.) that Lord Hardwicke decided that a third person is entitled to sue if there can be spelt out of the contract an intention by one of the parties to contract as trustee for him, even though nothing was said about any trust in the contract, and there was no trust fund to be administered. (See *Tomlinson* v. *Gill* (5).)

Throughout the history of the principle the difficulty has been, of course, to say what is sufficient interest to entitle the third person to recover. It has sometimes been supposed that there must always be something in the nature of a "trust" for his benefit. (See *Vandepitte's* case (6).) But this is an elusive test which does not explain all the cases, and it involves the trustee being made a nominal party to the action either as plaintiff or defendant, unless that formality is dispensed with, as it was in *Les Affréteurs Réunis Société Anonyme* v. *Leopold Walford Ld.* (7). The truth is that the principle is not so limited. It may be difficult to define what is a sufficient interest. Whilst it does not include the maintenance of prices to the public disadvantage, it does cover the protection of the legitimate property, rights and interests of the third person, although no agency or trust for him can be inferred. It covers, therefore, rights such as these which cannot justly be denied ; the right of a seller to enforce a commercial credit issued in his favour by a bank, under contract with the buyer ; the right of a widow to sue for a pension which her husband's employers promised to pay her under contract with him ; (See *Dutton* v. *Poole* (2) and cf. *In re Schebsman* (8) ) ; or the right of a man's servants and guests to claim on an insurance policy, taken out by him against

C. A.

1949

SMITH
AND
SNIPES
HALL
FARM LD.
*v.*
RIVER
DOUGLAS
CATCHMENT
BOARD.

Denning L.J.

(1) 1 Sm. L. C. 10th ed. 55, 13th ed. 51, 65, 73.
(2) (1677) 2 Lev. 210.
(3) (1776) 2 Cowp. 443.
(4) (1797) 7 Term R. 359.
(5) (1756) Ambler 330.
(6) [1933] A. C. 70, 79.
(7) [1919] A. C. 801.
(8) [1944] Ch. 83, 103, 104.

C. A.
1949

SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.

Denning L.J.

loss by burglary which is expressed to cover them; cf. *Prudential Staff Union v. Hall* (1). In some cases the legislature itself has intervened, as, for instance, to give the driver of a motor car the right to sue on an insurance policy taken out by the owner which is expressed to cover the driver. But this does not mean that the common law would not have reached the same result by itself.

The particular application of the principle with which we are concerned here is the case of covenants made with the owner of the land to which they relate. The law on this subject was fully expounded by Mr. Smith in his note to *Spencer's* case (2) which has always been regarded as authoritative. Such covenants are clearly intended, and usually expressed, to be for the benefit of whomsoever should be the owner of the land for the time being; and at common law each successive owner has a sufficient interest to sue because he holds the same estate as the original owner. The reason which Lord Coke gave for this rule is the reason which underlies the whole of the principle now under consideration. He said in his work upon Littleton that it was " to give damages to the party grieved." If a successor in title were not allowed to sue it would mean that the covenantor could break his contract with impunity, for it is clear that the original owner, after he has parted with the land, could recover no more than nominal damages for any breach that occurred thereafter. It was always held, however, at common law that, in order that a successor in title should be entitled to sue, he must be of the same estate as the original owner. That alone was a sufficient interest to entitle him to enforce the contract. The covenant was supposed to be made for the benefit of the owner and his successors in title, and not for the benefit of anyone else. This limitation, however, was, as is pointed out in Smith's Leading Cases, capable of being " productive of very serious and disagreeable consequences," and it has been removed by s. 78 of the Law of Property Act, 1925, which provides that a covenant relating to any land of the covenantee shall be deemed to be made with the covenantee and his successors in title, " and the persons deriving title " under him or them " and shall have effect as if such successors " and other persons " were expressed.

The covenant of the catchment board in this case clearly

(1) [1947] K. B. 685, 689, 690.    (2) 1 Sm. L. C. 10th ed. 55, 13th ed. 51, 65, 73.

2 K. B.        KING'S BENCH DIVISION.                    517

relates to the land of the covenantees. It was a covenant to do work on the land for the benefit of the land. By the statute, therefore, it is to be deemed to be made, not only with the original owner, but also with the purchasers of the land and their tenants as if they were expressed. Now if they were expressed, it would be clear that the covenant was made for their benefit; and they clearly have sufficient interest to entitle them to enforce it because they have suffered the damage. The result is that the plaintiffs come within the principle whereby a person interested can sue on a contract expressly made for his benefit.

    I would not wish to leave this subject without referring also to s. 56 of the Law of Property Act, 1925, which says that a person may take the benefit of any covenant or agreement respecting land or other property, although he may not be named as a party to the instrument. That section is no doubt, as Lord Greene has said, confined to cases when the person seeking to take advantage of it is a person "within "the benefit" of the covenant or agreement; (See *White* v. *Bijou Mansions* (1)); but, subject to that limitation, there is no reason why the section should not be given its full scope, just as Lord Dunedin was prepared to give full scope to its narrower predecessor, s. 5 of the Real Property Act, 1845. (See *Dyson* v. *Forster* (2).) Section 56 means, therefore, that a person may enforce an agreement respecting property made for his benefit, although he was not a party to it. So construed it is a clear statutory recognition of the principle to which I have referred and it is applicable to this case. If the principle had been canvassed in *In re Miller's Agreement* (3), it should, I think have been held there that the daughters had a right at common law to sue for their pension, a right which was reinforced by s. 56. I cannot believe that the covenantors there could break their contract with impunity. So much for the question of principle.

    Mr. Nield did urge that the benefit of the covenant should not run with the land here because there was no clearly defined piece of land to which it was attached. It is true that the agreement did not describe the lands by metes and bounds, but it did give a description of them which was capable of being rendered certain by extrinsic evidence; and that is sufficient. Id certum est quod certum reddi potest. Mr. Nield also argued that there was no servient tenement. But

C. A.

1949

SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.

Denning L.J.

(1) [1938] Ch. 351, 365.   (3) [1947] Ch. 615.
(2) [1909] A. C. 98.

C. A.
1949

SMITH
AND
SNIPES
HALL
FARM LD.
v.
RIVER
DOUGLAS
CATCHMENT
BOARD.

Denning L.J.

that is only material when there is a question whether the burden of a covenant runs with the land. This is a question of the benefit running, and ever since *The Prior's* case (1) it has been held that the covenantor is liable because of his covenant given to the owner of the dominant tenement and not because of his relationship to any servient tenement. In my opinion, therefore, the board are liable to the plaintiffs in damages for breach of covenant. It is thus unnecessary to consider whether they are liable in tort, but I will add a word about it. The decision of the House of Lords, in the *East Suffolk* case (2), shows that, in the absence of a contract, a catchment board is under no duty to exercise its powers with efficiency or dispatch or at all; but it also shows that if it does exercise its powers it must use reasonable care not to injure persons likely to be affected by its operations. The present case is very different from that one, because here the landowners, in consequence of the works done by the board, ploughed up the land and cultivated the fields; and in the result suffered damage which they would not have done if the board had done nothing, for in that case they would have had no crops there. The decision of the House of Lords does show, however, that, in considering whether the board broke its duty in tort, it is material to inquire into the expense of the works which it is said they ought to have constructed. An adjacent landowner must not be too critical if the board prefers thrift to efficiency, I suppose on the principle that he should not look a gift horse in the mouth and must be prepared to take it with some faults. But the duty in contract is a very different thing. There is no question of a gift horse there. The landowner paid his contribution in return for the board's promise, and they are in duty bound to fulfil it. I agree, therefore, that the appeal should be allowed.

*Appeal allowed.*
*Damages remitted for assessment.*
*Leave to appeal to House of Lords.*

Solicitors for plaintiffs: *Ellis & Fairbairn.*
Solicitors for defendants: *Norton, Rose, Greenwell & Co.,* for *A. H. Jolliffe, Preston.*

(1) 1 Sm. L. C. 10th ed. 55, 13th ed. 51, 65, 73.   (2) [1941] A. C. 74.

A. W. G.