# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————————— :

ED CAPITAL, LLC AND : 
ED CAPITAL MANAGEMENT, LLC, :
                        :

           Plaintiffs, :     Index No.: 15-cv-9056

v. :

BLOOMFIELD INVESTMENT : 
RESOURCES CORP., REUBEN BROTHERS :     **FIRST AMENDED COMPLAINT**
RESOURCES GROUP, RB RESOURCES :
LIMITED AND REUBEN BROTHERS :
LIMITED, :

           Defendants. :

———————————————————————— :

       Plaintiffs ED Capital, LLC and ED Capital Management, LLC (collectively, "Plaintiffs" or "ED Capital Entities"), as and for their First Amended Complaint against Defendants Bloomfield Investment Resources Corp. ("Bloomfield"), Reuben Brothers Resources Group, RB Resources Limited and Reuben Brothers Limited (collectively with Bloomfield, the "Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters:

## NATURE OF THE ACTION

       1.     This case is about the multi-continent efforts of two of the most sophisticated investors in the world—London-based billionaire brothers David and Simon Reuben (collectively, the "Reuben Brothers")—to rewrite a $25 million investment contract that their company, Bloomfield entered into through New York-based investment companies ED Capital, LLC and ED Capital Management, LLC.  Bloomfield's and the Reuben Brothers' machinations

to avoid unambiguous contractual terms and their promises have entailed repeated mischaracterizations of the investment as a loan, frivolous attachment and plenary actions in the Netherlands (the "Dutch Action"), and harassing non-party discovery sought through this Court in supposed aid of the Dutch Action. Bloomfield's improper coordinated attacks threaten Plaintiffs' survival, harm their business reputation and have caused them millions of dollars in lost business. Plaintiffs file this First Amended Complaint in response to Defendants' latest (and procedurally improper) motion to dismiss the original complaint on the erroneous grounds that the ED Capital Entities cannot enforce the promises Defendants concede they made to the ED Capital Entities. Defendants should not be permitted to avoid suit for their tortious conduct and broken promises under the guise of foreign law that provides them no immunity.

## PARTIES

2.      Plaintiff ED Capital, LLC is a Delaware limited liability company with its principal place of business at 825 Third Avenue, 2nd Floor, New York, New York 10022. The 100% owner of ED Capital, LLC is Elliot Daniloff, a United States citizen and a resident of the State of New York. ED Capital, LLC is the investment advisor for Synergy Hybrid Fund Ltd. and the Synergy Hybrid Feeder Fund Ltd. (collectively, the "Synergy Funds").

3.      Plaintiff ED Capital Management, LLC is a Delaware limited liability company with its principal place of business at 825 Third Avenue, 2nd Floor, New York, New York 10022. The 100% owner of ED Capital Management, LLC is Mr. Daniloff, a United States citizen and a resident of the State of New York. ED Capital Management, LLC is the investment manager for the Synergy Funds.

4.      Defendant Bloomfield Investment Resources Corp. is a corporation incorporated and operating under the laws of the British Virgin Islands with its principal place of business

located at Wickham's Cay II, Road Town, Tortola, British Virgin Islands. Bloomfield is a part of the investment group owned and controlled by the Reuben Brothers. Bloomfield was incorporated in the British Virgin Islands on or about August 31, 2011, for the sole purpose of investing in the Synergy Funds, and is an alter-ego or unfunded shell corporation controlled by the other defendants and indirectly by the Reuben Brothers.[1]

5.     Defendant RB Resources Limited is a corporation incorporated and operating under the laws of the British Virgin Islands with its principal place of business located at Wickham's Cay II, Road Town, Tortola, British Virgin Islands. RB Resources Limited is a part of the investment group owned and controlled by the Reuben Brothers. RB Resources Limited is also the sole member of Bloomfield.

6.     Defendant Reuben Brothers Resources Group is a corporation incorporated and operating under the laws of the British Virgin Islands with its principal place of business located at Wickham's Cay II, Road Town, Tortola, British Virgin Islands. Reuben Brothers Resources Group is a part of the investment group owned and controlled by the Reuben Brothers.

7.     Defendant Reuben Brothers Limited is a corporation incorporated and operating under the laws of Bermuda with its principal place of business located at 3 Mangrove Bay Road, Sandys Parish MA01, Bermuda. Reuben Brothers Limited is a part of the investment group owned and controlled by the Reuben Brothers.

---

[1] Bloomfield's specialized purpose (*i.e.*, investment in the Synergy Funds) is further demonstrated by David Rueben's remarks to Elliot Daniloff in a March 23, 2015 email about redeeming the investment. Mr. Reuben wrote "Who is Bloomfield! How are we redeeming this. [sic] Are we selling shares that we hold?" Mr. Daniloff responded: "Bloomfield is your company invested in SHF [the Synergy Funds]. I'll call you today to go over again."

## JURISDICTION AND VENUE

8.    This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a)(2) because the amount in controversy in this action exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs, and this controversy is between citizens of a state and citizens or subjects of a foreign state.

9.    This Court has personal jurisdiction over Defendants, and venue is proper in the district pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(c)(3), because Defendants purposefully directed their activities toward this forum by conducting business within the forum and by committing acts which have direct and foreseeable effects in the forum, specifically including, but not limited to, negotiating an investment with the Plaintiffs in whole or in part in New York, regularly transacting business in New York, maintaining a New York bank account for purposes of its investment(s) in the Synergy Funds, sending representatives (specifically Jamie Reuben and David Reuben) to New York and Florida to meet with Mr. Daniloff to discuss the investment, and applying to this Court for discovery from Plaintiffs for use in a foreign litigation pursuant to 28 U.S.C. § 1782, and because Defendants, as non-residents of the United States, may be sued in any judicial district.

## FACTS

**I.    Bloomfield and the Reuben Brothers Have Extensive Investment Experience, and Amassed a Fortune Investing in Russian Companies.**

10.    The Reuben Brothers are self-made billionaires, who leveraged their investment and financial savvy to amass a fortune that ranks as the second largest among private citizens in the United Kingdom, totaling a combined $13.7 billion according to *Forbes*.[2]   Most of the

---

[2] http://www.forbes.com/billionaires/list/#version:static_country:United%20Kingdom, last accessed Nov. 17, 2015.

Reuben Brothers' fortune came from investing in the post-Soviet Russian metals market, where, according to a 2004 *Guardian* profile, "[t]he brothers jumped feet first into the chaotic capitalist system that was taking hold of post-Soviet Russia in 1991 when more cautious investors were too nervous to dip their toes in the water. They made a killing, buying up a large portion of Russia's privatized aluminum industry through their company Trans-World [before] selling out for £300m . . . as the business climate turned distinctly chilly under President Putin's less accommodating premiership."[3] The Reuben Brothers describe themselves as "a leader in private equity, real estate investment and development, and venture capital" with investments in data centers, racecourses, pub companies, aerodromes, technology, media, energy, shipping vessels and mining.[4] Bloomfield is an entity in the Reuben Brothers' sprawling financial empire they use to make investments in privately held companies, among other things.

## II. Bloomfield Invested in the Synergy Funds With Full Knowledge That the Transaction Was an Investment Rather Than a Loan.

11. Consistent with the Reuben Brothers' longstanding interest in the Russian market and Russian companies, Bloomfield, on November 4, 2011, executed the 18-page Synergy Hybrid Fund Subscription Agreement (the "Subscription Agreement"), which along with the Synergy Hybrid Fund, Ltd. Confidential Private Placement Memorandum (the "Memorandum") govern the investment in the Synergy Funds.[5] The Subscription Agreement and Memorandum are clear as to the types of assets that the ED Capital Entities planned to acquire for the Synergy

---

[3] http://www.theguardian.com/business/2004/jun/27/russia, last accessed Nov. 17, 2015.

[4] http://www.reubenbrothers.com/, last accessed Nov. 17, 2015.

[5] The Subscription Agreement and Memorandum, as well as certain other documents referenced in this First Amended Complaint, were previously filed with the Court. (*See* ECF No. 27.) All documents cited herein are incorporated by reference.

Funds:  the investment objective is "to achieve long term capital appreciation by investing primarily, but not exclusively, in Russian public and privately held equity and debt securities." (Memorandum at 1.)  Accordingly, 100% of the shares of United Meat Group ("UMG"), a Russian corporation, are among the holdings of the Synergy Funds.  (Memorandum at 1.)  The potential risk of loss was also sufficiently disclosed and, by executing the Subscription Agreement, Bloomfield acknowledged that "[t]here can be no assurances that the [Synergy Funds] will achieve [their] investment objectives."  (Memorandum at 2.)

12.    There is nothing "informal" or "off the record" about the contractual terms under which Bloomfield made its investment, nor is there any doubt that the transaction at issue was an investment, not a loan.  Bloomfield in the Subscription Agreement agreed "to subscribe to as many of the Fund's Shares as may be purchased for U.S. $25m on 4th November, 2011 (the 'Purchase Date') at their Offering Price (as described in the Memorandum) as of the opening of business on the Purchase Date.  The subscriber <u>acknowledges that this subscription is irrevocable</u>[.]" (Subscription Agreement ¶ 1 (emphasis added).)

13.    In fact, Bloomfield repeatedly represents, agrees or promises throughout the Subscription Agreement that it is engaged in an investment, including:

- "[Bloomfield] agrees that [it] will make payment in the amount of [its] subscription in time sufficient to be received by the [Synergy Funds] at least two business days prior to the Purchase Date" (Subscription Agreement ¶ 2);

- "[Bloomfield] agrees that any Shares of the [Synergy Funds] hereby subscribed for will be held subject to the terms and conditions of the Memorandum and Articles of Association of the Fund, as amended from time to time[.]" (Subscription Agreement ¶ 3);

- "[Bloomfield] agrees that a legend . . . may be placed on each stock certificate issued to [Bloomfield] pursuant to this Subscription Agreement or otherwise acquired and that the

> [Synergy Funds] may take all steps it may deem necessary or
> desirable to see that the restrictions . . . are complied with[.]"
> (Subscription Agreement ¶ 14.)

14.     Bloomfield similarly acknowledges its "Shareholder" role in the Memorandum –
which is binding based on its execution of the Subscription Agreement – and agrees to the limits
associated with that role:

> As a Shareholder, you should be aware that you will have no right
> to participate in the management of the [Synergy Funds], and you
> will have no opportunity to select or evaluate any of the [Synergy
> Funds'] investments or strategies.  Accordingly, you should not
> invest in the [Synergy Funds] unless you are willing to entrust all
> aspects of the management of the [Synergy Funds] and its
> investments to the discretion of the [the ED Capital Entities].

(Memorandum at 21.)

15.     Neither the Subscription Agreement nor the Memorandum characterize
Bloomfield's $25 million payment – funded through its account at HSBC Private Bank (UK)
Ltd. and a correspondent account at HSBC Bank USA NY – as anything other than an
investment and nowhere in these documents (or any other documents) is the payment described
as a loan.

16.     The Reuben Brothers <u>themselves</u> admit their stake in UMG, held through
Bloomfield, was and is an investment, identifying UMG among the agricultural investments on
the U.K. website for Reuben Brothers Resources Group as late as November 16, 2015.[6]  The
Agriculture Investment page of Reuben Brothers Resources Group's home page stated:  "RBR's
focus on the agricultural sector reflects the significant opportunity for value creation provided by
the continued increase in demand for soft commodities driven by an ever growing world
population.  RBR looks to invest in vertically integrated agriculture companies with local

---

[6] http://www.3eee.co.uk/investments/agriculture/united-meat-group/, last accessed Nov. 17, 2015.

partners around the world." The <u>only</u> example of an agricultural investment listed on the page was UMG, which Reuben Brothers Resources Group describes as follows: "[UMG] was established in 2009 in Moscow as a holding company with the goal of developing production businesses in the agriculture sector. UMG is the 100% owner of a fully integrated poultry producer with planned capacity of 124,000 tonnes of poultry per annum in live weight."

17.    There are numerous other examples of the Reuben Brothers or their agents acknowledging and admitting that they made an investment, both before and after Bloomfield signed the Subscription Agreement, specifically including, but not limited to, the following:

- In an email dated September 14, 2011, Ben Webb, on behalf of the Reuben Brothers and Bloomfield, wrote to ED Capital's Genneady Zalko: "In order for us <u>to invest</u>, we will require that we become signatories on the bank accounts so that expenditure is controlled by our authorization."

- An email on September 15, 2011 from Ben Webb to Gennady Zalko states: "If we are unable to install a technical solution, then the best way for us to manage <u>our investment</u> would be to proceed as follows[.]"

- An email exchange on September 16, 2011 between Mr. Webb and ED Capital's Aleksandr Khaytin provides: "Dear Ben, Hope you are doing well. Please let me know <u>the investor's</u> legal name and contact details to arrange the subscription. [Response]: Hi Aleksandr, We are in the process of setting this up in combination with due diligence. I will let you know as soon as possible."

- In an email dated October 20, 2011, Ben Webb wrote to Gennady Zalko and Elliot Daniloff that he "will shortly send [the ED Capital Entities] the details of the BVI company <u>that will be investing</u>."

- An email from Ben Webb to Elliot Daniloff and Tracey Francis dated November 3, 2011, with the subject "Investment in Russia: Synergy Hybrid Fund," reports: "Dear Tracey Please see completed subscription document attached. I will forward hard copies to you now also. Elliott – our Geneva office have [sic] arranged payment, please see below. If you could please

confirm when you have received this, and next steps including transfer to the ING account, confirmation of our subscription and proposed use <u>of the investment</u> in Russia."

- A November 18, 2011 email from Ben Webb to Aleksandr Khaytin concedes: "[T]he <u>investment made by RBL</u> [Reuben Brothers Limited] is a loan to Bloomfield[.]"

- An email dated June 27, 2013 from David Reuben to Mr. Daniloff provides: "<u>We invested $25m on 9/11/11/ into their fund</u>. Based on the latest net asset value statement, it was worth $24.37 m as of 31/3/13, I understand the decrease is due to the payment of the management fees to the fund managers[.]"

- In an email dated July 2, 2013, Jamie Ruben confirms to Elliott Daniloff that in "2011 RB [Reuben Brothers] invested $25m into Synergy hybrid fund."

- In a letter dated December 16, 2013, on Bloomfield letterhead, Alexander Bushaev, a Director of Bloomfield, wrote: "Please take this letter as a confirmation that we, <u>the investor</u> to the Synergy Hybrid Feeder Fund Ltd. (the Fund) are fully aware of the decision of the UMG Finance BV corporate management, a wholly owned subsidiary of the [UMG], to issue a Eurobond to finance completion of ongoing projects and to fund preparation work for future projects. We are satisfied with information on this issue provided by UMG corporate management and the Fund's Investment Manager, and support this development."

- Numerous other emails pre-dating and in preparation for execution of the Subscription Agreement refer to the transaction as "the subscription," not the "loan."

- During this very litigation, Defendants' counsel conceded during oral argument before this Court that "Bloomfield invested in Synergy."

18.    Bloomfield agreed and promised to be bound by, and to honor, the investment decisions of the managers of the Synergy Funds, the ED Capital Entities. Specifically, the Memorandum states: "In general, the Fund does not and will not control any of the Managers,

their choice of investments and other investment decisions, all of which are entirely within the control of such Managers." (Memorandum at 35.)

19. In fact, and in recognition of the investment deference afforded to the ED Capital Entities under the Subscription Agreement and Memorandum, Defendants separately requested and received signatory authority on a UMG account in Moscow. This authority entitled Defendants to receive regular statements from the Moscow bank detailing UMG's use of operating funds and served as mechanism for monitoring UMG's performance. Because of changing geopolitical and economic circumstances in Russia in early 2015, the Reuben Brothers requested that $15 million held in this monitoring account be transferred to the Netherlands branch of Demir-Halkbank.

20. Bloomfield also promised and bound itself to maintain the confidentiality of both the Subscription Agreement and the Memorandum. The Subscription Agreement provides:

> [Bloomfield] agrees that this <u>Subscription Agreement</u>, <u>the Memorandum</u>, the Memorandum and Articles of Association of the [Synergy Funds] and all financial statements, tax reports, portfolio valuations, reviews or analyses of potential or actual investments, reports or other materials prepared or produced by the [Synergy Funds], the Administrator or the Investment Manager and all other documents and information concerning the affairs of the [Synergy Funds] and its investments (collectively, the "Confidential Information") that the Subscriber may receive pursuant to or in accordance with this Subscription Agreement, or otherwise as a result of its ownership of Shares in the [Synergy Funds], <u>constitute proprietary and confidential information about the Fund, the Administrator and/or the Investment Manager (the "Affected Parties")</u>.

(Subscription Agreement ¶ 22 (emphasis added).) As discussed in more detail below, Bloomfield completely ignored this promise and obligation in filings both before this Court and the Dutch Action.

21.     Moreover, Bloomfield explicitly acknowledged that the public dissemination of the Subscription Agreement and Memorandum without the ED Capital Entities' prior consent would cause "substantial and irreparable completive harm" to the ED Capital Entities:

> The Subscriber acknowledges that the Affected Parties derive independent economic value from the Confidential Information not being generally known and that the Confidential Information is the subject of reasonable efforts to maintain its secrecy. The Subscriber further acknowledges that the Confidential Information is a trade secret, the disclosure of which is likely to cause substantial and irreparable competitive harm to the Affected Parties and their respective businesses. The Subscriber shall not reproduce any of the Confidential Information or portion thereof or make the contents thereof available to any third party other than a disclosure on a need-to-know basis to the Subscriber's legal, accounting or investment advisers, auditors and representatives (collectively, "Advisers") without the prior consent of the Fund and the Investment Manager, except to the extent compelled to do so in accordance with applicable law (in which case the Subscriber shall promptly notify the [Synergy Funds] and the Investment Manager of the Subscriber's obligation to disclose any Confidential Information) or with respect to Confidential Information that otherwise becomes publicly available other than through breach of this provision by the Subscriber.

(Subscription Agreement ¶ 22 (emphasis added).)

22.     Finally, Bloomfield promised and agreed to indemnify the ED Capital Entities for losses suffered as a result of Bloomfield's breaches of the Subscription Agreement:

> To the extent permitted by applicable law, [Bloomfield] agrees to indemnify and hold harmless the Fund, the Investment Manager, the Administrator and their principals, officers and Directors against any loss, liability, cost or expense (including attorneys' fees, taxes and penalties) which may result, directly or indirectly, from any misrepresentation or breach of any warranty, condition, covenant or agreement set forth herein or in any other document delivered by [Bloomfield] to the [Synergy Funds]. The foregoing indemnification obligations and any other indemnification obligations hereunder shall survive the closing relating to the purchase of Shares by the Subscriber.

(Subscription Agreement ¶ 4.)

23.     Defendants admit they made these promises to the ED Capital Entities but contend that ED Capital Entities have no right to enforce these explicit promises, including Bloomfield's promise to indemnify the ED Capital Entities for harms caused by Bloomfield's breaches and broken promises.

### III.     Bloomfield Seeks to Renegotiate and Avoid the Terms of Its Investment.

24.     In or about June 2013, Bloomfield apparently became dissatisfied with its investment in the Synergy Funds and began pressuring the ED Capital Entities to "repay" its $25 million investment.  Despite the unambiguous terms of and promises made in the Subscription Agreement and Memorandum and the Reuben Brothers' sophistication and expertise, particularly as investors in Russian companies, they claimed that the $25 million had not been provided pursuant to the Subscription Agreement and Memorandum duly executed by Bloomfield, but was instead an undocumented "loan" to UMG.

25.     Incredibly, Bloomfield asserted that it had provided the $25 million in order to bolster the balance sheet of UMG as part of a scheme to attract other investors.  This was untrue and also extremely odd because it would mean that Bloomfield's intent was to deceive and defraud.  As Bloomfield was well aware, and as set forth in great detail in the Subscription Agreement and Memorandum, the $25 million was an investment in the Synergy Funds and not a loan.

26.     Upon information and belief, Bloomfield adopted this extraordinary position because it recognized that seeking a redemption could result in a significant loss on its investment.  Given the limited liquidity of the shares and the current market environment, Bloomfield understood that it was unlikely that the ED Capital Entities could find a buyer for the shares at Bloomfield's desired price, so it concocted its "loan" theory.

27.     But Bloomfield is bound by the redemption process that it agreed to in the Subscription Agreement and Memorandum.  The Memorandum requires that all "[r]edemption requests must be received by the [Synergy Funds] in writing at least 90 calendar days prior to the Redemption Date specified in the redemption request unless such notice is waived by the Directors."  (Memorandum at 7.)  Moreover, the Directors may, "in their sole and absolute discretion" in consultation with the Investment Manager, suspend the redemption of any series of shares, including the right to receive redemption proceeds, in a number of circumstances specified in the Memorandum, including but not limited to:

> [W]hen, as a result of events, conditions, or circumstances, disposal of the [Synergy Funds'] assets or other transactions in the ordinary course of the [Synergy Funds'] business involving the sale, transfer, delivery, or withdrawal of the [Synergy Funds'] securities and other investments and financial instruments is not in the Directors' sole and absolute discretion considered reasonably practicable, and/or if the Directors do not, in their sole and absolute discretion, believe that any such sale, transfer, delivery, or withdrawal is generally in the best interests of the Shareholders of that particular Class or Series.

(Memorandum at 68; *see also id.* at 8.)

28.     Despite its apparent desire for liquidity, however, Bloomfield has never requested a redemption of its shares in the Synergy Funds in accordance with the procedures set forth in the Memorandum.  The ED Capital Entities nevertheless have engaged in discussions regarding the redemption of Bloomfield's position since approximately June 2014 to satisfy Bloomfield's request to exit its investment in the Synergy Funds.  Contrary to Bloomfield's claims, the ED Capital Entities have at all times emphasized that any such sale could only occur in a manner consistent with the requirements of the Subscription Agreement and the Memorandum.

**IV.    Bloomfield Commences the Dutch Action Against UMG to Pressure the ED Capital Entities.**

29.    Apparently frustrated by the terms and promises that it agreed to in the Subscription Agreement and the Memorandum, Bloomfield decided to pressure the ED Capital Entities to relieve Bloomfield of its investment by pursuing its "loan" theory by initiating prejudgment attachment proceedings against UMG in the Netherlands on June 16, 2015. Bloomfield chose this venue, despite the fact that neither Bloomfield nor UMG have any significant connection to the forum other than the monitoring account at Demir-Halkbank, because the procedural rules and jurisdictional requirements of the forum ensure a protracted and costly, if ultimately meritless, litigation to pressure Plaintiffs and Mr. Daniloff to relent on Defendants' unjustified and unlawful demands to buy-out their investment position.

30.    Bloomfield generally alleges in the Dutch Action that it was entitled to garnish funds held in an account at Demir-Halkbank because UMG owed interest on an undocumented "loan." It is important to note that the money transferred to the Netherlands came from UMG's operations and is wholly distinct from the $25 million that Bloomfield invested in the Synergy Funds. It is also noteworthy that the Defendants, not once before initiating the Dutch Action, sought to exercise any control over the funds held in the monitoring account.

31.    While Bloomfield's petition was initially granted *ex parte* in the Dutch Action, the attachment was promptly lifted as to $3.3 million (necessary for a UMG bond payment) of the $15 million held in the account within days of UMG filing its opposition. The Dutch court only maintained the attachment as to the remaining funds because at the time UMG expected to receive funds for the termination of a certificate of deposit held at Bank Razvitiye prior to the next payment due on December 20, 2015. UMG's bond payment was needlessly and substantially delayed because Bloomfield filed the Dutch Action, resulting in the ED Capital

Entities paying creditors an additional $18,000 in interest and incurring more than $100,000 in legal costs to date. The Dutch court conditioned continuing the attachment as to the remaining $11.7 million in the UMG monitoring account on Bloomfield's filing of a plenary lawsuit.

32. In ruling on the attachment, the Dutch Court specifically noted that it may

> ultimately . . . emerge that Bloomfield has wrongly made the attachment, because the transaction between the parties should be regarded (not as a money loan but) as a risk-bearing investment, given the evidence submitted by UMG, in particular the 'subscription agreement,' and the statement of account quoted in 2.6, is far from imaginary. What surprises the court, moreover, is that it was not explicitly documented before the USD 25,000,000 were transferred, that this transaction involved a loan/deposit.

33. Ultimately, the Dutch Court allowed the attachment because it found Bloomfield's theory "not prima facie invalid" but specifically noted that "the chance of Bloomfield in the end turning out to have wrongly made the attachment is not inconceivable[.]"

34. On August 11, 2015, Bloomfield filed the plenary lawsuit against UMG asserting that its $25 million investment in the Synergy Funds was actually a "loan" and again completely ignoring the express terms of the Subscription Agreement and the Memorandum. The $11.7 million in the UMG monitoring account remains frozen pending the resolution of the plenary lawsuit, which could take several years. In addition, the ED Capital Entities have been forced to incur additional legal costs in connection with the Dutch Action and the related subpoenas issued by this Court (*see* Paragraph 36, *infra*).

**V.    Bloomfield Reveals the True Purpose of the Dutch Action.**

35. Consistent with its efforts to obscure that it is bound by the Subscription Agreement and the Memorandum, neither the ED Capital Entities nor Mr. Daniloff are named as defendants in the Dutch Action, despite the fact that Bloomfield alleged in the Dutch Action that Elliot Daniloff, the ED Capital Entities and UMG are one in the same and that the separate

entities "cannot . . . hide behind differences in personality, or legal personality." Moreover, much of Bloomfield's pleadings and exhibits in the Dutch Action contain disparaging allegations about Mr. Daniloff and the ED Capital Entities, which further highlights that Bloomfield maliciously and intentionally omitted Mr. Daniloff and the ED Capital Entities from the Dutch Action in an attempt to harm their reputations and coffers without allowing them an opportunity to defend their rights.

36.     Bloomfield, however, revealed that the goal of the Dutch Action was to harass the ED Capital Entities and Mr. Daniloff by, *inter alia*, applying on July 22, 2015 to this Court for leave to issue hopelessly broad subpoenas allegedly in aid of the Dutch Action (even though any discovery in that case had not yet begun).

37.     These subpoenas purportedly required the ED Capital Entities and Mr. Daniloff to respond to 69 separate document requests and prepare for testimony on 69 separate topics. Moreover, the expansive and overlapping requests in the subpoenas—including multiple years of tax returns—appear to be a harassment tactic designed to burden the ED Capital Entities and Mr. Daniloff with costly discovery obligations. In fact, the subpoenas ultimately resulted in the ED Capital Entities and Mr. Daniloff incurring costs associated with producing more than 17,000 pages of documents and being deposed.

38.     While litigating their prior two motions to dismiss, Defendants have consistently mischaracterized this Court's ruling on certain of the subpoena requests in a failed effort to justify its abuse of process directed towards the ED Capital Entities. Specifically, Defendants have repeatedly pointed to this Court's orders directing the ED Capital Entities to produce UMG's documents as evidence that its separate overbroad and harassing requests to the ED Capital Entities itself were sanctioned and approved by this Court. Furthermore, in arguing that

the ED Capital Entities should be required to produce UMG's documents, Bloomfield asserted that the ED Capital Entities had control over UMG's documents because the ED Capital Entities are the beneficial owners of UMG, further demonstrating that the Dutch Action was nominally directed against UMG but was really meant to affect the ED Capital Entities, whom Bloomfield deliberately failed to name as a party in the Dutch Action in order to deprive the ED Capital Entities a forum to defend their rights.

## VI. Bloomfield's Improper Conduct Has, And Will Continue To, Irreparably Harm the ED Capital Entities.

39.　　As long as UMG's funds are tied up in the Dutch Action, UMG will be unable to meet its financial obligations, which has been harming—in the form of actual losses, expenses, business losses and reputational harm—the ED Capital Entities. Bloomfield knows this, and is using its slow-moving Dutch Action to further pressure the ED Capital Entities.

40.　　For example, the Dutch Action caused UMG to miss a bond payment on or about December 20, 2015.

41.　　Without access to the funds the Netherlands court had frozen by December 7, 2015, UMG was unable to make that upcoming bond payment, which caused direct harm to the ED Capital Entities, both in the form of actual lost business and lost fees and reputational harm.

42.　　There was no other source of funds with which UMG would have been able to make that payment because Bank Razvitiye, on November 12, 2015, indicated that it would be unable to release the funds owed pursuant to the certificate of deposit. Specifically, the English translation of the letter (from the original Russian) states: "We are asking you to consider the possibility of increasing (prolonging) the deadline for the allocation of monetary funds in a foreign currency, which were invited to you in the form of the Bank's proprietary bills, for up to

eight months (till [sic] the end of August 2016). The funds borrowed from you in a foreign currency were allocated by the Bank in Eurobonds with the term of maturity August of 2016."

43.     In other words, Bank Razvitiye was severely undercapitalized, and used UMG's funds to lend to another party, who was not obligated to repay the funds until August 2016 (Bank Razvitiye had its banking license revoked in October 2016, potentially resulting in the total loss of these funds).

44.     When Bloomfield was informed that the funds held at Bank Razvitiye would not be available to UMG to make the December 20, 2015 bond payment, it responded that it was "happy to find a constructive solution" but did not agree to the immediate release of any funds held in the monitoring account at Demir-Halkbank.

45.     If UMG is rendered insolvent by Bloomfield's and the Reuben Brothers' frivolous lawsuit in the Netherlands, the value of the Synergy Funds, the majority of which is invested in UMG, will drop to zero wiping out the investors' equity and triggering a "death spiral" for the ED Capital Entities, which makes substantially all of its money through the management and performance fees it earns from the Synergy Funds (performance fees totaling approximately $5 million have not been paid to the ED Capital Entities). This could potentially destroy hundreds of millions of dollars of value and equity in UMG, the Synergy Funds and the ED Capital Entities. The ED Capital Entities have had to expend significant sums to defend against the Dutch Action and Bloomfield's overbroad and harassing discovery demands in this Court. In addition, the ED Capital Entities have incurred significant expenses in back interest payments as a result of the Dutch court initially granting Bloomfield's petition as described in Paragraph 31, *supra*.

46.     Moreover, with one of its primary assets impaired by the frivolous and lengthy Dutch Action, the value of the Synergy Funds have already decreased, and there has been tremendous reputational harm to the ED Capital Entities.

47.     In fact, the Dutch Action has driven down the valuation of the Synergy Funds and stymied the ED Capital Entities' ability to sell shares and provide Bloomfield with its desired liquidity.

48.     The Dutch Action even prompted at least one other investor to sell its shares, for which such investor received a small upfront payment with remainder payable in 5 years because of the impact of that litigation on UMG, the Synergy Funds and the ED Capital Entities.

49.     Also as a result of the Dutch Action, UMG was unable to obtain an additional $30 million of financing, resulting in further lost management fees, performance fees and reputational harm to the ED Capital Entities.

50.     The reputational harm Plaintiffs have suffered, and will suffer, will be astronomical.  Indeed, at least six (6) investors have already refused to do business with the ED Capital Entities—which would have infused $150 million into the Synergy Funds—due to the Dutch Action, causing a loss to the ED Capital Entities of at least $3 million in management fees and $20.6 million in performance fees.

51.     Bloomfield's response to the ED Capital Entities' good faith attempts to resolve the situation caused by Bloomfield's own actions was only to offer additional threats inconsistent with its contractual promises.

**COUNT I**
**(<u>ABUSE OF PROCESS</u>)**

52.     Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

53.     Bloomfield, by maliciously suing UMG in the Netherlands, attaching its bank account, deliberately omitting the ED Capital Entities as a party to the Dutch Action in an effort to deprive the ED Capital Entities from protecting their rights, and by issuing overbroad and harassing subpoenas to the ED Capital Entities has employed regularly issued legal process for the collateral and improper purpose to compel the ED Capital Entities to immediately redeem Bloomfield's $25 million investment in the Synergy Funds, despite Bloomfield's lack of entitlement to that relief and despite the clear language of the agreements between the parties, which unambiguously describe Bloomfield's investment as an investment.

54.     Bloomfield maliciously filed the Dutch Action and maliciously issued the overbroad subpoenas with intent to harm the ED Capital Entities and Mr. Daniloff, without excuse or justification.

55.     Bloomfield maliciously filed the Dutch Action and maliciously issued the overbroad subpoenas to achieve a collateral objective that is outside the legitimate ends of the process.

56.     Because of Bloomfield's actions, Plaintiffs have suffered special damages in an amount to be determined at trial, but in excess of $75,000, and specifically including legal fees to protect the ED Capital Entities' interests in the Dutch Action; more than $100,000 in fees and costs to respond to the harassing subpoenas; reputational harm and loss of business, including the loss of at least six (6) potential investors, $3 million in management fees and $20.6 million in performance fees.

WHEREFORE, Plaintiffs hereby respectfully request entry of a judgment in their favor and against Bloomfield awarding, as follows:

      a.   Compensatory Damages and interest;

b. Special Damages;

c. Punitive Damages;

d. Attorney's Fees, Expenses and Costs of Suit; and

e. Such other and further relief as may be proper.

**COUNT II**
**(PRIMA FACIE TORT)**

57.     Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

58.     Bloomfield has intentionally inflicted harm on Plaintiffs by filing the baseless and frivolous Dutch Action without naming Plaintiffs in order to foreclose Plaintiffs from protecting their rights, specifically intended to deny funds to UMG in order to cause it to miss bond payments and thereby trigger the ED Capital Entities' death spiral impacting or destroying many millions of dollars of value in the Plaintiffs.

59.     Bloomfield has intentionally inflicted harm on Plaintiffs by issuing overbroad and harassing subpoenas designed to force Plaintiffs to expend monies in response, all in an effort to pressure Plaintiffs to buy-back Bloomfield's investment.

60.     Bloomfield filed the Dutch Action against UMG and issued overbroad and harassing subpoenas maliciously because Plaintiffs refused to buy-back Bloomfield's investment in the Synergy Funds.

61.     There is no excuse or justification for Bloomfield to have filed the Dutch Action and to issue overbroad and harassing subpoenas in furtherance of the Dutch Action, except for Bloomfield's malevolent desire to harm Plaintiffs and companies related to Plaintiffs, up to and including their destruction.

62.     Plaintiffs have suffered special damages, because Bloomfield's lawsuit threatens UMG's ability to make its bond payment, which in turn threatens the solvency of Plaintiffs. Plaintiffs have experienced increased borrowing costs of at least $18,000 because of the threat Bloomfield's lawsuit poses to their credit and ongoing viability, as well as quantifiable harm to Plaintiffs' reputation in the financial community and corresponding ability to attract new investors and maintain current investors.  Plaintiffs also suffered special damages including legal fees to protect the ED Capital Entities' interests in the Dutch Action; more than $100,000 in fees and costs to respond to the harassing subpoenas; and reputational harm and loss of business, including the loss of at least six (6) potential investors, $3 million in management fees and $20.6 million in performance fees.

63.     Outside of the malevolent context in which Bloomfield filed the Dutch Action against UMG, the act of filing a lawsuit and issuing subpoenas, by itself, is lawful behavior. Plaintiffs are therefore in the position of suffering grievous injury, without a traditional tort cause of action with which they may seek a remedy.

64.     Because of Bloomfield's actions, Plaintiffs have suffered damages, in addition to the special damages noted above, in an amount to be determined at trial, but in excess of $75,000.

65.     The harm to Plaintiffs as a result of Bloomfield's malicious action is entirely foreseeable, and indeed, is the sole motivating factor behind Bloomfield's commencement of frivolous Dutch Action.

WHEREFORE, Plaintiffs hereby respectfully request entry of a judgment in their favor and against Defendants awarding, as follows:

a)     Compensatory Damages and interest;

b)      Special Damages;

c)      Punitive Damages;

d)      Attorney's Fees, Expenses and Costs of Suit; and

e)      Such other and further relief as may be proper.

## COUNT III
## (BREACH OF CONTRACT)

66.      Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

67.      The Subscription Agreement, and the Memorandum incorporated therein by reference, contain numerous provisions governing the relationship between the investors and the Synergy Funds and the ED Capital Entities.

68.      For example, on pages 50-51 in the Memorandum, the investor acknowledges:

> Each Subscriber will be required to represent that the Shares are being acquired for its own account, for investment, and not with a view to resale or distribution.  The Shares are suitable investments only for sophisticated investors for whom an investment in the Fund does not constitute a complete investment program, who fully understand and are willing to assume the risks involved in the Fund's specialized investment strategy, and who have the financial resources necessary to bear the potential loss of their entire investment in the Shares.

69.      Investors agree elsewhere in the Memorandum that by investing in the Fund, the investor wholly delegated to the Investment Manager all investment decisions relating to the Synergy Funds, including when and at what price holdings can be liquidated.

70.      Bloomfield has no contractual right to challenge or attempt to extort the ED Capital Entities into selling certain assets of the Synergy Funds (*i.e.*, the UMG shares) on a schedule and at a price that Bloomfield attempts to dictate, and indeed Bloomfield is *violating* its

obligations under the Subscription Agreement and Memorandum by doing so through the frivolous Dutch Action.

71.     Bloomfield has also violated its contract with the Synergy Funds and the ED Capital Entities by apparently misrepresenting its purpose in investing in the funds, as Bloomfield now claims it never intended its investment to be an investment, but rather as a means to deceive and defraud.

72.     It is a violation of the Subscription Agreement for Bloomfield to invest in the Synergy Funds under false pretenses, and to misrepresent its intended purposes, as Bloomfield now claims it did by signing the Subscription Agreement.

73.     It is a further violation of the Subscription Agreement to disclose or publish the Subscription Agreement and Memorandum, as well as other investment-related documents, which Bloomfield has now done in two courts on two different continents, and which violation Bloomfield explicitly acknowledged would cause Plaintiffs substantial and irreparable completive harm.

74.     Plaintiffs have been damaged by Bloomfield's breaches of contract.

75.     Although Plaintiffs are not parties to the Subscription Agreement and Memorandum, which are governed by Cayman Islands law, Plaintiffs have the right to enforce the promises made to them pursuant to the collateral contract doctrine recognized by Cayman Islands law. Under the collateral contract doctrine, Cayman Islands law allows Plaintiffs to enforce the promises made to them and for their benefit under the Subscription Agreement and Memorandum because Bloomfield intended to and did in fact invest and entered into the Subscription Agreement as consideration for the collateral contract whereby Plaintiffs promised

to manage and invest the funds, as set forth and described in the Memorandum and the documents referenced therein.

WHEREFORE, Plaintiffs hereby respectfully request entry of a judgment in their favor and against Bloomfield awarding, as follows:

f. Compensatory Damages and interest;

g. Special Damages;

h. Attorney's Fees, Expenses and Costs of Suit; and

i. Such other and further relief as may be proper.

**COUNT IV**
**(INDEMNIFICATION)**

76. Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

77. In the Subscription Agreement, Bloomfield expressly agreed to indemnify and hold Plaintiffs harmless for all loss, liability, cost or expense which results or may result from, among other things, breach of any warranty, condition, covenant or agreement set forth in the Subscription Agreement or any other document Bloomfield executed and delivered to Plaintiffs.

78. As set forth in more detail above, Bloomfield has breached the Subscription Agreement by repeatedly and publicly disclosing confidential information belonging to Plaintiffs.

79. Bloomfield has also breached the Subscription Agreement by trying to force an immediate redemption, at full value, of its shares in the Synergy Funds, and by using frivolous litigation to pressure the ED Capital Entities into renegotiating the terms governing Bloomfield's investment.

80.     As set forth in more detail above, Bloomfield has also made misrepresentations about the nature of its investment, which it now claims was made with the purpose to deceive and defraud, causing harm to the ED Capital Entities.

81.     Bloomfield is responsible under the Subscription Agreement to pay for all losses or damage caused by its disclosure of proprietary and confidential information, all damage and losses caused by its other breaches, and also to pay Plaintiffs' legal fees in connection with this matter.

82.     Although Plaintiffs are not parties to the Subscription Agreement and Memorandum, which are governed by Cayman Islands law, Plaintiffs have the right to enforce the promises made to them pursuant to the collateral contract doctrine recognized by Cayman Islands law.  Under the collateral contract doctrine, Cayman Islands law allows Plaintiffs to enforce the promises made to them and for their benefit under the Subscription Agreement and Memorandum because Bloomfield intended to and did in fact invest and entered into the Subscription Agreement as consideration for the collateral contract whereby Plaintiffs promised to manage and invest the funds, as set forth and described in the Memorandum and the documents referenced therein.

WHEREFORE, Plaintiffs hereby respectfully request entry of a judgment in their favor and against Bloomfield, as follows:

    a.   Compensatory Damages and interest;

    b.   Special Damages;

    c.   Attorney's Fees, Expenses and Costs of Suit; and

    d.   Such other and further relief as may be proper.

## COUNT V
## (PROMISSORY ESTOPPEL)

83.     Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

84.     In the alternative, Defendants are estopped from breaking the promises made to ED Capital Entities in the Subscription Agreement and Memorandum, should the Court find that the ED Capital Entities have no right to assert a breach of contract cause of action under Cayman Islands law and the collateral contract doctrine.

85.     Because promissory estoppel is a claim outside of the contract, New York law applies since the promises and detrimental reliance were made in New York.  In any event, the elements of promissory estoppel in New York are identical to the elements of promissory estoppel in the Cayman Islands.

86.     Under New York law, a cause of action for promissory estoppel exists when the plaintiff reasonably relies on a promise made by the defendant and such reliance causes the plaintiff damages.

87.     The Subscription Agreement, and the Memorandum incorporated therein by reference, contain numerous provisions governing the relationship between the investors and the Synergy Funds and the ED Capital Entities, including many promises made by Bloomfield to the ED Capital Entities or for the ED Capital Entities' benefit.

88.     For example, on pages 50-51 in the Memorandum, Bloomfield acknowledges and promises:

> Each Subscriber will be required to represent that the Shares are being acquired for its own account, for investment, and not with a view to resale or distribution.  The Shares are suitable investments only for sophisticated investors for whom an investment in the Fund does not constitute a complete investment program, who

fully understand and are willing to assume the risks involved in the Fund's specialized investment strategy, and who have the financial resources necessary to bear the potential loss of their entire investment in the Shares.

89.     Bloomfield agrees and promises elsewhere in the Memorandum that by investing in the Synergy Funds, Bloomfield wholly delegates to the ED Capital Entities all investment decisions relating to the Synergy Funds, including when and at what price holdings can be liquidated.

90.     Bloomfield has no right to challenge or attempt to extort the ED Capital Entities into selling certain assets of the Synergy Funds (*i.e.*, the UMG shares) on a schedule and at a price that Bloomfield attempts to dictate, and indeed Bloomfield is *violating* its promises under the Subscription Agreement and Memorandum by doing so through the frivolous Dutch Action.

91.     Bloomfield has also violated its promise to the ED Capital Entities by misrepresenting its purpose in investing in the Synergy Funds, as Bloomfield now claims it never intended its investment to be an investment, but rather as a means to deceive and defraud.

92.     It is a violation of the Subscription Agreement and Bloomfield's promises therein for Bloomfield to invest in the Synergy Funds under false pretenses, and to misrepresent its intended purposes, as Bloomfield now claims it did by signing the Subscription Agreement.

93.     Bloomfield further promised in the Subscription Agreement not to disclose or publish the Subscription Agreement and Memorandum, as well as other investment-related documents, which Bloomfield has now done in two courts on two different continents, and which violation Bloomfield explicitly acknowledged would cause Plaintiffs substantial and irreparable completive harm.

94.     In the Subscription Agreement, Bloomfield expressly promised to indemnify and hold Plaintiffs harmless for all loss, liability, cost or expense which results or may result from,

among other things, breach of any warranty, condition, covenant or agreement set forth in the Subscription Agreement or any other document Bloomfield executed and delivered to Plaintiffs.

95.     As set forth in more detail above, Bloomfield has broken its promises in the Subscription Agreement by repeatedly and publicly disclosing confidential information belonging to Plaintiffs.

96.     Bloomfield has also broken its promises in the Subscription Agreement by trying to force an immediate redemption, at full value, of its shares in the Synergy Funds, and by using frivolous litigation to pressure the ED Capital Entities into renegotiating the terms governing the parties' relationship.

97.     As set forth in more detail above, Bloomfield has also made misrepresentations about the nature of its investment, which it now claims was made with the purpose to deceive and defraud, causing harm to the ED Capital Entities.

98.     Bloomfield promised in the Subscription Agreement to pay for all losses or damage caused by its disclosure of proprietary and confidential information, all damage and losses caused by its other breaches, and also to pay Plaintiffs' legal fees in connection with this matter.

99.     Plaintiffs reasonably and foreseeably relied on Bloomfield's promises in the Subscription Agreement and Memorandum and managed Bloomfield's investment in the Synergy Funds only because Bloomfield made those promises.

100.     Plaintiffs have been damaged by Bloomfield's failure to adhere to the promises Plaintiffs relied on, including by experiencing increased borrowing costs of at least $18,000 because of the threat Bloomfield's lawsuit poses to their credit and ongoing viability; quantifiable harm to Plaintiffs' reputation in the financial community and corresponding ability

to attract new investors and maintain current investors; legal fees to protect the ED Capital Entities' interests in the Dutch Action; legal fees and costs to respond to the harassing subpoenas; and reputational harm and loss of business, including the loss of at least six (6) potential investors, $3 million in management fees and $20.6 million in performance fees.

101.    After making their promises to Plaintiffs and Plaintiffs having acted in reliance thereof, it simply would be unconscionable to refuse to enforce the promises so made by refusing to allow Plaintiffs to pursue a cause of action based on Defendants' broken promises.

102.    Plaintiffs are thus entitled to money damages by such amount to be determined at trial but believed to be in excess of $75,000.

WHEREFORE, Plaintiffs hereby respectfully request entry of a judgment in their favor and against Bloomfield, as follows:

a.    Compensatory Damages and interest;

b.    Special Damages;

c.    Attorney's Fees, Expenses and Costs of Suit; and

d.    Such other and further relief as may be proper.

## COUNT VI
## (PREJUDGMENT ATTACHMENT)

103.    Plaintiffs repeat and reallege each and every previous allegation as if fully set forth herein.

104.    Plaintiffs have alleged herein a number of causes of action entitling them to a money judgment against Defendants, including several breach of contract theories, contractual indemnification, promissory estoppel and claims for prima facie tort and abuse of process.

105.    As set forth herein, Plaintiffs are likely to succeed on the merits of their claims seeking monetary damages, because Bloomfield has violated the terms of its contracts with

Plaintiffs and the Synergy Funds in several different ways, and has maliciously filed fraudulent and frivolous litigation for the sole purpose of harming Plaintiffs.

106. The amount demanded from Defendants exceeds all known or possible counterclaims Defendants might assert.

107. Defendants are foreign corporations not qualified to do business in the State of New York.

108. Defendants, with intent to defraud Plaintiffs and its other creditors or frustrate the enforcement of a judgment that might be rendered in Plaintiffs' favor, has assigned, disposed of, encumbered or secreted property or removed it from the state, or is about to do some or all of those things.

109. Pursuant to CPLR § 6201 et seq., Plaintiffs are entitled to prejudgment attachment of any bank accounts or funds that Defendants maintain in the State of New York.

110. Plaintiffs are willing to file an appropriate bond to cover all costs and damages, including reasonable attorney's fees, which may be sustained by reason of the attachment if Defendants recover judgment or it is finally decided that the Plaintiffs were not entitled to an attachment of Defendants' property.

WHEREFORE, Plaintiffs hereby respectfully request entry of a judgment in their favor and against Bloomfield, as follows:

The accounts of Defendants at HSBC Bank USA NY, or any other financial institution with an office, branch, or other facility located within the State of New York are hereby attached pursuant to CPLR 6201 and other appropriate state and federal statutes, and there shall be no withdrawals, transfers, recharacterizations or any other financial transaction in the accounts unless and until Bloomfield

dismisses the Dutch Action and provides UMG full and unfettered access to its funds at Demir-Halkbank in the Netherlands.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all claims that can be so tried.

Dated: January 17, 2016
      New York, New York

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: _____
    Richard J.L. Lomuscio
    Andrew L. Van Houter
    1177 Avenue of the Americas, 41st Floor
    New York, New York  10036
    Telephone:  (212) 248-3140
    Fax:  (212) 248-3141
    richard.lomuscio@dbr.com

    *Attorneys for Plaintiffs ED Capital, LLC*
    *and ED Capital Management, LLC*